# In The Matter Of:

*Great American Assurance v.*
*Braddy Preparatory Academy, et al.*

---

*Dr. Carroll Harrison Braddy*
*August 19, 2020*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



**REGENCY-BRENTANO, INC.**
*Certified Court Reporters*

Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

GREAT AMERICAN ASSURANCE COMPANY,)
                                 )
            Plaintiff,            ) CIVIL ACTION FILE NO:
                                 )
      vs.                         ) 1:18-cv-04974-TWT
                                 )
BRADDY PREPARATORY ACADEMY, INC.,)
                                 )
            Defendant,            )
                                 )
      vs.                         )
                                 )
POWERS-LEAVITT INSURANCE AGENCY, )
INC.,                             )
                                 )
            Third-Party Defendant. )
                          - - -

            Continued deposition of DR. CARROLL

      HARRISON BRADDY, taken on behalf of the

      Plaintiff, pursuant to Notice, in accordance

      with the Federal Rules of Civil Procedure,

      before Louise Griffith, Certified Court

      Reporter, at 1600 Parkwood Circle, Suite 200,

      Atlanta, Georgia, on the 19th day of August,

      2020, commencing at the hour of 12:01 p.m.

_____

                    REGENCY-BRENTANO, INC.
                  CERTIFIED COURT REPORTERS
                     13 Corporate Square
                           Suite 140
                   Atlanta, Georgia 30329
                       (404) 321-3333

```
 1              INDEX TO EXAMINATIONS

 2   DR. CARROLL HARRISON BRADDY               Page

 3   Cross-examination (Continued) by MR. WILDES    4
     Cross-examination by MR. DOWLING          100
 4   Recross-examination by MR. WILDES         138
     Recross-examination by MR. DOWLING        151
 5   Further Recross-examination by MR. WILDES  158
     Further Recross-examination by MR. DOWLING 163
 6

 7              PLAINTIFF'S EXHIBITS

 8   Exhibit   Description                      Page

 9   P-120     9/26/2018 E-mail with Attachments   14
     P-121     10/2018 E-mails                   39
10   P-122     Incident/Investigation Report     44
     P-123     6/3/2019 Letter                   58
11   P-124     Series of 2018 E-mails            72
     P-125     Braddy Preparatory Academy, Inc.'s  137
12             Responses and Objections to
               Powers-Leavitt Insurance Agency,
13             Inc.'s First Interrogatories

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

```
 1   APPEARANCES OF COUNSEL:

 2        ON BEHALF OF THE PLAINTIFF:

 3             PAUL WILDES, ESQ.
              Drew Eckl & Farnham, LLP
 4             303 Peachtree Street, N.E.
              Suite 3500
 5             Atlanta, GA  30308

 6        ON BEHALF OF THE DEFENDANT:

 7             DAVID J. FORESTNER, ESQ.
              Taylor English Duma, LLP
 8             1600 Parkwood Circle
              Suite 200
 9             Atlanta, GA  30339

10        ON BEHALF OF THE THIRD-PARTY DEFENDANT:

11             MATTHEW I. DOWLING, ESQ.
              Cruser Mitchell Novitz Sanchez
12             Gaston & Zimet, LLP
              275 Scientific Drive
13             Meridian II, Suite 2000
              Norcross, GA  30092
14                          - - -

15             (Whereupon, disclosure as required by the

16        Georgia Board of Court Reporting was made by the

17        court reporter, a written copy of which is

18        attached hereto.)

19

20

21

22

23

24

25
```

1          MR. WILDES:  We'll go on the record for the

2     case of Great American Assurance Company versus

3     Braddy Preparatory Academy versus Powers-Leavitt

4     Insurance Agency.  This will be the continuation

5     of the deposition of Dr. Harrison Braddy taken

6     for the purpose of discovery and all other

7     purposes permitted under the Federal Rules of

8     Civil Procedure.  This deposition is being taken

9     with agreement to its date, time, and place

10     pursuant to proper notice.

11          Dave, do you want to enter in the usual

12     stipulations waiving all objections except for

13     those to the form of the question and

14     responsiveness of the answer and privilege until

15     we use this transcript for any purpose?

16          MR. FORESTNER:  Yes.

17          MR. DOWLING:  It's agreeable.

18              DR. CARROLL HARRISON BRADDY,

19  having been first duly sworn, was examined and testified

20  as follows:

21              CROSS-EXAMINATION (Continued)

22  BY Mr. Wildes:

23     Q    Dr. Braddy, my name is Paul Wildes.  I'm

24  here representing Great American Assurance Company.

25  There was another attorney here the last time we took

1   your deposition, so I'm going to finish what he

2   started.  He went over some ground rules with you

3   during -- or before your last deposition.  I'm going

4   to briefly go over those again just to make sure that

5   things run smoothly.

6           First off, and I'm sure you know this, this

7   is not going to be like a normal conversation.  The

8   court reporter is going to be typing everything that

9   we say down, so it's important that we don't

10  crosstalk or talk over each other.  So I'm going to

11  ask a question; you're going to give me an answer.

12  I'm gonna ask that we both do our best to avoid

13  talking over each other.  Even if you feel like you

14  understand what I'm going to ask, try not to cut me

15  short.  If you're like everybody else I depose, you

16  might do that once in a while.  That's completely

17  fine.  I'll just remind you not to do that.  And if

18  you see me doing that, I'll remind myself not to do

19  that.

20          If you don't understand all my questions or

21  any of my questions, just let me know and I'll repeat

22  or rephrase it.  If later on in the deposition you

23  realize that you maybe misunderstood a question that

24  I asked, just tell me that.  And then tell me what

25  question it was and I'll go back and repeat it or

1    rephrase it and you can give a different answer for
2    the record, if necessary.  I'll try to remember to
3    give you an opportunity to do that at the end of the
4    deposition as well.
5              Also, try to give verbal responses to all
6    my questions.  Just do your best to avoid nodding or
7    shaking your head or giving me some other type of
8    nonverbal response such as shrugging your shoulders,
9    waving your hands, pointing to a body part, for
10   instance, something like that.  The court reporter is
11   not going to be able to get that clearly down on the
12   record.  So if I say something like was that a yes or
13   was that a no, I'm not trying to be rude.  I'm just
14   try to get a clear record.
15             If you want to take a break off the record
16   for any reason, that's fine.  Just let me know and we
17   can do that.  The only thing that I ask is, if I've
18   asked you a question, if you'll please answer my
19   question before you take a break.
20             Do you have any questions for me?
21        A    No.
22        Q    Can you, please, state your name for the
23   record before we get started?
24        A    Carroll Harrison Braddy, Junior.
25        Q    Dr. Braddy, during your last deposition we

1  talked about -- or Mike asked you questions primarily

2  about the loss that happened on August 2nd.  What I

3  want to talk to you about now is the other two losses

4  that happened to the property at the property while

5  you have been in possession of the property.

6          Can you describe those other two losses for

7  me?  Or other three losses, I think it is by now.

8  You don't have to go into detail.  You can just tell

9  me generally what the loss was.

10         MR. FORESTNER:  And are you, are you

11     talking about the vandalism, the fire, and then

12     the other fire?

13         MR. WILDES:  Exactly.

14         MR. FORESTNER:  Okay.

15     Q    (By Mr. Wildes) I'm not trying to hide the

16  ball from you here.

17     A    Okay.

18     Q    I'm just getting the conversation going.

19     A    Okay.  So the vandalism; tree damage; tree,

20  tree falling due to the storm on one of the

21  buildings; and windstorm.

22     Q    Was there also a fire claim; fire damage to

23  one of the buildings?

24     A    After, after.  Yes.  After the -- I'm

25  sorry.  You're saying for this particular -- what

1  Mike Bagley, Attorney Bagley asked me?

2      Q     No.  I'm just speaking about any losses

3  you've had at the East Point campus since you started

4  to lease it from the campus.

5      A     Okay.  Fire.

6      Q     Okay.  And the fire claim is with another

7  insurance carrier; is that correct?

8      A     Yes.

9      Q     So how did you come to know about the

10 vandalism that happened at the property?

11     A     I was inspecting the property and noticed

12 that there was vandalism.  I was called by -- I was

13 notified by Russ Hart, Mr. Russ Hart, that he and the

14 independent adjuster for Great American were looking

15 at a possible windstorm damage.  And when they went

16 into one of the buildings, they noticed -- he noticed

17 that there was vandalism.  And when I was -- you

18 know, as soon as I was -- he notified me, I then went

19 and inspected the premises; walked all of the

20 buildings, with, with pictures, taking pictures.  And

21 then that's when I noticed it.

22     Q     And by "noticed it," you mean put Great

23 American on notice of it, or noticed the damage

24 yourself?

25     A     I noticed the damage.  And I believe we put

1    Great American on notice.

2         Q    Okay.  Now, when Russ Hart and the

3    independent adjuster noticed possible vandalism

4    damage, is that the first time that you are aware

5    that vandalism -- or possible vandalism had been seen

6    at the property since you began to either lease or

7    license the property?

8         A    The first time, no.  To that extent, yes.

9         Q    To what extent?

10        A    To the extent of the vandalism on the

11   inside of the properties.

12        Q    Okay.  So the first time that anybody -- or

13   you're aware that anybody noticed vandalism on the

14   inside of the properties was when Russ Hart noticed

15   the vandalism while inspecting the property with the

16   independent adjuster from Great American?

17        A    Yes.

18        Q    Okay.  And before that, had you noticed any

19   other type of vandalism at the property, either

20   inside or outside?

21        A    The vandalism that I noticed outside before

22   that, if that's perceived to be vandalism, was -- I

23   don't know if it's perceived to be vandalism or not,

24   but it was outdoor units for several buildings that

25   we acknowledged were missing.  And that's -- when I

1  say "units," I'm referring to AC units; the ones that

2  are outdoors.

3      Q    Okay.  Did you notice any other type of

4  possible vandalism outside of the buildings other

5  than the missing AC units?

6      A    No.

7      Q    Okay.  And when did you notice the missing

8  AC units?

9      A    Missing AC units were there in the

10 beginning.

11     Q    Okay.  Is it your understanding that the

12 missing AC units were there before you got insurance

13 with Great American before you took possession of the

14 property?  Let me rephrase that.  Strike that.

15          Is it your understanding that the AC units

16 were already missing at the time that you started to

17 lease the property and got insurance with Great

18 American?

19     A    I don't recall it being, you know, a -- I

20 don't, I don't recall it being a disclosure between

21 the inspections, you know, like, you know, between

22 the lessor, you know.  So I do know that there, there

23 were several units that were missing outside of

24 several dormitory buildings.  Now, when they actually

25 were taken, I don't, I don't know.

1          I do know that when we assumed the property

2   that they were not -- those units were not there.

3   And we were, you know, clear, you know, for the

4   record, that those units were, were not a part of any

5   type of claim because they were not there.  We did

6   not acknowledge those units as being there.  I don't

7   know when they were actually, you know, removed from

8   the property.

9        Q    Okay.  So are the missing AC units not a

10  part of your vandalism claim with Great American?

11       A    Correct.

12       Q    Okay.  And when Russ Hart told you about

13  the vandalism that him and the independent adjuster

14  saw at the property, how was this communicated?  Was

15  it by e-mail?  By phone?  Do you recall?

16       A    By phone.

17       Q    Okay.  No e-mail or written correspondence

18  regarding the vandalism that he discovered at the

19  property to you?

20       A    No.

21       Q    Before Russ Hart noticed the vandalism, do

22  you know the last time the buildings were inspected?

23       A    The buildings were inspected regularly.  I

24  don't know the said date of the last time, you know,

25  the buildings were inspected.

1      Q     Okay.  Now, I believe that, that Russ went

2    out to the property -- correct me if I'm wrong -- a

3    couple times with the independent adjuster; is that

4    right?

5      A     I believe so.

6      Q     Okay.  Do you know whether he noticed the

7    vandalism during his first visit, or the second

8    visit; or the third visit, if there was a third

9    visit?

10     A     I don't.

11     Q     I think there were only two.

12     A     I don't know.

13     Q     Okay.  Did anybody else other than Russ

14   Hart notice possible vandalism at the buildings at

15   that property?

16     A     Yes.

17     Q     Who?

18     A     Myself as well as the broker Lolethia

19   Chapman who conducted a pre-inspection with me and a

20   post-inspection.

21     Q     Okay.  Let's talk about the pre-inspection.

22           When did that occur?

23     A     Before the lease.

24     Q     Okay.  And was any vandalism noticed during

25   the pre-inspection?

1      A     Only the missing AC units.

2      Q     Okay.  And were all the insides of the

3  buildings inspected during the pre-inspection?

4      A     Yes.

5      Q     Sorry.

6            When did that pre-inspection take place?  I

7  know that you said it occurred before the lease, but

8  how far before the lease did it occur?

9      A     Sometime probably in -- around, around

10 about April.

11     Q     Okay.  And that's when you noticed the

12 missing AC units; during that inspection?

13     A     I wasn't, I wasn't -- it could have been.

14     Q     Okay.

15     A     It could have been.

16     Q     Was there any documentation related to this

17 pre-inspection of the property with you and

18 Ms. Chapman?

19     A     No.

20     Q     Okay.  Was anybody else there other than

21 you and Ms. Chapman for this inspection?

22     A     No.

23     Q     Okay.  Did you all inspect the property one

24 time, or did you go out there multiple times before

25 you began your lease?

1      A     Went out multiple times.

2      Q     And did you ever, did you ever observe

3   anything new during one of your latter visits that

4   you didn't observe during your -- an earlier visit

5   that might indicate some ongoing vandalism or, or

6   changing condition of the property of any type?

7      A     Not that I recall.

8      Q     Did you ever hire a third-party inspector

9   to come out to the property and assess the condition

10  of the property before you leased it?

11     A     Before I leased it?

12     Q     Right.

13     A     No.

14     Q     Okay.  This is going to be Exhibit 120.

15           Dr. Braddy, if you could look this over.

16  I've marked this as Exhibit 120.  It's an e-mail

17  correspondence I believe from you.  That's your

18  e-mail address up there, georgiadoctors@yahoo.com?

19                      (Whereupon, the court reporter

20                       marked Plaintiff's Exhibit No. 120

21                       for identification.)

22     A     Mm-hmm.

23     Q     And the e-mail was sent to Glenn Hileman

24  and Kelsy Vargo; is that correct?

25     A     Yes.

1        Q    Okay.  And reading the e-mail it appears
2   that you were reporting some vandalism that was
3   noticed at the property to Mr. Hileman and Kelsy
4   Vargo, and Mrs. Chapman and Dr. Frazier are also
5   copied on this e-mail it appears?
6        A    Yes.
7        Q    Okay.  Was this e-mail sent out after you
8   were informed and after you inspected the property in
9   relation to the vandalism noticed by Russ Hart?
10            To ask that another way:  Is the vandalism
11   that's referred to in this e-mail the vandalism that
12   was noticed by Russ Hart and by you when you visited
13   the property?
14        A    Yes.
15        Q    Okay.  So this e-mail was sent on
16   September 26.
17            Does that give you a better idea of when
18   maybe Russ notified you of the possible vandalism at
19   the property and, and around the date that you
20   inspected the property after being put on notice of
21   that?
22        A    My dates are kind of off right now.
23            Can you ask that question again?
24        Q    Sure.  It appears that you sent this e-mail
25   on September 26.

1        A        Mm-hmm.

2        Q        And my question was whether based on that

3    date the e-mail was sent --

4        A        Mm-hmm.

5        Q        -- do you recall when Dr. Frazier put you

6    on notice of the vandalism, and, also, when you might

7    have went out to inspect the property before the

8    reported vandalism?

9        A        It was around this date.  I don't recall

10    the date, but --

11        Q        Okay.  But --

12        A        -- it was around this time.

13        Q        -- around September 26?

14        A        Yes.

15        Q        Okay.  And if you could thumb through these

16    pictures for me.

17        A        Mm-hmm.

18        Q        And you can take your time.  And they're on

19    the front and back of these pages.

20        A        Okay.

21        Q        Okay.  You'll see from the heading of the

22    e-mail there were several attachments to the e-mail.

23              Did you attach these pictures to this

24    e-mail?

25        A        I believe so.

1     Q     Okay.  And were these pictures taken by
2 you?
3     A     Yes.
4     Q     Were they taken on your cell phone, or did
5 you have a camera?
6     A     They were taken on my cell phone.
7     Q     And do you still have that same cell phone?
8     A     I do.
9     Q     Okay.
10     A     Well, no, I don't.  I don't.  I'm sorry.
11     Q     When you switch cell phones, do you store
12 your pictures somewhere such as in your computer or
13 something?
14     A     In the Cloud or something like that.
15     Q     In the Cloud?
16     A     Yes.
17     Q     Okay.  So you would still have possession
18 of these pictures?
19     A     I believe so.
20     Q     Okay.  So the e-mail says that, that
21 Mrs. Chapman, Lolethia -- is that how you say that?
22     A     Lolethia.
23     Q     So she was there when you inspected the
24 property after being put on notice of the vandalism
25 by Russ; is that correct?

1      A      I called her after I was notified and went

2   to see the, the vandalism.  Once I got -- once I, you

3   know, looked at the vandalism and looked at

4   exactly -- in particular, one of these particular

5   pictures being the apartment buildings that we were

6   actually very close to getting, getting into relative

7   to renovation, that's when I called her and asked

8   that she would come and meet me at the property.  And

9   she met me at the property and then we just took and

10  we talked the entire campus.

11      Q      Okay.  In and out of all buildings?

12      A      Yes.

13      Q      Okay.  So are the photos that are attached

14  to this e-mail, is that an accurate representation of

15  all the vandalism or possible vandalism damage that

16  you observed?

17      A      No.

18      Q      Okay.  Why didn't you take more photos of

19  the rest of the vandalism damage?

20      A      I took as many pictures as I could take of

21  the vandalism.  And the other types -- there were no

22  other types, if I -- well, let me see.  I took as

23  many pictures as I could relative to the various

24  types of vandalism.  And at that particular time, I

25  was overwhelmed.  I, I did not take a picture of

1    every single room or open area.  But if it was a, if
2    it was a torn-out ceiling and wires, I took a picture
3    of that torn-out ceiling and wires.  And if the next
4    room had the same, then I, I, you know, may have not
5    have taken a picture of that particular room, if that
6    makes -- if I'm clear with that.
7          Q     Yeah.  That's clear.
8                You said you took pictures of the different
9    types of pictures, but it might have only been one
10   picture of that type of -- I mean, type of vandalism,
11   but it might have been only one picture of that type
12   of vandalism.
13               What are the types of vandalism that you're
14   referring to?
15         A     I'm referring to torn-out ceilings;
16   torn-out wiring; HVAC, torn-out HVAC.
17         Q     You're referring to internal HVAC units?
18         A     Sure.  Yes.
19         Q     Okay.  Anything else?  Any other type of
20   vandalism that you observed?
21         A     Plumbing.
22         Q     Okay.  What type of plumbing vandalism?
23         A     Torn-out sinks, pipes.
24         Q     Any other types of vandalism that you
25   observed?

1      A     Outside of electrical, HVAC, ceilings, and

2   plumbing, that -- those are pretty much the types of

3   vandalism that I observed.  There was one case that

4   I'm aware of, and that was some graffiti, graffiti on

5   the walls of one particular unit.

6      Q     And you're referring to the graffiti that

7   is in the pictures?

8      A     Yes.

9      Q     Okay.

10     A     And there was also some typical, maybe, in

11  another, you know, room maybe some graffiti.  I

12  wouldn't utilize it as -- we didn't -- I didn't claim

13  that to be, per se, necessarily vandalism in that we

14  were, we were actually planning on painting the walls

15  anyway, but I did take those pictures of the walls.

16     Q     Okay.  How many times after Russ put you on

17  notice did you go out and inspect the property?

18     A     Thereafter --

19           MR. FORESTNER:  Object to the form.

20           What time frame?

21           THE WITNESS:  Yeah.

22           MR. FORESTNER:  This is -- they're still on

23      the premises.

24           THE WITNESS:  Yeah.

25     Q     (By Mr. Wildes) Okay.  We'll limit it to

1  before you reported the claim; the vandalism claim to

2  Great American.  Actually, we'll limit it to before you

3  sent this e-mail.  Okay?

4          How many times had you visited the property

5  before sending this e-mail to Glenn?

6      A    Before sending this e-mail?

7      Q    Right.

8      A    Maybe approximately four, four times.

9      Q    Okay.  And do you recall the amount of time

10  you stayed out there during those visits, or did it

11  differ?

12     A    It differed.

13     Q    Okay.  What's the max amount of time you

14  stayed out at the property in any of those visits?

15     A    Several hours.  I don't, I don't recall,

16  you know, back then, but it was for several hours.

17     Q    And during each of those visits did you

18  inspect every building on the campus?

19     A    The initial visit I inspected every

20  building.  During the follow-up visits in which were

21  visits to ensure that we were able to board up and

22  properly secure and reinforce, you know, to limit

23  additional damage, you know, relative to the

24  vandalism.

25     Q    When you visited the property after being

1   put on notice by Russ of possible vandalism, did you

2   notice any outside AC units that were no longer there

3   that were there during your first inspection of the

4   property with Ms. Chapman?

5       A    Not that I recall.

6       Q    Okay.  Did you take any more photos than

7   the photos that were attached to Exhibit 120 that I

8   just showed you that you have?

9       A    Possibly.  I think I took more photos.

10      Q    Okay.  And where would those photos be

11  located right now?

12      A    We submitted, we submitted them all.

13      Q    Okay.  So there's no photos that -- you

14  don't have any photos that you haven't submitted?

15  And by "submitted," who do you mean submitted to?

16      A    Submitted it to counsel/Great American

17  through our exhibits.

18      Q    Okay.  So if you did take other photos

19  other than the ones that are in Exhibit 120, they

20  would have been included in the document production

21  that you gave to Great American?

22      A    I believe so.

23      Q    Okay.

24      A    I'm just looking.  I don't know how many

25  pictures were submitted, but I submitted all of the

1  pictures that I thought I, you know, had taken.

2      Q    Okay.  Is it possible that you haven't

3  submitted some photos of the buildings that you have?

4      A    Let me see.

5      Q    I believe we have all the photos that were

6  attached to the e-mail.  I'm speaking about other

7  photos that you would have taken during these visits

8  that you didn't attach to this e-mail.

9          MR. FORESTNER:  If you know.

10         THE WITNESS:  Not that I recall.  I don't

11     know.  I don't know.

12     Q    (By Mr. Wildes) Do you know if Russ Hart took

13 any photos of possible vandalism damage when he visited

14 the property at any point?

15     A    I don't know.

16     Q    Okay.  If Russ Hart took photos of the

17 property, did he usually send those photos to you?

18     A    I would think so.

19     Q    Are all these photos in Exhibit 120, were

20 they taken during one visit to the property?

21     A    Yes.

22     Q    Okay.  So when you visited the property the

23 other times you didn't take anymore photos?

24     A    I could have.  I could have, but I would

25 have to check.  I believe I submitted what I could

1   pull together from the pictures that I gathered from

2   my, my cell phone.

3       Q    And you didn't take any pictures during

4   your pre-lease inspection of the property with

5   Ms. Chapman?

6       A    No.  I did not.  I already had pictures of

7   the property.  And the pictures represented what I

8   saw --

9       Q    Okay.

10      A    -- pre.

11      Q    The pictures that you had of the property

12  before you leased it, where did you get those?

13      A    We received -- it was either from EPR,

14  the -- or it was from the Stella group.

15      Q    And do you still have, do you still have

16  those?

17      A    I should have.  They, they were not

18  individual pictures.  They were a part of -- I

19  believe it was a phase or conditional study.

20      Q    Were the only pictures that you had before

21  you leased the property of the property contained in

22  that study?

23      A    Yes.

24      Q    If you, if you go through Exhibit 120, is

25  it possible for you to identify what buildings these

1  pictures are of?

2      A     The apartment buildings, the dormitory.

3      Q     Which dormitory?  There is several,

4  correct?

5      A     Yes.

6      Q     Okay.  Do you know which one these pictures

7  are of?

8      A     I would have to, I would have to really

9  take a guess.  And I don't, I don't, you know.

10     Q     Okay.  Can you identify any other buildings

11 other than the individual dormitories?

12     A     Dormitories, apartment building.

13     Q     I know there are multiple apartment

14 buildings on the campus.

15     A     Yes.

16     Q     Do you know which apartment buildings these

17 pictures are depicting?

18     A     I don't know what, what dormitory.  I

19 could --

20           MR. FORESTNER:  Don't guess.

21           THE WITNESS:  Yeah.  I don't know exactly

22      what -- the dormitory buildings on the property

23      are quite similar and so I wouldn't want to take

24      a guess.  I do know that this particular

25      building where there's graffiti on the wall is

1          the president's house.

2          Q     (By Mr. Wildes) Okay.  So you've identified

3     the apartments, dormitory, and the president's house.

4                Can you identify any other buildings based

5     on these pictures?

6          A     Apartments and dormitories.

7          Q     Okay.  Is that all?

8          A     Yes.

9          Q     Okay.  Do you recall whether you sent Glenn

10    at Highmark any pictures other than the ones that you

11    attached to this e-mail?  By "this e-mail," I mean

12    Exhibit 120.

13         A     No, I don't.  I don't recall.

14         Q     Did you send these pictures to anybody else

15    other than the people that were copied or this e-mail

16    was sent directly to?

17         A     I don't think so.  I could have sent them

18    to Mr. Hart, but I don't recall.

19         Q     Did you or anybody else repair any of the

20    vandalism that you observed at the property in the

21    fall of 2018?

22         A     Yes.  We had a immediate cleanup crew come

23    out and remove debris.  So all of the ceilings that

24    had been torn down, we had a crew to come out and

25    remove all of that.  And we had them to come out and,

1    let's see, board, board up/reinforce to not add any

2    additional or, or allow for any additional intruders,

3    you know, or damage to, to happen.

4         Q    Okay.  So you hired a crew to come out to

5    repair the ceilings and board up the windows.

6              Anything else?

7         A    They didn't repair.  They cleaned up the

8    debris that was on the floor.  If you look at the

9    exhibit you'll see where the ceilings which is the

10   actual, actual place where Great American adjuster

11   and Mr. Hart were looking with what was wind -- the

12   wind damage claim, or storm damage -- windstorm

13   damage claim of the roof, when they went into this

14   apartment building here they noticed that this had

15   been vandalized.  And so if you look at the

16   exhibit -- I don't know.  The exhibit is not marked.

17   But you'll see the -- all the debris that's on the,

18   the floor.

19        Q    Yeah.  Let me clarify the record.

20             By "exhibit," you're referring to --

21        A    Yeah.  It's not numbered, but I don't know

22   what --

23             MR. FORESTNER:  It's Exhibit 120.

24             THE WITNESS:  I'm sorry.  Exhibit 120.

25             MR. FORESTNER:  Do you want me to have him

1       put a blue X on the page?

2             MR. WILDES:  Pages 14 and 15 of the

3       double-sided exhibit.  You can put an X on the

4       page.

5             MR. FORESTNER:  Yeah.  Just go ahead and

6       put an X over here.

7             THE WITNESS:  Okay.

8       Q     (By Mr. Wildes) So the page on the exhibit

9   that you've put an X on, you hired a crew to come out

10  and clean up the debris related to that picture --

11      A     The debris --

12      Q     -- or that type of damage?

13      A     Exactly.  So they came out and cleaned up

14  all of this.  They also came out and, like I said,

15  boarded, re -- reinforced the security of the

16  individual -- every, every building on, on the

17  property so that we could avoid any additional

18  damages.

19      Q     Okay.  Did they only work on the buildings

20  that there were vandalism to?

21      A     No.

22      Q     So they worked on other buildings that

23  hadn't been vandalized?

24      A     Yes.

25      Q     Okay.  Do you remember the name of this

1   crew?  Is it a company?

2        A    It was a company by the name of Guyco.

3        Q    Guyco?  Like the insurance company?

4        A    Yeah.  Yes.

5        Q    Okay.

6             MR. FORESTNER:  Was it spelled the same?

7             THE WITNESS:  Yeah.

8             MR. FORESTNER:  Okay.

9        Q    (By Mr. Wildes) Nothing after Guyco?  Just

10  Guyco?

11       A    Guyco Plumbing and Construction.

12       Q    Did you only hire one crew to do that work?

13       A    I believe we had some general laborers as

14  well who came, you know, came out to, you know, clean

15  out all of the buildings.

16       Q    Okay.  Do you -- were they affiliated with

17  a company, or were they individuals?  And if they

18  were individuals, do you know their names?

19       A    No.  I don't know their names.

20       Q    Were they affiliated with a company?

21       A    No.

22       Q    All right.  Other than Guyco and these,

23  these manual laborers, did you hire anybody else or

24  did anybody else come out to the property to do

25  anything related to this vandalism damage?

1      A      Not that I can recall, you know, as of

2  today.

3      Q      Okay.  Do you remember when Guyco or these

4  manual laborers came out; whereabouts?  Doesn't have

5  to be specific.

6      A      It was shortly after -- I believe it was

7  shortly after the claim was submitted.

8      Q      Okay.

9      A      I believe it was shortly after the claim

10  was submitted.

11      Q      Okay.  By "shortly after," you mean within

12  a couple weeks, or within a month?

13      A      Within, within -- I don't want to give a

14  time cause just it's been so long, but it was within

15  a reasonable amount of time.  And I can say that

16  because I wanted to make sure that the work that we

17  were currently doing, you know, relative to

18  renovations, that, that this didn't impede against

19  any type of, you know, current work, renovation work

20  that we were actually doing on the property.  And,

21  also, to, to -- for it not to become a hazard and

22  just sitting there.  It was -- a lot of it was wet

23  and so we wanted to kind of get it cleaned up as to,

24  you know, not to further damage the property.

25      Q      Okay.  When Guyco and these manual laborers

1  came out you said they boarded up some windows.

2          Do you recall what buildings they put these

3  boards on?

4      A    I don't recall.

5      Q    Okay.  When you took -- when you began to

6  lease the property there were already boards on some

7  of the windows; is that correct?

8      A    Yes.

9      Q    Okay.  Do you remember what buildings there

10 were already boards on?

11     A    No.  Not, not a lot that I -- not -- I

12 don't think it was a lot of buildings.  Those

13 buildings were intact.  The windows were fairly new,

14 so those boards -- I know that they were boarded.

15 And so I know that we came and we went ahead and

16 after this, you know, boarded up every single window

17 that we could possibly, you know, board up.  That was

18 my order.  And that was to, to preserve, you know,

19 all of those windows; and, particularly, the first

20 floor of buildings.

21     Q    Okay.  You said "every single window."

22          Did you board up every single window on the

23 first floor of every building on the property?  Is

24 that what you're saying?

25     A    Not every building on the property.  The

1   buildings that were actually not in use.

2       Q    Okay.  And which buildings were those; do

3   you recall?

4       A    I don't recall those particular buildings.

5   They were the buildings that we weren't -- that we

6   were not utilizing.  So I would say they were not --

7   the buildings that we were not utilizing, but these

8   were the buildings that we were renovating and we

9   were, you know, in the process of renovating.  Those,

10  those were the buildings that we actually -- but the

11  buildings that we were renovating and buildings that

12  we were -- the same buildings we were not utilizing,

13  if that makes sense.  The buildings that we were

14  utilizing, we didn't board up those windows.

15      Q    Okay.  So you boarded up the windows on the

16  buildings that you weren't utilizing but you were

17  renovating?

18      A    Right.  Correct.

19      Q    Okay.  And can you remember what those

20  buildings were?

21      A    If I recall, the windows -- I can remember

22  the buildings that weren't, but I, I don't -- because

23  there's several buildings.  I don't want to just

24  throw out names of buildings that I, I, I -- I can

25  say Burns Hall, Head Hall, Dodson, the apartment

1  buildings, the back of the gymnasium; although we

2  were utilizing the gymnasium.  The first floor of the

3  gymnasium, we had them to reinforce and make sure all

4  of those windows were boarded.  And I would say -- I

5  think it would be safe to say the remainder of the

6  dormitory buildings on the campus.

7      Q    Were what?  Being renovated, or not being

8  renovated?

9      A    Were being renovated.

10     Q    Okay.

11     A    They were in a renovation phase and they

12 were to be boarded.

13     Q    Okay.  So Burns Hall, Head Hall, Dodson

14 Hall, the apartments, the back of the gym, and the

15 dormitories were all under renovation?

16     A    Yes.

17     Q    Okay.

18     A    But, however, the gymnasium, we were

19 utilizing the gymnasium.

20     Q    And by "renovations," what exactly do you

21 mean?

22     A    Drawings, drone footage.  The apartments

23 were in the process of being -- were in the process

24 of getting the HVAC system ready, so they had -- the

25 apartments had all been inspected.  The

1   administration building HVAC system was renovated.

2   Some units were replaced.  The same with the library.

3        Q    And by "same," you mean HVAC units being

4   replaced?

5        A    HVAC units being replaced.  HVAC system

6   being updated.

7        Q    In what building?

8        A    Both administration building, old main, and

9   the library, as well as the gymnasium.  The, the

10   elevator in the library was being fixed and inspected

11   by Fulton County engineering; whichever, you know,

12   county regulation that regulates the elevators.  That

13   was being done and completed.

14        The fire system in the library was being

15   updated and testing done as a result of the initial

16   inspection that we received when we started

17   renovation, which we failed, so we had to provide

18   additional updates as well as renovations to the fire

19   system which, which resulted in a passing for the

20   fire inspection for the, for the library.

21        Q    Anything else?

22        A    Landscaping design; replacement of a --

23   part, part of a wall that was in the library that had

24   maybe sort of a dent or something in it.  So they,

25   they cut the sheetrock and they had to replace that,

1    so replacement of sheetrock; painting; electrical.

2    Electrical was on the library as well as the

3    administration as well as old main.

4        Q    Anything else?

5        A    That's due to the, the timing and, you

6    know, the lapse in time.  I can -- that's what I can

7    remember.

8        Q    Okay.  Before we move on, just turning back

9    to this exhibit one more time.

10       A    Mm-hmm.

11       Q    You'll see in the body of the -- and I'm

12   referring to Exhibit 120.  You'll see in the body of

13   the e-mail that it says that the vandalism is beyond

14   the scope of what we had identified as needing to be

15   replaced and updated and remodeled.

16            Do you see that?

17       A    Mm-hmm.

18       Q    Okay.  Do you have any documentation

19   showing, you know, your identification of things

20   needing to be replaced, updated, and remodeled?

21            Do you understand my question?  Was this

22   documented in any way?

23       A    This is beyond the scope.  This -- okay.

24   So what -- you're -- okay.  Give me one minute.

25            So this was beyond the scope what we had

1    identified as needing to be replaced and updated.

2    So, you know, once we walked the property and we --

3    we pretty much knew exactly what we needed to do.  We

4    knew that we -- this was, you know, by evidence of,

5    for example, the HVAC company that we hired that came

6    out and actually did a full inspection.

7            While he was -- this company was currently

8    fixing and updating the current, you know, HVAC

9    systems in other buildings, he did an inspection for

10   his next phase which was the apartment buildings.

11   And so when, when, when -- I'm saying -- when I'm

12   saying beyond the scope, I'm saying that, okay, well,

13   now it's different than, you know --

14       Q    I believe I know what you're saying.  Let

15   me ask it this way.

16           The, the things needing to be replaced and

17   updated and remodeled, does that include anything

18   beyond what you described to me as the renovations

19   that Braddy Prep was doing on the property?

20       A    Does that, does that -- does this

21   include --

22       Q    No.

23           Does it --

24       A    -- beyond --

25       Q    -- include anything beyond what you just

1    described to me as what Braddy Prep was doing on the

2    property?

3         A    Correct.  It, it -- this, this, this does

4    not include the scope of what we were currently doing

5    to the property.  This is beyond the scope of what we

6    looked at that -- what we documented, you know,

7    relative to the, the -- having the HVAC company come

8    out, look at phase two of the renovation, give us a

9    quote to get these particular units -- apartment

10   units up and going relative to HVAC.  They went in,

11   they went through every unit, and then they said,

12   okay, this is what you'll need to get these units up

13   and going.  That documentation which we submitted,

14   that documentation was now voided because it was --

15   this was beyond the scope at that point.

16        Q    Right.  Right.  So just to clarify, what

17   I'm trying to determine is whether you are referring

18   to anything beyond what you described to me.  So you

19   described some HVAC work on the apartments.  You

20   described some HVAC work on the library.  I get that.

21             Are you, are you referring to in this

22   e-mail anything beyond what you just described to me

23   as the work being performed on Braddy Prep, or is

24   that what you're referring to in the e-mail?

25        A    In the e-mail, I'm referring to the

1   vandalism that has occurred.  And it is beyond what

2   we are currently -- or what we currently had, as I

3   stated, completed and/or we were undergoing

4   renovation.

5        Q    Okay.  And you just described to me that --

6        A    Yes.

7        Q    -- correct?

8        A    Yes.

9        Q    Okay.  Other than the invoices and whatnot

10  that you've submitted to Great American, is there any

11  documentation of these renovation efforts, or have

12  you submitted everything to Great American --

13       A    Yes.

14       Q    -- that documents that?

15       A    Yes.

16       Q    Okay.

17       A    All the documents I have.

18       Q    Okay.  So this is Exhibit Number 121.

19            Dr. Braddy, what I've marked as Exhibit

20  121, these are e-mails between Great American and

21  Mr. Hart.  You're copied on these e-mails.  I just

22  had a couple questions about this.

23            So based on the e-mails, it appears that

24  you put Great American, or somebody put Great

25  American, on notice of the vandalism loss on

1   October 11, 2018; is that correct?  Or on or about
2   that time.
3                        (Whereupon, the court reporter
4                        marked Plaintiff's Exhibit No. 121
5                        for identification.)
6           MR. FORESTNER:  Objection to the form of
7       the question.
8       Q    (By Mr. Wildes) Dr. Braddy, do you recall
9   when you put Great American on notice of the vandalism
10  claim, or whether somebody representing your, your
11  company did?
12      A    I, I don't, I don't recall.  However, I
13  mean, I can say that it was, it was within -- I want
14  to -- it was in a reasonable time from the date of
15  noticing the, the claim.
16      Q    Okay.  Do you remember how far -- how soon
17  after you sent this e-mail to Glenn on September 26
18  you reported the vandalism claim to Great American?
19  Or somebody from Braddy Prep did?
20      A    From September 26?  I --
21          MR. FORESTNER:  If you don't know --
22          THE WITNESS:  -- I don't know the exact
23      date.
24      Q    (By Mr. Wildes) Okay.  Does anybody have an
25  idea or know when exactly the vandalism happened on the

1  property?

2      A    It happened, it happened between -- I

3  can -- I don't, I don't know the exact time the

4  vandalism happened --

5      Q    Okay.

6      A    -- on the property.

7      Q    Okay.  Is anybody aware whether the

8  vandalism happened on one day, or happened over

9  multiple days?

10      A    No.

11      Q    Okay.  So the, the date of loss that Braddy

12  Prep gave to Great American, what significance does

13  that have, if any, as far as when the vandalism

14  occurred?

15      A    I would say the significance would be that

16  the date of loss was the day that we informed Great

17  American after, after, you know, going through our

18  inspection and having the, the broker come to walk

19  the entire campus with me to identify as a witness

20  with me that, you know, this is what, what -- this is

21  what happened.  We don't know.  It happened between,

22  I don't know, I would say maybe sometime between

23  August to whenever the, the date -- whenever the

24  Great American was notified.

25          Actually, Great American noticed the

1    damage, the vandalism damage, and -- along with

2    Mr. Hart.  And that's when I was called and I

3    proceeded to go out and conduct the inspection.  And

4    when I saw that it was indeed different and it was

5    indeed vandalism, that's when we, we -- Braddy Prep

6    submitted the claim.

7        Q    Okay.  And by that point, had anybody else

8    seen the vandalism other than you, Ms. Chapman, Russ

9    Hart, and the independent adjuster that you're aware

10   of?

11       A    By that point?

12       Q    Right.

13       A    No.

14       Q    Okay.

15       A    Not that I'm aware of.

16       Q    And how are you -- is it possible that the

17   vandalism could have occurred after you started

18   leasing the property, but before August 2018?

19       A    I, I don't think so.

20       Q    Why do you say that?

21       A    Because we had walked the property and we

22   were actively engaged in the property in early

23   August, so...

24       Q    So when do you think is the first, first

25   time that the vandalism could have happened at the

1  property?

2      A    I would say anytime after -- I mean, I

3  could just guess anytime after -- cause we -- the

4  latter part of August or the first of September.

5  However, I'm just, I'm just guessing.

6      Q    Is there any documentation that the

7  vandalism that you observed at the property occurred

8  during your policy period with Great American and not

9  before it?

10          So to ask it another way, is there any

11  documentation showing that the vandalism occurred

12  after you began to lease the property and not before?

13          MR. FORESTNER:  Object to the form of the

14      question.

15          THE WITNESS:  There's no documentation.

16      The documentation is, is -- well, there's no

17      documentation because there were -- there was no

18      vandalism.

19      Q    (By Mr. Wildes) Let me ask it this way.

20          Are you aware of any documentation,

21  photographs, or reports that show -- that depict

22  portions of the property that are now damaged that

23  were not damaged before you began to lease the

24  property?

25      A    Yes.

1    Q   Okay.  You, you -- and what, what documents

2 or photographs is that?

3    A   That's the phase -- I believe it's the

4 phase one or conditional use document that was

5 submitted.

6    Q   Okay.  Is that the only document that would

7 evidence that the vandalism happened after you began

8 to lease the property and not before?

9    A   I wouldn't say that.  It's, it's a document

10 that is -- that would give rise to evidence that the

11 property was damaged afterwards.  Because the phase

12 was done before and it wasn't done by Braddy Prep

13 Academy.

14    Q   Okay.  Do you know when that phase was

15 done; the phase one report?

16    A   I think it was done -- I believe it was

17 done in between maybe 2015 or 2016 maybe.

18    Q   Okay.  Are you aware of any vandalism that

19 occurred at East Point campus before Braddy Prep

20 leased it?

21    A   Not that I recall.

22    Q   Besides the missing AC units?

23    A   Before Braddy Prep leased, or -- not that I

24 recall.

25    Q   Okay.  So when you inspected the property

1    with Mrs. Chapman, you didn't see any vandalism

2    damage to any building on the East Point campus?

3          A    No.  Not to -- not, not -- the missing

4    units, I don't know if that's considered vandalism or

5    not.  But to the, to the scope of Exhibit 120, you

6    know, no.  I don't think, you know -- I'm not aware

7    of any, any -- everything that, that was in Exhibit

8    120 happened after Braddy Prep leased the property.

9          Q    Okay.  But you testified earlier that

10   Exhibit 120 does not contain all the vandalism that

11   you observed on the property.

12               So I'm asking you irrespective of what's in

13   Exhibit 120 whether you saw any vandalism damage or

14   what could be perceived as vandalism damage when you

15   and Ms. Chapman inspected the property before you

16   leased it.

17         A    No.

18              MR. WILDES:  Okay.  Mark that as Exhibit

19         122.

20                         (Whereupon, the court reporter

21                         marked Plaintiff's Exhibit No. 122

22                         for identification.)

23         Q    (By Mr. Wildes) Dr. Braddy, I've marked this

24   as Exhibit 122.

25               Do you recognize this?

1          MR. FORESTNER:  Have you ever seen it

2     before?

3          THE WITNESS:  Probably.

4     Q    (By Mr. Wildes) Okay.  Well, I'll represent

5 to you that this is a police report.  You can take a

6 minute to look over it.  Just tell me when you're ready

7 to proceed.  It's not very long.

8     A    Okay.

9     Q    Okay.  Based on this report, it appears

10 that you were present when the police visited East

11 Point campus?

12    A    Yes.

13    Q    Okay.  And if you look at the top

14 right-hand corner, date/time reported is

15 October 15th, 2018?

16    A    Mm-hmm.  Yes.

17    Q    Does that sound about the time that you

18 reported the incident to the police; the vandalism to

19 the police?

20    A    I guess, yes.

21    Q    Okay.  Do you have a reason to think that

22 that's incorrect?

23    A    Just because of the date; the lapse in time

24 to date.

25    Q    Oh.  You're unaware of the specific date?

1       A     Yeah.

2       Q     Okay.  Does it --

3       A     Considering it's -- it was two years ago.

4       Q     Right.

5             Does it sound about the time --

6       A     Yeah.

7       Q     -- that you reported it to the police?

8       A     I would say so.

9       Q     And by that time it had been about three

10   weeks since Russ Hart reported it to you?

11      A     Possibly.

12      Q     Okay.  Is there a reason you waited so long

13   to report it to the police?

14      A     The -- let's see.  The police -- I don't --

15   three weeks to me was -- I would say it was

16   possible/reasonable considering that we wanted to

17   make sure that we knew what to report.

18      Q     Okay.  So at the back of the exhibit -- so

19   it would be page 2 of the police report -- at the

20   very end -- or, I guess, the second paragraph from

21   the end it says:  Carroll displayed photos via phone

22   in reference to the above locations:  Damaged

23   ceiling, drywall, copper, and other structure damage.

24            The photos that you gave to the police

25   officer, are those the same photos that were attached

1   to the e-mail Exhibit 120 that we went over earlier?

2               MR. FORESTNER:  It says "displayed."  It

3       doesn't say given.

4       Q    (By Mr. Wildes) Displayed.

5       A    Yeah.

6       Q    So you showed photos to the police officer

7   that you took on your phone?

8       A    I believe so.

9       Q    Okay.  And my question is whether those

10  photos were the same as the ones that you attached to

11  the exhibit, or are there other photos that you

12  showed to the police officer?

13              MR. FORESTNER:  If you recall.

14              THE WITNESS:  I don't recall.

15      Q    (By Mr. Wildes) This police report, same page

16  as we were looking at, lists several buildings:  Dodson

17  Hall, Head Hall, family house, Gilbert Hall, president

18  hall, apartment 3, 4, 5, maintenance, and warehouse.

19  And it says:  Carroll advised that the following

20  buildings had been vandalized.

21              Is that an accurate representation of all

22  the buildings that were vandalized on the property?

23      A    No.

24      Q    What's missing?

25      A    I don't, I don't know Apartment 3, 4.  I

1  can, I can guess that this would be an adequate

2  description of all the properties.

3       Q    That were vandalized?

4       A    That were vandalized, with the exception of

5  my understanding of Apartment 3, 4, 5.  I don't know

6  exactly, you know, how the police report would say

7  Apartment 3, 4, 5.  I don't know.  I didn't, I didn't

8  give him, like, Apartment 3, 4, 5.

9       Q    Okay.  What --

10      A    But the apartments were vandalized.  I just

11 don't know how to, you know, label the apartments.

12      Q    Okay.  Was there anybody else at the

13 property with you when the police came out?

14      A    I don't, I don't, I don't remember.

15      Q    Okay.  Did anybody else provide any

16 information to the police officer about what

17 buildings were damaged?

18      A    No.  Not that I recall.

19      Q    The, the list of damages that you give at

20 the bottom of the police report, is that a -- I know

21 it's not a general, but is that an accurate

22 representation of the damages that you had observed

23 by that time?

24      A    Yes.

25      Q    Okay.

1          MR. FORESTNER:  Can we take a break?

2          MR. WILDES:  Yeah.

3          (Whereupon, a brief recess was taken.)

4     Q    (By Mr. Wildes) Turning back to Exhibit 122,

5     the police report.

6          So, Dr. Braddy, you didn't mention anything

7     to the police officer about the library?

8     A    I don't, I don't recall.

9     Q    Okay.  What about old main or Burns Hall?

10    A    I don't recall.

11    Q    What about Roberts Hall?

12    A    I think so.

13    Q    Do you know why that's not included in this

14    list of buildings?

15    A    No.

16    Q    What about the admin building?

17    A    I don't recall.

18    Q    What about the dormitories?

19    A    You just named them.

20    Q    What was that?

21    A    The halls.

22    Q    Roberts Hall?

23    A    Roberts Hall, Gilbert Hall, Dodson Hall,

24    apartments.  When I speak of dormitories, that's what

25    I'm speaking of.

```
 1      Q    So Gilbert Hall and Dodson Hall.
 2           Does that mean that there was no vandalism
 3  to Roberts Hall?
 4      A    Yes.  There was vandalism to Roberts Hall.
 5      Q    Do you know why it wasn't included in the
 6  police report?
 7      A    I don't.
 8      Q    The maintenance and the warehouse at the
 9  bottom of the list, do you see that?
10      A    Yes.
11      Q    What is that referring to?
12      A    The, the warehouse that's on the campus.
13      Q    Okay.  Is the warehouse and the
14  maintenance, is that the same thing?
15      A    Yes.
16      Q    Okay.  And by, by the "warehouse," you mean
17  the big tin shed --
18      A    Yes.
19      Q    -- behind one of the dorm rooms?
20      A    Yes.
21      Q    Okay.  Was there any vandalism to the
22  library?
23      A    Not that I recall.
24      Q    What about old main and Burns Hall?  It's
25  not included in this list.
```

1     A     Yeah.  Not that I recall.  I do recall that

2   the officer wasn't thorough in his -- in the, the

3   narrative because it was a -- the, the -- because it

4   was a large campus.  And the date of the incident --

5   the suspected date of the incident was not the date

6   of the report, but -- and I shared with the, with the

7   officer that I needed to make sure that I at least

8   did a police report for, you know, in case the

9   insurance company needed a police report.  So I do

10  recall that one officer coming.  And, and the one

11  officer did not -- he took the report from his car.

12    Q     Okay.  What do you mean that he wasn't

13  thorough?

14    A     Well, I -- let me retract that and restate

15  because I don't know if he was thorough or not, so I

16  retract that.  But I would like to say that the

17  police officer did not go into each of the buildings.

18  He did not go into any building.  He stated that if,

19  if I could just show him some of the pictures and

20  kind of, you know, the different names of the, the

21  buildings.

22          And so what we -- what I showed him, we

23  looked at -- you know, I shared with him some photos.

24  And he stated that the -- he would just notate the

25  address of the campus and, because there was a

1   plethora of buildings, and that, you know, he would
2   just make sure that he notate that the address of the
3   campus.  And even at the latter part he stated that
4   it would require additional force to come out and
5   actually go through every single building and that he
6   would just give a general narrative, but he would
7   make sure that he put the address of the campus; the
8   university campus.

9           And I believe he also stated that the
10  campus at one point had its own police, its own
11  police department, so -- but he, he did state that,
12  that he would make sure that the address was on the
13  building -- I mean, on the police report.  And that
14  it probably -- that I could actually come and pick up
15  the police report.  He only gave me a case number,
16  so- it wasn't -- I could not read the narrative right
17  there, you know.

18          So he gave me Case Number 18-015152 on a
19  card and asked me, you know -- told me, you know,
20  that the police report would be ready in a matter of,
21  I guess, so many days; that I could, I could actually
22  pick the police report up.  So I didn't have time
23  to -- it was not, you know, a time for me to look at
24  narrative and, you know, kind of say, okay, well, you
25  missed this, you missed this, you missed this.  This

1  incident report wasn't populated at the time of the

2  police being dispatched and me actually speaking with

3  the officer.

4      Q   Okay.  Looking at the police report now,

5  what do you, what do you think that he missed?

6      A   I don't know the -- I would have to see a

7  diagram of the campus because I think -- I don't know

8  if I stated Burns Hall.  But if I stated Burns Hall,

9  I will probably want to retract the term Burns Hall

10 because I believe Burns Hall is our administration

11 building.  But I would have to see a diagram of the

12 campus and I could, you know, I could definitely

13 point out.

14     Q   So do you believe that some buildings are

15 missing?  And, if so, can you list the buildings that

16 you believe are missing from the list?  Is that easy

17 enough?

18     A   If I, if I could see a diagram I could --

19     Q   Okay.

20     A   -- point out those buildings.  Yes.

21     Q   Did you believe that the officer was not

22 being thorough when he was -- when he reported to the

23 scene and when you were speaking with him?

24     A   I don't -- I can't speak relative to the

25 officer's standards of investigation.  However, I

1  will say that the officer informed me that he would

2  make sure that the address of -- the main university

3  address was on the report and that -- he asked me

4  specifically what damages did I, you know, incur; the

5  campus incur.

6          And I stated the ceilings, drywall, copper,

7  plumbing.  I mean, the sinks.  And he stated that he

8  would just -- so I see where it says "and other

9  structure damage."  But shortly thereafter the police

10 report, the officer had to leave very quickly.

11      Q    But you never requested a copy of the

12 police report after the fact?

13      A    I don't know.  I believe I -- I don't know

14 if I requested a copy.  I may have requested a copy

15 to be sent to Great American.  I don't know if Great

16 American required a copy of the police report or not.

17      Q    Was there any vandalism to the admin

18 building?

19      A    If it was, it was maybe some type of

20 suspected vandalism.  I don't, I don't think so.

21      Q    Is it, is it possible for you to describe

22 what vandalism you noticed at these buildings on the

23 police report?

24      A    Damaged ceilings.

25      Q    Individually, like, per building?

1              You can go down the list if that's easier.

2       A    If I had a diagram, I could.  But,

3   actually, just, I mean, the police report was

4   completed in 2018.

5       Q    I'll look for a diagram and then we'll --

6       A    Okay.  Okay.

7       Q    -- come back to it if I have one.

8       A    Good deal.  Thanks.

9       Q    And just to clarify.

10             The, the vandalism that you -- that's

11  described on this police report and that we've been

12  speaking about during this deposition, you -- did you

13  notice all that on the first day you visited the

14  property after being put on notice of the vandalism

15  by Russ?

16             Stated another way:  Did you notice any new

17  vandalism during subsequent visits or, say, after you

18  filled out this police report after the police came

19  to the property?

20      A    Not that I recall.

21      Q    Okay.  Did you file any other police

22  reports other than this one?

23      A    Not that I recall.

24      Q    Okay.  I want to look at your -- this has

25  already been marked as Exhibit Number 110.

1          Dave, if you want to look at it.  You
2     probably already have a copy, though.
3          Have you seen that before?
4     A    Yes.
5     Q    Okay.  I want to look at paragraph 17 on
6     the affidavit.  Just let me know when you're there.
7     A    I'm here.
8     Q    Okay.  It says that:  Since the filing of
9     the instant action, Braddy Prep has attempted to file
10    two additional claims for plaintiff:  One for
11    vandalism, and another for damage stemming from a
12    falling tree.  Plaintiff has refused to investigate
13    these claims and has instead instructed us to wait
14    until the current action is resolved.
15         What's the basis for that claim in
16    paragraph 17; that Great American has refused to
17    investigate the claims and has instructed us to wait
18    until the current action is resolved?
19    A    We reached out to Great American.  And
20    Great American stated that the insurance -- the
21    policy was currently -- I don't, I don't want to, to
22    quote because I don't recall, but I'm going to
23    paraphrase that they stated that, in essence, the
24    policy was in litigation and that they -- we would
25    have to wait until current litigation is over to --

1  for them to address.

2          Q     Okay.  Who told you that?

3          A     Ms. -- I don't want to mispronounce her

4  name.

5          Q     Donna from Great American?

6          A     Donna.

7          Q     Okay.  Did she tell you that directly, or

8  did she communicate that through one of your agents?

9          A     She communicated that I believe via e-mail.

10         Q     Directly to you, or were you copied on the

11 e-mail?

12         A     I don't know if it was directly to me, but

13 I did -- it was, it was -- I did receive a

14 communication from Donna regarding the refusal to

15 move forward on those.

16         Q     Okay.  Looking at paragraph 122 -- not

17 paragraph 122.  I'm sorry.  Exhibit 122.

18         A     Mm-hmm.

19         Q     Maybe it was 121.  It's right there; the

20 series of e-mails.

21               The -- if you'll look through that, the

22 adjuster actually attempted to inspect the vandalism

23 claim after you reported it, correct?

24         A     Where are you?

25         Q     It's throughout the e-mails talking about

1  Great American's attempts to come out -- have

2  somebody come out and inspect the property.  You can

3  take a minute to read through that.

4          And, actually, Ty Whitaker, the independent

5  adjuster, actually came out to the property after you

6  reported the vandalism claim and attempted to inspect

7  the property, but that Russ didn't show up for the

8  inspection; is that correct?

9      A    Not that I know of.  From what I was

10  informed was that Ty Whitaker and Russ Hart had some

11  scheduling issues I think on both ends and they just

12  could not at the time meet at the same time to

13  inspect the property.

14      Q    So Great American didn't refuse to

15  investigate the vandalism claim?

16      A    Yes.

17          MR. WILDES:  What exhibit are we on?

18          THE REPORTER:  123.

19          MR. WILDES:  Mark this as 123.

20              (Whereupon, the court reporter

21              marked Plaintiff's Exhibit No. 123

22              for identification.)

23          MR. FORESTNER:  It's not going to be in

24      there.

25          THE WITNESS:  Okay.

1      Q      (By Mr. Wildes) I've marked a letter as

2    Exhibit 123.

3            Have you ever seen this document before?

4    Have you seen that before?

5      A      I believe so.

6      Q      Okay.  So you are aware that Great American

7    had offered to, to inspect your two other claims

8    under a reservation of rights?

9      A      Yes; on June, June 2 -- June 3rd, 2019.

10     Q      Okay.  And were you aware that they had

11   sent another letter to your previous attorney

12   offering to do the same thing?

13     A      I don't -- I'm not -- not that I recall.

14     Q      Okay.

15     A      I do know that this was, you know, after we

16   were well into litigation that we received this, this

17   notice that Great American was -- had offered to

18   inspect the two additional claims.

19     Q      Okay.  So in that case, I guess an accurate

20   statement -- and assuming that this is the only

21   letter that Great American sent offering to inspect

22   the two subsequent claims -- a more accurate

23   statement in paragraph 17 was -- would be until

24   June 9th, Great American -- 2019, Great American had

25   refused to inspect the subsequent two claims?

1              MR. FORESTNER:  Objection to the form of

2        the question.

3              This affidavit is in December of 2018.

4        Q    (By Mr. Wildes) So the affidavit is no longer

5    accurate.

6              Would you agree with that?

7              MR. FORESTNER:  Object to the form of the

8        question.

9        Q    (By Mr. Wildes) Is it still your position

10   that Great American has refused to investigate the

11   vandalism claim and the tree claim?

12       A    Great American has refused to investigate

13   the two claims -- the additional claims, rather, that

14   we submitted.  As a matter of fact, I received a

15   letter -- I mean, I received notice via e-mail, as I

16   stated, from Donna when the tree -- I believe it was

17   the tree fell on -- due to storm when the tree fell

18   on one of the dormitories.  And she e-mailed back

19   that this was in litigation.

20              And to that extent we received well into

21   litigation a notice on June 3rd, 2019 from Great

22   American stating that they were -- they would be

23   interested in investigating the damages which we

24   actually had to have the tree by that time removed.

25   And although there was damages, Great American

1  refused at the time that we actually filed and

2  requested for relief relative to that claim.  They

3  later submitted a letter on June 3rd, 2019 to Braddy

4  Prep's counsel stating that they were interested in

5  investigating damage of something that happened the

6  previous year.

7       Q    And your previous attorney didn't give you

8  a similar letter --

9       A    I can't speak for --

10      Q    -- in 2018 offering to inspect the claims?

11      A    I was being represented by --

12           MR. FORESTNER:  If you recall.  If you

13      don't --

14           THE WITNESS:  Yeah.  I don't recall cause I

15      don't -- yeah.

16      Q    (By Mr. Wildes) When was the first time you

17  went to the property following the tree falling?

18      A    Can you, can you rephrase that question,

19  please?

20      Q    Yeah, I can.

21           When was the first time you went to the

22  property following, following you being put on notice

23  that there had been some sort of tree-related damage

24  at the property?

25      A    The same day.

1      Q      Okay.  And I have a loss date of

2   November 16th, 2018.

3             Does that sound correct?

4      A      I would...

5      Q      It's the date that Great American was

6   given.

7      A      Okay.

8      Q      Does that sound correct?  Do you have any

9   reason to think that's not correct?

10     A      Yeah.  I don't, I don't -- because of the

11  lapse in timing, I don't recall.

12     Q      Okay.

13     A      But I don't have any reason to think that

14  it's not.

15     Q      Was anybody with you when you visited the

16  property that day?

17     A      No.

18     Q      Okay.  Anybody at the property when you

19  arrived?

20     A      No.

21     Q      And can you describe the damage that you

22  observed when you arrived at the property that day?

23  And to what building?

24     A      A tree had fallen on -- I believe it's Head

25  Hall.

1      Q     Okay.  And what kind of damage did you

2  observe?

3      A     The tree was impeding the ingress and

4  egress of the gymnasium.

5      Q     Okay.  I'm just talking about damage to a

6  building; to the building.

7      A     Okay.  The tree had caused the window of

8  the second floor to be damaged/broken as well as the

9  tree took down some of the gutter type, you know.

10     Q     Okay.  Anything else?

11     A     There was also -- and to that regard, to

12 include a bit of structural damage to the building

13 where the tree impacted the building.

14     Q     Okay.  And by "structural damage," what do

15 you mean exactly?  Brick damage?

16     A     Brick damage.

17     Q     Okay.  Anything else you mean by that?

18     A     Due to the tree?  Yeah.  That -- I mean,

19 that's what -- that's that I recall, you know, from

20 what I could, you know, what I could see.  I'm not a

21 professional contractor or a contractor by far, so...

22     Q     Right.

23           Do you remember how long you stayed out

24 there?

25     A     Maybe an hour.

1      Q    Okay.  Did anybody do anything related to

2  that tree damage other than remove the tree from the

3  building and the parking lot?  Any repairs made at

4  all?

5      A    No.

6      Q    Okay.  Anybody take any photos of the tree

7  damage?

8      A    Yes.

9      Q    Okay.  Who did?

10      A    I did.

11      Q    Okay.  And did you take those on your

12  phone?

13      A    Yes.

14      Q    All right.  Have you given those to your

15  attorney to produce to Great American?

16      A    Great American has them.

17      Q    Okay.  Does Great American have all of the

18  pictures that you took of the tree damage?

19      A    Yes.

20      Q    Okay.  Have you obtained any estimates,

21  bids, or any sort of documentation from any

22  contractor or vendor related to the vandalism that's

23  occurred at the property other than what you've

24  obtained from Hart and Lang?

25      A    No.  I reached out to just companies.  And

1  they require -- due to the magnitude of damage and

2  various, you know, buildings, they would require a

3  significant amount of -- a significant fee to, to

4  produce a comprehensive estimate.  And we actually

5  shared that with Great American in the beginning, you

6  know, and we didn't get any assistance relative to

7  that.  And you'll see that in various e-mails.  So we

8  did reach out to a company that agreed to come out

9  and provide an estimate of the damages.

10      Q    Okay.  The company you're referring to is

11  Lang?

12      A    Yes.

13      Q    Okay.  And when Lang visited the property,

14  were you present?

15      A    Yes.

16      Q    Okay.  Who from Lang came out and inspected

17  the property?

18      A    I don't recall.

19      Q    Was it Lawrence Nelson?  Does that ring a

20  bell?

21      A    Could have been.  I don't remember their

22  name.

23      Q    Okay.  Do you remember how many times

24  somebody from Lang came out to the property?

25      A    No.  I don't know how many times.

1      Q     More than once?

2      A     I don't, I don't know.

3      Q     Okay.  So to answer my original question,

4   is Lang and Hart the only two companies or

5   individuals or anybody that has given you any sort of

6   opinion, estimate, or anything related to the

7   vandalism claim at, at East Point?

8      A     I don't recall any other official opinions.

9      Q     Okay.  What about informal opinions?

10      A     Not that I, not that I remember.

11      Q     Okay.  And these other companies that you

12   reached out to, they never actually came out to the

13   property and looked at it?

14      A     No.  I gave, you know, just a description

15   of what, you know, happened and the address.  They

16   pulled it up.  Said, okay, this will cost, you know,

17   a rough estimate of probably, you know, 30 to $50,000

18   to go through these buildings.

19      Q     Who communicated with these companies?

20      A     I did.

21      Q     Okay.  Anybody else from Braddy Prep --

22      A     No.

23      Q     -- or any affiliated company?

24      A     No.

25      Q     How did you communicate with these

1    companies?

2         A    I just called them on the phone.

3         Q    Okay.  No e-mail exchange or any other

4    written correspondence?

5         A    No.

6         Q    So you provided this information over the

7    phone to them and they over the phone provided you a

8    rough estimate of how much it was going to cost to

9    fix?

10        A    No.  A rough estimate of how much it was

11   going to cost for the estimate.

12        Q    Got you.

13             What about the tree claim?  Has anybody

14   provided you with an opinion regarding how much it's

15   going to cost to fix other than Russ Hart?

16        A    No.

17        Q    Have you had any contact with -- other than

18   the contractors or the companies that you just

19   described to me that you reached out to regarding the

20   vandalism claim, have you had any contact with any

21   other third parties regarding either the vandalism

22   claim or the tree claim other than Russ Hart?

23        A    No.

24        Q    And Lang?

25        A    No.

1    Q    Do you have a previous -- did you have a
2  previous relationship with Lang, or is this the first
3  time that you dealt with him?
4    A    First time I ever met him.
5    Q    Okay.  Did you know somebody else that had
6  used Lang before, or --
7    A    No.
8    Q    -- how did you find out about him?
9    A    I asked Russ Hart if he could find, you
10  know, someone who would be willing to come out and
11  provide an estimate based on good faith that we
12  would, you know, pay for the estimate once we're able
13  to -- the insurance company was able to, you know,
14  agree to pay for the damages that we incurred while
15  we were under Great American auspices.
16    Q    Okay.  Who did you have contact with at, at
17  Braddy Prep or any affiliated companies with Braddy
18  Prep other than, other than Russ and -- I guess it
19  would be only Russ regarding these two, two losses:
20  The vandalism claim and the tree claim?
21    A    Right.
22    Q    Did you speak with anybody else at Braddy
23  Prep about these two claims, or damages related to
24  the claims?
25    A    Ms. Brooks.  Lorraine Brooks.

1      Q     Okay.  Anybody else other than Lorraine?

2      A     Possibly Keith Hughes.

3      Q     Okay.  Anybody else?

4      A     No.  Not --

5      Q     Did Lorraine Brooks ever come out to the

6  property and see any of the vandalism?

7      A     No.

8      Q     What about Keith?

9      A     I believe Keith -- Keith came out for the

10  tree.

11      Q     Okay.  What about the vandalism?

12      A     Keith has -- he, he saw the vandalism.

13      Q     He did?

14      A     (Witness nods head.)

15      Q     When did he see the vandalism?

16      A     I don't know the exact date.  It was

17  probably -- I don't know the exact date.

18      Q     Was it during a visit where you were also

19  present?

20      A     Yes.  Yeah.

21      Q     Was Keith always -- or were you always

22  present when Keith was at the property?

23      A     No.

24      Q     But you think you were present when he saw

25  the vandalism?

1      A      Yeah.

2      Q      When he saw the vandalism, was that during

3   one of your approximately four visits after Russ Hart

4   put you on notice of it?

5      A      No.

6      Q      Okay.

7      A      Keith was, was brought on after all of this

8   litigation, you know, was occurring.  He was brought

9   on as a facilities director after all of this; all of

10   the claims and all of the windstorm, the vandalism

11   damage to the roof, and everything within this

12   overall case.  Keith was brought on later, so Keith

13   has no prior knowledge of this claim --

14      Q      Okay.

15      A      -- other than the tree.  He was there and a

16   part of staff when the tree actually fell.

17      Q      Okay.  So Keith took Dr. Frazier's spot; is

18   that right?  Or he came into a similar position after

19   Dr. Frazier left?

20      A      I wouldn't say necessarily a similar

21   position, but Keith came in as facilities

22   maintenance, you know, director.

23      Q      Okay.  And how did you communicate with

24   Ms. Brooks about the vandalism or tree claim:

25   Through e-mail, over the phone?

1        A      Just called her.

2        Q      Okay.  Any e-mail exchanges between you and

3   Ms. Brooks about the vandalism claim --

4        A      No.

5        Q      -- or vandalism damage?

6               What about between you and Keith?  Any

7   e-mail exchanges or written correspondence between

8   you two about the vandalism damage?

9        A      No.

10       Q      And the fire that occurred at the property,

11  can you tell me a little bit about that?

12       A      Someone had got into one of the buildings.

13  And on the second floor they -- maybe a hoarder or

14  some type of, you know, person that had got into the

15  building -- put the wood back; made it look like, you

16  know, the building was secure.  And they actually --

17  I don't know what they were doing on the second floor

18  in one of the building -- in one of the rooms, but

19  they -- whatever happened cause the fire.  And the

20  fire was contained within that particular room;

21  however, it -- the smoke kind of went throughout.

22       Q      What building was that?

23       A      Head Hall, I believe.

24       Q      Okay.  And when did that occur?

25       A      I don't know the exact date.  Within the

1    last, within the last four -- within the last five
2    months.
3         Q    Okay.  Who is your carrier for that claim?
4         A    I don't know.  I'll have to get back with
5    you afterwards on that.
6         Q    So you're not sure of the insurance
7    carrier?
8         A    Uh-uh.  Not sure of the name.
9         Q    Has there been any other damages that
10   you're aware of at East Point campus other than the
11   wind-related damages, the vandalism, the tree claim,
12   and the fire damage?
13        A    No.
14        Q    So this will be Exhibit 124.
15             Have you seen this e-mail chain before,
16   Dr. Braddy?  I assume you have.  You're the --
17                      (Whereupon, the court reporter
18                      marked Plaintiff's Exhibit No. 124
19                      for identification.)
20        A    Mm-hmm.
21        Q    -- at the top of it.  So based on this
22   e-mail, it looks like there was some damage done to
23   the gym in May.
24             Particularly on May the 8th, 2018; is that
25   right?

1      A     Mm-hmm.  Yes.

2      Q     Okay.  And then it looks like some damage

3  happened on June 3rd, if you turn to the last page.

4  It's another e-mail from you to Glenn on June 3rd,

5  2018:  FLA trashed the gym.  Paint all over the

6  place.

7      A     Yes.

8      Q     Stage is flooded.

9            What exactly was the damage done to the gym

10 during these two incidents?  And if there's been more

11 incidents, please tell me that as well.

12     A     Fulton Leadership Academy is an academy

13 that we allowed to facilitate their physical

14 education in, in the gym; in our gym.  And so...

15     Q     Well, specifically, what, what damage did

16 they do to the gym?

17     A     So the damage that they did to the gym was

18 some paint that they allowed to drip on the carpet.

19     Q     And based on the last page, it looks like

20 there was some flooding as well?  "Stage is flooded."

21     A     Yeah.  Stage, stage was flooded.

22     Q     Okay.  Can you describe?  What do you mean

23 by "flooded"?  What was the extent of the flood?  And

24 where did the water come from, if you can recall or

25 know?

1      A    I don't recall.  I believe that the

2  flooding was from the H -- from the HVAC system.

3      Q    Okay.

4      A    And as a result of that, I believe that's

5  where our HVAC guy worked to fix, to fix that.

6      Q    So, I mean, how much water flooded from the

7  HVAC?

8      A    It was dripping.  I can't, you know, say

9  how much water.  It was --

10     Q    Is "flooded" a strong word for the amount

11  of water that was on the, on the stage?

12     A    I would say it's a strong word for the

13  stage.  The stage is approximately maybe -- I would

14  say maybe probably -- let's see.  Maybe, maybe 14x14.

15     Q    Okay.  And was the whole thing covered in

16  water, or just a portion?

17     A    Just a portion.

18     Q    Okay.  How big was the portion covered in

19  water?

20     A    It was, it was probably -- it was puddled.

21  So we were able to place buckets and a trash can --

22  industrial trash can style barrel, if you will --

23     Q    Okay.

24     A    -- under the water in an effort to, you

25  know, to salvage the, the space and not, not allow it

1  to damage -- provide any further damage and also drip

2  on the gymnasium floor.

3      Q    Were you successful in containment --

4  containing the water to the stage?

5      A    Yes.

6      Q    All right.  Did you do any repairs to the

7  gym after these two incidents related to these two

8  incidents?

9      A    Yes.

10      Q    Okay.  Do you have documentation of those

11  repairs?

12      A    No.  Actually, if I'm not mistaken, I

13  believe we required Fulton Leadership to assist in

14  the repair of paint removal.  It was a very limited,

15  you know, repair.

16      Q    Okay.  So all the repairs were done

17  in-house, so to speak, or did you hire any third

18  parties to come and conduct repairs related to these

19  two incidents?

20      A    I believe for the HVAC we had HVAC, but I

21  believe it would be -- it would have been in-house

22  for the other, other damages.  They were clearly

23  related to wear and tear and also just not taking

24  care of one's -- you know, another one's property

25  correctly.

1      Q    Okay.  But to answer my question, is there
2 any documentation related to any repairs done related
3 to --
4      A    No.  No.
5      Q    "No"?
6           Okay.  And, no, you didn't contact any
7 third parties or contractors to do anything related
8 to this damage?
9      A    No.  It wasn't, it wasn't to that extent.
10     Q    Okay.  Was the top of the stage ever
11 replaced?
12     A    Yes.
13     Q    Okay.  When was that done?
14     A    I don't, I don't recall.
15     Q    Okay.  And why was that done; do you
16 recall?
17     A    Because there was water that was dripping.
18 And it dripped down to the, the stage and caused
19 it -- the wood to buckle.
20     Q    Okay.  Is this water from HVAC, or water
21 from somewhere else?
22     A    No; water from HVAC.
23     Q    Okay.  So it's the same water you were
24 referring to earlier?
25     A    Right.

1      Q    So who paid for the stage being replaced?

2      A    I believe we paid.  I believe Braddy Prep

3 paid for it.

4      Q    And who came and installed the stage?

5      A    It was in-house.

6      Q    So any documentation related to the stage

7 installment?

8      A    No.  The stage is fairly small.  Like I

9 said, it's probably maybe four -- maybe 14 feet by

10 14 feet, or 15 feet by --

11      Q    Is the stage replacement included in your

12 claim or any claim with Great American?

13      A    No.

14      Q    Do you have any photos related to or of the

15 damage that was caused by Fulton Leadership Academy

16 to the gym?

17      A    I think so.  Like I stated, you know, for

18 the record, the damage was, you know, very minimal.

19 It was mostly a lot of trash that we needed to clean

20 out and a pail -- a 5-gallon bucket of -- or a gallon

21 of paint had spilled on the carpet and so --

22      Q    Was there any damage to the bathrooms in

23 the gym?

24      A    I would say wear and tear damage that

25 was -- caused the sinks to -- faucets to run.

1    Q    Okay.  So looking back at the police

2    report, the gym is not included in the list of

3    buildings.

4              Was there any vandalism to the gym?

5    A    No.

6    Q    Dr. Braddy --

7    A    Now, also, we probably -- to answer -- to

8    add to the -- my answer from your last question was

9    there any damage done to the gym --

10   Q    Well, I asked if there was any vandalism

11   done to the gym; not damage.

12   A    Vandalism.  Okay.  So in defining

13   vandalism, you know, windows being broken or, you

14   know, something like a rock being thrown at a window.

15   So we had a few of those that happened throughout

16   time, but we just replaced, you know, a cracked

17   window.

18   Q    Okay.  Other than broken windows, any

19   other --

20   A    No.

21   Q    -- damage to the gym that you perceived or

22   anybody else perceived --

23   A    No.

24   Q    -- as vandalism?

25              Okay.  And this is an obvious question, but

1    you're aware of the lawsuit that Great American has

2    filed against Braddy Prep; the declaratory judgment

3    action?

4        A    Yes.

5        Q    Okay.  Have you reviewed all those

6    pleadings that have been filed in that action, and

7    have you participated in responding to discovery;

8    stuff like that?

9        A    Yes.

10       Q    Okay.  Were you involved in preparing the

11   affidavit that I went over with you earlier?  I

12   think -- right there.  That's the only copy.  And,

13   also, I only have one copy of this, but this is

14   marked as Exhibit 2.  It's Mrs. Brooks' affidavit.

15       A    Yes.

16       Q    All right.  Were you involved in preparing

17   both of these?

18       A    Yes.  No.  I wasn't involved in preparing

19   hers.  I was involved in preparing mine.

20       Q    Okay.  How were you, how were you involved

21   in preparing yours?  Just to be clear, you don't have

22   to tell me anything about your communications with

23   your attorney.

24       A    Okay.

25       Q    The substance of those communications.

1      A      Okay.  So I was involved by acknowledging

2  the declaration and signing it.

3      Q      So you were pretty much handed the

4  declaration and you confirmed that it was true --

5  whether it was true or false?

6      A      Yes.  I mean, I, I shared each -- I mean,

7  with, with counsel each, each count, if you will.

8  And then it was sent to me and I signed it.

9      Q      Okay.  During the first part of your

10  deposition there were a number of documents that you

11  acknowledged and you agreed to produce when we

12  reconvened for the deposition or afterwards.  I'm

13  going to go through the list of documents after

14  reading the transcript that it appears you agreed to

15  produce and we can talk about those.

16              The first is Highmark phase one report that

17  you described during your deposition.  I believe it

18  was you agreed to look for that report, but we

19  haven't received that report from you yet.

20      A      Mm-hmm.

21      Q      Were you able to locate that report?

22      A      I was -- I believe so.  I believe I was

23  able to locate part of the report.

24      Q      What part would that be?

25      A      It was -- it's an e-mail.  So I'm having to

 1  go back through all of the e-mails to find the actual
 2  attachment.
 3      Q    Okay.
 4           MR. FORESTNER:  So he hasn't found it yet.
 5           THE WITNESS:  No.  I haven't found it yet.
 6      Q    (By Mr. Wildes) Okay.  Are you actively still
 7  looking for that report?
 8      A    Yes.
 9      Q    Okay.  And have you done anything else to
10  search for that report other than looking through
11  your e-mails?
12      A    That's the only place that I would have it.
13      Q    Okay.  Have you contacted -- who produced
14  the report?  Highmark?
15      A    I believe EPR would have produced it.
16      Q    Have you contacted EPR or Highmark for the
17  report?
18      A    I did.  I contacted --
19           MR. FORESTNER:  He's talking about since
20       your last deposition.
21           MR. WILDES:  Correct.
22           THE WITNESS:  Oh.  No.
23           MR. FORESTNER:  I wouldn't have allowed him
24       to do that.
25           THE WITNESS:  No.

1      Q     (By Mr. Wildes) The next item is photographs
2   made of the campus before or after negotiating the, the
3   lease purchase.
4      A     Say it -- can you repeat that?
5      Q     Yeah.  Photographs made of the campus
6   before and after negotiating the lease and purchase
7   of the property.
8      A     Yes.
9      Q     Okay.  Have you since your last deposition
10  found any photographs that would be responsive to our
11  requests for you to produce that?
12     A     I -- photographs, no.  Drone footage.
13           MR. FORESTNER:  We provided the drone
14        footage.
15           THE WITNESS:  Yeah.  I submitted that.
16     Q     (By Mr. Wildes) Have you provided any -- have
17  you found any other drone footage other than the drone
18  footage that was contained in the e-mail -- I mean, not
19  the e-mail, but the YouTube clip --
20     A     Yeah.  Every, every --
21     Q     -- that you all sent us?
22     A     Yeah.  Every -- everything that I had, you
23  know, I forwarded to you all.
24     Q     Okay.
25     A     And that was just during our time of

1  renovation when we had to kind of create -- get

2  drawings.  And I believe I forwarded the drawings as

3  well.

4      Q    Okay.  But specifically about the

5  photographs --

6      A    Mm-hmm.

7      Q    -- other than the drone footage, have you

8  found any other photographs that were taken of the

9  campus before or after negotiating the lease or

10 purchase of the property?

11     A    No.

12     Q    Okay.

13     A    No.

14     Q    Are you still actively looking for those

15 photographs, or have you decided that none exist --

16     A    Yeah.

17     Q    -- and that your testimony was wrong?

18     A    Yeah.  Well, I, I thought that I would

19 actually have photographs of the campus.  But instead

20 of the photographs, it was the drone footage.  So I

21 assumed that they took pictures, but they actually

22 just -- they did photographs.  And, of course, they

23 provided drawings.

24     Q    Okay.  Is it possible that there are

25 photographs of the property before or after, you

1    know, you leased the property or after you purchased

2    the property that you haven't produced to Great

3    American?

4         A    Other than the photographs that are in the,

5    the phase report.

6         Q    No?

7         A    Right.

8         Q    Okay.  The -- you revealed during your last

9    deposition that there was a construction consultant

10   that came out to the property or, or gave you an

11   opinion on the property called FOCC.

12             Do you recall that?

13        A    FOCC.

14        Q    You testified during your last deposition,

15   or the first part of your deposition, that FOCC, a

16   company by that name, was involved in East Point

17   campus in some way.  I think as a construction

18   consultant.  And you agreed to produce documents

19   related to their involvement.

20        A     If there, if there was, if there was

21   documentation that I stated, then for the record I

22   want to retract that because I, I produced all the

23   documentation that I could find.

24        Q    What have you done, if anything, to search

25   for any records from OF -- FOCC?

1      A      Looked through e-mails.

2      Q      Have you contacted them?

3      A      No.

4      Q      Are you still actively looking for any

5  documents?

6      A      I'm actively looking for all documents that

7  I've requested -- that, that Great American requested

8  through my last deposition.

9      Q      So you're still actively looking for

10  documents from FOCC?

11      A      I don't know.  I do not have any

12  documentation from FOCC.

13      Q      Okay.  So you're not actively looking for

14  documents from FOCC?

15      A      No.  I'm actively looking, I'm actively

16  looking for any and all documents.  However, I don't

17  believe I have any documentation from FOCC.

18      Q      What, what -- from, from your first

19  deposition to now, what -- how have you come to that

20  conclusion?

21      A      Through looking through all of the exhibits

22  and being inundated with all of the contractors and

23  folks that were coming out, companies coming out

24  working, giving estimates, et cetera.  It, it was

25  oversight.

1    Q    Okay.  Just to clarify, is it your position
2  now that nobody came out to the property that goes by
3  the name OF -- FOCC, or you just don't have
4  documentation related to their visit to the property?
5    A    Correct.  I don't have documentation.  And
6  I would have to get -- I don't recall FOCC.  That's
7  something that I would have to get back with you on.
8  FOCC.  Cause I don't even, I don't even know that
9  acronym.
10    Q    Okay.
11    A    And because of the timing between my last
12  deposition and today and all of what has occurred,
13  you know, I wouldn't know.
14    Q    Do you know why you would have mentioned
15  that during the first part of your deposition if they
16  actually didn't come out to the property?
17    A    Well, I'm not saying that they did not come
18  out to the property.  I need to research and see
19  exactly what is FOCC.
20    Q    Right.  That's what we --
21    A    Yeah.
22    Q    -- asked you to do after your first
23  deposition.
24    A    Right.  So if --
25          MR. FORESTNER:  We'll look into it.

1          THE WITNESS:  Yeah.

2      Q    (By Mr. Wildes) Next item is records

3  regarding inspections of the buildings in conjunction

4  to accreditation of your, of your school.  As far as I

5  can tell, you haven't produced any records regarding

6  these type of inspections since your last deposition.

7  And you agreed to do so during the deposition.

8          MR. FORESTNER:  He agreed to look.

9          THE WITNESS:  Yeah.

10      Q    (By Mr. Wildes) Have you looked?

11      A    Yes.

12      Q    Okay.  What have you done to, to try to

13  find these inspections?

14      A    Went through sites, reached out --

15      Q    What sites?  And who did you reach out to?

16      A    I reached out to, to Braddy Prep to see if

17  there's any type of booklets or standards that, you

18  know, we can submit to Great American regarding the,

19  the requirements for obtaining accreditation.

20      Q    Did you reach out to anybody else other

21  than Braddy Prep?

22      A    Other than that, I've looked at -- I've

23  researched the online standards and accreditation

24  agencies.

25      Q    Okay.  What sites specifically are you

1   referring to, or are you referring to a number of

2   different sites?  I'm unclear on that.

3       A    Yes.  Georgia Accrediting Commission.

4       Q    Okay.  Anything else?

5       A    Advanced Ed.

6       Q    Okay.  Anything else?

7       A    Southern Association of Colleges and

8   Schools.

9       Q    Okay.  And have you found any records

10  regarding inspections related to accreditation?

11      A    I'm still looking.

12      Q    Okay.  What do you mean by that, you're

13  still looking?

14      A    I'm still looking for official requirements

15  for initial provisional education -- provisional

16  accreditation candidacy accreditation and, and full

17  accreditation.

18      Q    Okay.  So is that what you were referring

19  to in your deposition?  Cause it sounded -- and based

20  on my reading of the testimony, it sounded like you

21  were -- that there were some type of records

22  regarding that inspections -- regarding inspections

23  that were performed so you could get your

24  accreditation.

25           Is that --

1    A    Well, you're talking about then -- well,

2  that's, that's required to obtain accreditation.

3    Q    Okay.  Did any inspection like that ever

4  occur?

5    A    Well, part of that inspection would be

6  obtaining the necessary fire approval; CE -- COs,

7  certificate of occupancies; obtaining clearance for

8  gymnasium; obtaining life safety clearance from the

9  fire department, fire marshal; obtaining all of

10 those.

11        MR. FORESTNER:  The East Point campus

12     hasn't been inspected for accreditation, has it?

13        THE WITNESS:  No.  No.  It hasn't been

14     inspected.  No.

15    Q    (By Mr. Wildes) So if you were to produce

16 something along the lines of that request, it would be

17 something like a pamphlet or a booklet --

18    A    Mm-hmm.

19    Q    -- outlining the inspections that you have

20 to do to get accreditation?

21    A    Correct.

22    Q    But not necessarily records of inspections

23 that were conducted to get the accreditation?

24    A    Correct.

25    Q    Okay.  So that'll lead me into my next

1    question, or -- the next category of documents you

2    agreed to look for was building permits and

3    inspections I think that you mentioned in relation to

4    accreditation, or in relation to something else.

5            Have you found any permits, or, or --

6        A    We produced --

7        Q    -- any inspection reports that you haven't

8    produced?

9        A    Right.  I've produced all reports that I --

10   we've received.

11       Q    Okay.  So you're not actively looking for

12   more building permits or inspection reports?

13       A    We have submitted all of the --

14       Q    Okay.

15       A    -- inspection reports that we've received.

16       Q    The next one, we already touched on this a

17   little bit.  It's records from Go Mo studio, or pro,

18   or LLC, whatever they go by.

19       A    That was submitted to you.

20       Q    Okay.  And that's only the YouTube clip?

21       A    The YouTube clip.

22       Q    That's the only thing we've received.

23       A    You should have received a YouTube clip.

24   You should have received the drawings.  You should

25   have received the invoices that we paid for the

1  drawing services and...

2      Q    Have you received any type of uncut clips

3  from Go Mo?

4      A    What do you mean uncut?

5      Q    So --

6           MR. FORESTNER:  We've requested them.

7      Q    (By Mr. Wildes) -- the video footage that --

8  before they edited it and cut it up to put it into that

9  YouTube video; the raw footage, so to speak.

10     A    Yeah.

11     Q    It probably would have been a lot longer

12  than the 30-second or 20-second video that you all

13  produced.

14     A    No.

15     Q    "No"?

16          You haven't received any of that?

17     A    We don't have it.  Yeah.  And they don't

18  have it.  I reached out to them.  They don't have it.

19     Q    Go Mo doesn't have it?

20     A    Right.

21     Q    Did they tell you why they don't have it?

22     A    They -- they were, they were a small

23  company.  They changed their management.  And they're

24  doing -- they're actually doing something else now

25  related to media production.  So they looked into

1 their system and they just don't, don't have any --

2 anything related to what -- any raw footage or

3 anything.  So what we do have is -- we submitted to

4 you all.

5      Q    Okay.  The next one is records from an

6 expert that Dr. Frazier was unable to name.  Oh, no.

7 I think that you were talking about an expert.  He

8 was paid to assess the damage to East Point campus,

9 but I don't think you could recall his name during

10 the first part of your deposition.  But you did

11 testify to something along the lines that you all did

12 retain some sort of expert to come out and give you

13 an opinion on the property.

14           Do you recall any experts coming out to the

15 property other than maybe Lang and Russ Hart to give

16 you an assessment of the damages to the property?

17      A    It wasn't an assessment of all the damages.

18 And we submitted that.  I don't have his name, but we

19 submitted his invoices that we paid.  And he was an

20 estimator, I believe.  And he --

21      Q    What did he estimate?

22      A    He looked at several buildings as to, you

23 know, what needed to be done.

24      Q    Is this pre wind damage or post wind

25 damage?  By "wind damage," I mean the August 2nd,

1    2018 loss.

2         A    Yeah.  This was post.

3         Q    Okay.  So he came out to the property to

4    give you an opinion on what needed to be done related

5    to the damage to the property?

6         A    Yes.

7         Q    Not general renovations?

8         A    Yes.

9         Q    Okay.  And you can't --

10        A    No, no, no; related to general renovations.

11        Q    So not related to the wind, vandalism, or

12   tree damage?

13        A    No.  Because I specifically asked him if he

14   could do -- give us kind of a breakdown.  And when he

15   looked at various buildings, he was -- he stated that

16   what he would have to -- what he would provide would

17   be to make sure that -- he would provide an on-site

18   service to make sure that the construction companies

19   or the -- whoever the contractors are are doing

20   exactly what they are -- were hired to do, and that

21   would -- that Braddy Prep would be staying within its

22   budget and not going over budget, as well as paying

23   over what it would cost to renovate buildings.

24        Q    Okay.  So he was going to be a project

25   manager of some sort?

1      A      Yeah.

2      Q      Okay.

3      A      A project manager.

4      Q      But did he actually give you an opinion on

5  the work that actually needed to be completed at the

6  property, or did he just say I'll make sure the work

7  gets done, whatever it is?

8      A      No.  He gave -- he spent hours and I

9  submitted that to Great American, along with what he

10 actually stated that he actually went through.

11     Q      So he produced some sort of report for you?

12     A      Mm-hmm.  And we submitted it to Great

13 American.

14     Q      Okay.  And you can't remember his name or

15 the company's name?

16     A      No.  But I can get, I can get it to you.

17     Q      Do you know where that is?

18     A      I'm sure that I could, could get it, get it

19 for you.  We, we submitted it to you all; to Great

20 American.

21     Q      Well, off the top of my head, I can't

22 remember seeing it.  So if it's no trouble to you, if

23 you'll --

24     A      No problem.

25     Q      -- get that and then produce it to your

1 attorney so he can give it to me --

2    A    No problem.

3    Q    -- that would be great.

4         What about the after-school program you

5 discussed during your deposition?  I believe you

6 mentioned there were some records related to that.

7    A    The after-school program?

8    Q    Yeah.

9         Was there an after-school program that was,

10 that was located on the East Point campus at any

11 time?

12    A    What type of after-school program?

13    Q    It might have been affiliated with the

14 YMCA.  I'm not sure.

15    A    That was a summer program.

16    Q    Okay.  Was there any after-school program?

17    A    The -- we negotiated -- we were negotiating

18 an after-school program.  We actually facilitated a

19 summer camp program --

20    Q    Okay.

21    A    -- on campus.

22    Q    When you negotiated the after-school

23 program, what does that mean "negotiated the

24 after-school program"?

25    A    That means that we would be facilitating an

1    after-school program for the YMCA.

2        Q    Okay.  So the negotiations, did they happen

3    over e-mail?  Any other, you know, written, written

4    correspondence associated with that that you would

5    have access to and be able to produce to us?

6        A    I can look and see.  I've looked and I

7    didn't find anything, but I can look and see.

8        Q    Okay.  What did you do to look

9    specifically?  Just go through your e-mails?

10       A    Yeah, go through my e-mails.  The majority

11   of our conversations were face to face with the

12   executive director.  Now, also Fulton Leadership, we,

13   you know, we allowed Fulton Leadership to facilitate

14   an after-school program, so that's why I wanted to be

15   clear when you asked about after-school program what

16   exactly, you know, did I say so that I can make sure

17   that I'm giving you the right, correct, you know,

18   answer as accurate as possible.

19       Q    So did Fulton Leadership, did they ever use

20   the campus to do an after-school program?

21       A    Yes.  They had sports; their basketball

22   team --

23       Q    Other than -- I know they --

24       A    -- after school.

25       Q    Sorry.  I know that they used the gym in, I

1  think, April of 2018.

2      A    April, May.  And I think they went -- they

3  used the gym until the end of school year, so it was

4  not just one month.  They used the gym till the end

5  of school year.  The gym was being -- you know, we

6  were -- we allowed them to facilitate education

7  through both the gym and the -- our -- not soccer;

8  our volleyball court.

9      Q    Okay.

10     A    So we allowed that to happen.  And, also,

11 after school.  They had after-school sports

12 program --

13     Q    In the gym?

14     A    -- so we allowed that to happen.

15     Q    In the gym?

16     A    Yeah, in the gym.

17     Q    Okay.  Is that different than what you --

18 that seems like the same thing to me.

19     A    No.  Physical education is classes and

20 education as well as health education was done in the

21 gym.  We have classrooms in the gym, et cetera.  Then

22 you have auxillary extracurricular activities such as

23 basketball, AAU, those types of leagues.  And they

24 facilitated their after-school sports program there

25 on the campus as well.

1      Q     Okay.  And this was only in -- at the end
2  of the year/spring of 2018 that they did this, or did
3  they --
4      A     This was from April until the end of the
5  school year.
6      Q     And by "the end of the school year," do you
7  mean May?
8      A     Whenever --
9      Q     Or June?
10      A     Probably --
11      Q     Okay.
12      A     I would say June to be on the safe side.
13      Q     Okay.
14      A     Whenever school ends.
15      Q     Right.
16            But it's safe to say that, say, after
17  August going forward, Fulton Leadership never used
18  the school for an after-school program?  I shouldn't
19  say "school."  The campus for an after-school
20  program.
21      A     Correct.
22      Q     Okay.
23      A     I believe so.
24      Q     The -- there's a portion of the property
25  that was deeded.  Actually, it wasn't deeded.  It's

1   owned by AUC, correct --

2        A     Yes.

3        Q     -- right now?

4              And is that intended to be used for

5   behavioral health and primary care outpatient

6   services?

7        A     Yes.  Behavioral health, behavioral health

8   encompasses primary care, but it's intended to be

9   used for a behavioral health learning campus.  That

10  learning campus speaks to kids with special needs and

11  provides groups training life skills, skill

12  development, family training, individual therapy, and

13  play therapy, et cetera, for grades K through 12 as

14  well as post secondary.

15       Q     Okay.  Will it still be used under the name

16  Braddy Prep, or will it be used under another company

17  name?

18       A     It's used under the name of -- I mean, the

19  AUC has allowed Braddy Prep to stay.  The visions --

20  the vision of the AUC aligns with Braddy Prep vision.

21  And so Braddy Prep would be on campus and

22  facilitating its mission.

23       Q     Okay.  But I guess my question is whether

24  the portion of the property that's now owned by AUC,

25  is that going to be used to conduct Braddy

1  Preparatory Academy's customary operations of being a

2  school for kids?

3       A    Mm-hmm.  Being a school for kids with

4  specialized services.

5            MR. WILDES:  Okay.  Yeah.  I don't have

6       anything more right now.

7            MR. DOWLING:  Take a quick break.

8            MR. FORESTNER:  Sure.

9            (Whereupon, a brief recess was taken.)

10                 CROSS-EXAMINATION

11  BY Mr. Dowling:

12       Q    Dr. Braddy, my name is Matt Dowling.  I

13  represent Powers-Leavitt in this.  You've seen me

14  sitting over here quietly the last couple times we've

15  met.  I haven't had an occasion to ask questions yet.

16  Fortunately, I'll hopefully be able to keep this

17  pretty quick since Great American's counsel has kind

18  of covered the bulk of everything.  I got a handful

19  of follow ups from today and a couple of things to

20  clarify from when we last met.

21            One thing today, if you can pull up the

22  Exhibit 124.

23       A    Mm-hmm.

24       Q    And on the second page at the very bottom

25  there's the message that's all underlined?

1        A      Yes.

2        Q      The second sentence in there:  I'm

3   concerned with the way things are going could place

4   the CO in jeopardy as well as increase liability.

5               What's the, what's the CO?

6        A      Certificate of occupancy.

7        Q      Okay.  Did you have a CO at that point?

8        A      Yes.

9        Q      Okay.  I got a little lost on the timeline

10  earlier when you were talking about going to the,

11  going to the East Point campus with Lolethia Chapman

12  versus when you went independently, so I'm going to

13  just try to clarify that just to make sure I have it

14  down right.

15              Did -- so the first time that you and

16  Lothia went --

17              MR. FORESTNER:  Lolethia.

18              MR. DOWLING:  Lolethia.  Okay.  Much

19        better.  Thank you.

20        Q      (By Mr. Dowling) -- went to the campus was

21  April 2018; is that right?  I'm sorry.  Let me clarify

22  that.  With regards to pre and post vandalism claim

23  discovery.

24        A      With regards to pre and post?

25        Q      Right.

1      A      Pre or post?  I'm sorry.  I'm sorry.

2      Q      You were -- the questions earlier were

3  about when you were on the campus and saw it without

4  vandalism or with just --

5      A      Okay.

6      Q      -- you know, the outside AC units missing.

7      A      Okay.  So that was April.

8      Q      Okay.  April of '18.

9             And that -- on that visit, that was you and

10  Lolethia?

11      A      Right.

12      Q      Did you go inside --

13      A      Yes.

14      Q      -- the buildings on that visit?

15      A      Yes.  And we had been -- now, for the

16  record, we -- that was not the first time.  We had

17  actually, you know, been.  This was negotiation.  We,

18  we had already went through and we continued to, but

19  the license to utilize the campus started on April 1

20  in which we had 30 days to --

21      Q      Okay.

22      A      Yeah.

23      Q      So on that April visit, that was -- like

24  once the license agreement was in place, then the two

25  of you went out --

1        A      Sure.

2        Q      -- and walked all of the buildings?

3        A      Sure.

4        Q      And at that point you didn't see any

5    vandalism?

6        A      No.

7        Q      When did you next go to the campus with

8    Lolethia?

9        A      Well, Lolethia had -- she, she came to

10   visit the campus periodically.

11       Q      Okay.

12       A      The next official visit was when I had

13   actually been contacted regarding the vandalism.

14       Q      Okay.

15       A      And at that point I looked at what was

16   presented and I immediately called Lolethia

17   Chapman -- her office is very close to the campus --

18   and asked if she could come over ASAP and meet me

19   because we have, we have a major problem.

20       Q      And so -- okay.  And so that would have

21   been latish September?  I mean, I'm not trying to pin

22   you down --

23       A      Yeah.  I know.

24       Q      -- to some specific date.

25       A      I mean, the dates is all -- it could have

1  been between latter part of September; you know,

2  latter part of September.

3      Q    And you said earlier, I think, that you

4  personally visited the campus --

5      A    Yes.

6      Q    -- four, four times in between those two

7  visits that you went on with yourself and Lolethia;

8  is that right?  Did I get that right?

9      A    I would say approximately four times from

10  when Lolethia and I walked the campus.

11      Q    So about once a month during the summer of

12  2018?

13      A    No.  I wouldn't say once a month.  When the

14  vandalism happened, I visited the campus often.

15      Q    Okay.

16      A    Yeah.  Because we needed to make sure that

17  everything was secure and, you know, that it

18  maintained its, you know, secure -- security.

19      Q    And then did you have an estimate for when

20  you thought the vandalism occurred?

21      A    No.  I would say that we believe that the

22  vandalism occurred between the latter part of -- mid,

23  mid to latter part of August to maybe latter part of

24  September.

25      Q    At that point, was Dr. Frazier still the

1  caretaker or steward at the property?

2      A    I don't, I don't think so.

3      Q    So Keith Hughes had taken over in the

4  steward role at that point?

5      A    I believe Keith maybe started with us in

6  November maybe.  Yeah.

7      Q    So did you have a steward/caretaker person?

8  Was anyone filling that role in -- between mid to

9  late August and late September when the vandalism may

10  have happened?

11      A    Yes.  We had -- well, you know, between,

12  between myself and I believe we had -- just have to

13  think back.  We had someone on the property at all

14  times for the most part, or, or at least in rotation.

15  Let me see here.  Yeah.  So I believe we, we had

16  some, some -- that there was support.  There was,

17  there was someone on the property.

18      Q    Do you know who that would have been

19  between mid August and late September?

20          MR. FORESTNER:  That would have been

21      through November.

22          THE WITNESS:  So between -- we had -- they,

23      they had training.  We had a training.  They

24      were utilizing our -- the, the election -- some

25      election committees were utilizing our library.

1        We allowed them to utilize our library and

2        student center for trainings and, and certain

3        things like that.  The -- that was in September,

4        October, November.

5        Q     (By Mr. Dowling) And how often was the

6   election committee using the library at that point?

7        A     24/7.

8        Q     Do you know if they had someone literally

9   physically on campus in the library 24/7?

10       A     Yeah.  24/7.

11       Q     Other than someone from the election

12  committee in the library, did you at your direction

13  or control have any Braddy Prep employees or another

14  contractor, you know, like a, like a Dr. Frazier;

15  someone that was going to be there on your behalf to

16  keep an eye on the property during that period?

17       A     We actually -- you know, I, I would drive

18  through the property all the time.  Again, we were

19  also still in the process of renovating, so we still

20  had people working, you know, throughout the property

21  renovating.  We had landscapers, lawn care.  I don't

22  know if it's the national -- was it the National

23  Democratic Party, or -- I don't know if it's the

24  national or the state, but it was being utilized.

25  There was heavy traffic throughout that, that time

1    frame.

2         Q    When you say "heavy traffic," what does

3    that mean?

4         A    Heavy traffic, meaning people were there.

5         Q    And did any of those people ever tell you

6    or anyone else affiliated with Braddy Prep that

7    they'd seen anything suspicious --

8         A    No.

9         Q    -- observed any ne'er-do-wells roaming the

10   campus?

11        A    I would go every other day almost to check

12   on the campus.  And there was, there was no other --

13   nothing suspicious.  The --

14            MR. FORESTNER:  Listen to the question.

15            THE WITNESS:  Okay.

16            MR. FORESTNER:  I'm sorry.

17            MR. DOWLING:  I thought he was answering.

18            MR. FORESTNER:  All right.

19            (Whereupon, the court reporter read back

20        the previous question on page 107, line 13.)

21            THE WITNESS:  No.

22        Q    (By Mr. Dowling) And in that period while you

23   were driving through the campus a couple -- how many

24   times a week would you say you would go?

25        A    Probably about -- I can't recall.  Several

 1  times.

 2  　　Q　　Did you ever in your trips through see any

 3  signs of forced entry in any of the buildings?

 4  　　A　　No.

 5  　　Q　　Did you ever see anything that alerted you

 6  or gave, gave rise for you to think, man, somebody

 7  might be breaking into these buildings?

 8  　　A　　No.　That was August, so, no.

 9  　　Q　　Did you have -- in that period, mid to late

10  August through the end of September, did you have

11  anyone that you instructed to regularly inspect each

12  individual building on the campus?

13  　　A　　No.　I was pretty much making sure that

14  everything was intact.

15  　　Q　　And in terms of the renovations at one

16  time, I think you said that that was -- that really

17  entailed getting drawings together, creating,

18  creating plans; is that accurate?

19  　　A　　Getting drawings; creating plans; obtaining

20  certificate of occupancy; obtaining approvals for

21  fire; you know, code upgrades, HVAC renovations,

22  installations --

23  　　Q　　And, and --

24  　　A　　-- et cetera.

25  　　Q　　I'm sorry.　Go ahead.

1          A     Et cetera.

2          Q     And those were the types of renovations

3     that were going on from April --

4          A     Right.

5          Q     -- until late August, mid September?

6          A     (Witness nods head.)

7          Q     So those renovations did not entail having

8     people physically in the buildings, right?  I mean,

9     making a drawing, that's a desk job; cranking out a

10    permit, desk job.

11              So you didn't have folks that were in those

12    buildings physically renovating, right?

13         A     No.  Yes, we did.  We had HVAC system

14    companies inside the buildings.

15         Q     Library?  Admin?

16         A     Library, admin, old main, gymnasium, the

17    apartments.  Yeah.  They were inside.  Every, every

18    contractor for the most part, you know, who actually

19    worked on renovations, they, they were kind of

20    inside.  I mean, you maybe had one that was out.  But

21    even the drawings, they didn't do the drawings from

22    the outside of the buildings.  They actually went

23    into the buildings and, and into every room.

24         Q     Have you produced -- I don't think I've

25    seen those drawings.

1          Have you found those to be able to give to

2     us?

3          A     We forwarded it to Great American.

4                MR. FORESTNER:  I'll, I'll check and see.

5          Q     (By Mr. Dowling) And, if not, can you,

6     please, track those down and get those to Dave for us?

7          A     (Witness nods head.)

8          Q     And you have provided all of the invoices

9     and records --

10         A     Mm-hmm.

11         Q     -- for all of the contractors that were on

12    the campus during that period from April until --

13    April '18 until --

14         A     Yes.

15         Q     -- late summer/early fall of 2018?

16         A     Yes.

17         Q     The folks that came out after you found the

18    vandalism, the Guyco Plumbing and construction, do

19    you remember who you spoke with at that company?

20         A     We got -- his name is Gregory Bryant.

21         Q     Did you have any prior relationship with

22    him?

23         A     Yeah.  I've known him for quite some time.

24         Q     How so?

25         A     He's done -- he would do plumbing and

1   construction work for us.

2       Q     And is the Guyco Plumbing construction

3   company Gregory Bryant's company?

4       A     Yes.

5       Q     Where is he based?

6       A     Well, he's deceased now.

7       Q     Sorry to hear that.

8             Is his company ongoing; do you know?

9       A     I don't know.

10      Q     Do you know how many employees he had?

11      A     I don't know.

12      Q     How many, how many days did it take for

13  Guyco Plumbing and construction to, to clean up after

14  you discovered the vandalism?

15      A     I would say maybe about -- took them maybe,

16  I'm estimating, maybe three -- two, two weeks; maybe

17  two weeks.

18      Q     And how did -- did they invoice you for the

19  work?

20      A     Yes.

21      Q     How did you pay them?

22      A     I don't, I don't remember.  I don't

23  remember.  I'd have, I'd have to check.  I don't know

24  if it was cash or check.

25      Q     Would there be a record of that payment

1    somewhere in your files?

2        A    I can check and see.

3        Q    Okay.  We'd certainly appreciate it if you

4    would.  And, also, I don't believe I've seen an

5    invoice from, from that company either in the

6    contractor documents that you've provided so far.

7        A    I don't know if they, I don't know if they

8    produced that kind -- I don't know if he produced an

9    invoice.

10       Q    We'd certainly appreciate it if you'd check

11   through --

12       A    Mm-hmm.

13       Q    -- all the records related to that as well.

14       A    Sure.

15       Q    Do you remember how much you paid them?

16       A    I don't.

17       Q    Where had -- strike that.

18            Prior to doing the vandalism in mediation,

19   how many times had you engaged Mr. Bryant's Guyco

20   Plumbing and construction company to do work on

21   behalf of either yourself personally or any of the

22   myriad entities that you control?

23       A    Maybe three, three -- maybe three to four

24   years.

25       Q    Where, where did -- like physically which

1   locations did you use them?

2        A    Different, different facilities:  125,

3   Highway 138, Riverdale, 7265 Mt. Zion Road.

4        Q    Any other properties or locations?

5        A    Not that I recall.

6        Q    And I think you said that Keith Hughes did

7   not visit the campus prior to --

8        A    Right.

9        Q    -- the vandalism occurring; is that right?

10       A    Correct.

11       Q    So he only saw it in a post vandalized

12  state?

13       A    Right.

14       Q    Okay.  So did -- post April of 2018, did

15  Braddy Prep ever occupy 1706 Washington Road?

16       A    No.

17       Q    What's your understanding of when Point

18  University left the -- what we're calling the East

19  Point campus?

20       A    I have absolutely no clue when they left.

21       Q    Is it fair to say that when you were in the

22  process of negotiating the lease for the East Point

23  campus Point had, had been out for some time?

24       A    I think, I think it's fair to say that

25  they -- that Point University wasn't -- was no longer

1  occupying East Point campus when I negotiated the

2  lease.

3          MR. DOWLING:  Okay.  Go off the record for

4      a second.

5          (Whereupon, a discussion was held off the

6      record.)

7      Q    (By Mr. Dowling) In terms of procuring

8  insurance for the East Point campus, my understanding

9  is that you delegated that completely to Lorraine

10 Brooks; is that right?

11     A    Yes.

12     Q    And you never personally had any

13 interactions whatsoever with anyone affiliated with

14 Powers-Leavitt Insurance Agency during the time that

15 you were negotiating the lease and procuring

16 insurance?

17     A    I don't know if I spoke with Gizela Evans

18 via phone or not.

19     Q    I know you did afterwards with Russ Hart.

20     A    Yeah.  So I don't recall speaking with her

21 during the -- it was all via, you know, e-mailing,

22 you know, back and forth with landlord, et cetera.

23     Q    And during those -- did you have any

24 insurance-related conversations with the landlord

25 during the period you were working to try to get the

1   policies in place for the East Point campus?

2        A     Not that I, not that I recall.

3        Q     Hand you what we've previously marked as

4   Exhibit 37.  If you will just kind of, you know, take

5   a quick look through -- well, take as much time as

6   you need to review that e-mail correspondence.

7        A     Okay.

8        Q     It does not look to me like you were copied

9   on any of those messages, but I would like to confirm

10  that; you know, if there's a BCC that didn't show up

11  on, you know, the printed copies that we got or

12  anything like that.  I just want to make sure that

13  that is correct and that you were not copied in any

14  way, shape, or form on any of this e-mail

15  correspondence.

16       A     No.  Not that I -- I don't see me being

17  copied on this.

18       Q     And as you're sitting here right now

19  looking at this correspondence, do you recall, you

20  know, other than sitting here right now being

21  provided a copy of it before today?

22       A     A copy of this?

23       Q     Correct.

24       A     No.  I don't recall.

25       Q     And, you know, Lorraine never forwarded you

1  any of the e-mails that are in the body of, you know,

2  the messages that are contained in Exhibit 37?

3       A    From Linda, from Heidi, from Gizela

4  (inaudible).

5            THE REPORTER:  Keep your voice up or just

6       think to yourself cause I'm having a hard time

7       hearing you.

8            THE WITNESS:  Oh, I'm sorry.  I'm just

9       reading.

10           No.  She didn't -- Lorraine didn't forward

11      me anything.

12      Q    (By Mr. Dowling) Yeah.  Just wanted to make

13  sure.

14           And walk me through, you know, the -- at

15  what point during the lease negotiations did the, you

16  know, insurance procurement process start?  And how

17  did you go about communicating to Lorraine what you

18  needed given the lease negotiations?

19      A    Once we received the initial license which

20  was separate from the lease that became a part of the

21  lease --

22      Q    Right.

23      A    -- we -- I gave it to Lorraine and she

24  looked.  And I told her we need to have -- you know,

25  we need to get insurance.  And within the body of the

1   contract was the requirement for the insurance and

2   she sent it over to Gizela Evans.  Gizela Evans maybe

3   called her and -- for some type of verification

4   maybe.

5          MR. FORESTNER:  Don't, don't speculate.

6      Just --

7          THE WITNESS:  Okay.  So I was kind of out

8      of it.  I was being copied on, you know, the

9      communication.  So Gizela added it, added the

10     property as an additional location, and --

11  Q     (By Mr. Dowling) Go ahead.  I'm sorry.

12  A     Go ahead.

13  Q     You can finish.

14  A     To that regard, there were -- there was

15  immediate looping in of EPR, their counsel stating

16  that the required -- clarifying the requirements.

17  Gizela stated that she wanted to know why was the

18  additional buildings needing to be added, needing to

19  be insured.  The EPR landlord counsel stated that

20  this was a true triple net lease and that Braddy Prep

21  was responsible for the entire campus and went ahead

22  to explain the requirements.  And Gizela responded

23  and said that makes sense.  And after that, there was

24  some additional back and forth.  And at the end,

25  Gizela sent over the binder or certificate of

1 insurance to EPR and to Braddy Prep.

2      Q     And you said in there that you were getting

3 copied on the correspondence?

4      A     Yes.

5      Q     What, what correspondence were you being

6 copied on?

7      A     What I've just stated, that was a rundown

8 of the e-mails that was going back and forth between

9 landlord and Gizela.  Gizela wanted clarity for the

10 additional buildings that were not currently going to

11 be occupied, and the landlord explaining to Gizela

12 that this was a true triple net lease, and that

13 Braddy Prep was required to hold -- list them as a

14 hold -- list the landlord as a hold for the entire

15 campus.  And Gizela responded via e-mail and said

16 that makes sense.  And then we received a copy of the

17 certificate of insurance and it was also forwarded to

18 EPR.

19      Q     Yeah.  Well, and my question is when you

20 said you were copied, I'm curious, like, specifically

21 which e-mails and correspondence you were copied on.

22 We just went through Exhibit 37.  You said you didn't

23 receive any of those e-mails at any point, were never

24 forwarded any copy, so I'm --

25           MR. FORESTNER:  Or did you review this

1       later?  That's what he's asking.

2             THE WITNESS:  This, this -- okay.  So I was

3       never forwarded this e-mail.  This e-mail is the

4       latter part of after everything happened.  Of

5       course, the e-mail is dated April 2nd, so this

6       is when everything began to kick off relative to

7       questions and...

8       Q    (By Mr. Dowling) Right.

9             And my question then to you is

10  contemporaneously, you know, on, on April 2nd, you

11  know, were you being copied on or otherwise looped

12  into this ongoing dialogue with Lorraine, Gizela, the

13  folks at EPR?

14      A    Not on April 2nd.

15      Q    At what point were you looped in?

16      A    I don't, I don't know the date, but it's in

17  the record a copy of the e-mail thread.  It was, it

18  was very much so, you know, close, you know, from the

19  date of...

20      Q    I'm going to hand you what we've previously

21  marked as Exhibit 11.  And, again, go ahead and take

22  your time looking back through that.  And, you know,

23  this is more of that correspondence from that same

24  time period.

25      A    Mm-hmm.  Same day.

1      Q    I have not seen, you know, your e-mail
2   address or you copied in any way, shape, or form on
3   those.  And so, again, I'm just trying to get
4   clarity, you know.
5      A    It's the same date, April 2nd.
6      Q    Right.
7      A    I wasn't looped in on April 2nd.
8      Q    And that's what I'm trying to figure out.
9      A    Right.
10     Q    You know, during the whole time that the
11  insurance procurement process was, was happening, I
12  haven't seen any correspondence where you were
13  copied.  And I'm just trying to make sure that that
14  is the universe that we're in and that everything
15  with Braddy Prep procuring insurance, dialoguing with
16  Powers-Leavitt and the landlord is limited to those
17  folks that we can see physically copied on the
18  e-mails that we have all been provided and are in the
19  record.
20     A    For this date, April 2nd?
21     Q    For all of the, the insurance
22  correspondence.
23          I mean, if you -- you know, do you remember
24  being looped into that dialogue --
25     A    Yes.

1      Q      -- at some point?

2              Do you remember when you were looped into

3   that dialogue?

4      A      I'd have to look at the, the exhibits.

5      Q      I'll represent to you, and I think

6   everybody else at the table will represent to you,

7   that we haven't seen anything where you were looped

8   into that dialogue.  So if you, if you were, we'd

9   certainly ask that you go back and, you know,

10  quadruple check your e-mail to see and provide to us

11  when that happened.

12     A      I wasn't a part of April 2nd --

13     Q      Okay.

14     A      -- dialogue and, and any other maybe thread

15  from this same original thread.  Cause this was my

16  directive to Lorraine to reach out to Powers-Leavitt

17  so that we can add the insurance for this location.

18     Q      This one you've just been handed, Exhibit

19  13, again, I'm just -- you know, haven't seen you

20  copied on any of those.  Just want clarity that you

21  did not get somehow blind carbon copied or otherwise

22  forwarded copies of this correspondence at the time

23  that it was happening.

24              MR. FORESTNER:  Okay.  That's on the 27th.

25              Here's Exhibit 40 from the same date.

1      Q    (By Mr. Dowling) Yeah.  And the same

2  questions.  Please take your time and review all of the

3  e-mail threads in this exhibit.  And, again, if there

4  are any of these that you were somehow BCC'd on or

5  otherwise provided a copy of at the time that it was

6  happening, please let us know or confirm that you

7  weren't.

8      A    Okay.

9      Q    So were you contemporaneously copied on any

10  of the e-mails in -- I'm sorry, Dave.  Which exhibit

11  is he on right now?

12         MR. FORESTNER:  He's on 40.

13      Q    (By Mr. Dowling) Yeah.

14         Were you contemporaneously copied or

15  otherwise provided a copy of any of the

16  correspondence in Exhibit 40 contemporaneously --

17      A    I mean, I was provided a copy of, of the

18  communication.

19      Q    When and how?  And to help clarify, I mean,

20  I'm talking about, you know, at the time these

21  e-mails are going around; you know, Friday,

22  April 27th, 2018; you know, April 2nd, 2018.  The

23  dates and times that are captured in the two from

24  CC'd portions of those messages, I'm just trying

25  to --

1        A        Okay.

2        Q        -- clarify if you were at that point in

3    time involved --

4        A        Yeah.

5        Q        -- or copied on these messages?

6        A        I can't, I can't speak to that, you know.

7    If you're asking me if I was notified at 6:25 on

8    April 27th of this actual e-mail, I don't, don't

9    know.

10        Q        Were you notified within 24 hours of that

11    e-mail about the substance of the correspondence?

12        A        I don't, I don't recall.  Not that I

13    recall.

14              MR. FORESTNER:  You want him to have 16

15        now?

16              MR. DOWLING:  Yes, please.

17              MR. FORESTNER:  He's done looking at it.

18        Q        (By Mr. Dowling) Okay.  And, Dr. Braddy,

19    same, same questions.

20              You know, contemporaneously, in close

21    proximity in time with these e-mails being sent and

22    exchanged, were you provided copies or otherwise that

23    involved the substance of the dialogue?

24        A        I mean, I was, was aware of what was going

25    on, but when, when this particular e-mail was sent

1    out, I can't -- I don't recall being notified.  I

2    didn't -- you know, that wasn't required.

3        Q    During, during this period from late March

4    until late April of 2018 when you delegated obtaining

5    insurance coverage for the East Point campus to

6    Lorraine Brooks, did you have any substantive

7    conversations with her about how the insurance

8    procurement process was going?

9        A    Not that I recall.  It's, it's -- it was

10   normal carryout that if, you know, I asked Lorraine

11   to provide -- get insurance or add -- in this case,

12   you know, it was adding an additional location,

13   that's...

14       Q    When you, when you instructed her to get

15   the coverage for the additional location, did you

16   tell her what your plans were for the property?

17       A    Not -- I don't, I don't think I actually

18   sat and said it's going to be, you know, a

19   therapeutic boarding school.  You know, that's not

20   how we -- I give her the directive.  I give her the

21   official contract.  She's very competent.  She reads

22   it and she gets exactly what's required for the

23   insurance.

24       Q    So she handles the administrative

25   component, but you didn't have substantive

1   conversations with her about the plans or development

2   of the East Point campus; is that fair?

3       A    I don't recall having a substantive

4   conversation with her.

5       Q    At the time when or shortly before you

6   instructed Lorraine to get insurance coverage for the

7   new location at the East Point campus, did you tell

8   her that it had been vacant for some time?

9       A    I don't, don't remember.

10      Q    Did you talk to her at all substantively

11  about the development plans that you had for the East

12  Point campus?

13      A    No.  Typically, I don't discuss the

14  development.  Lorraine is competent.  She would, she

15  would read a contract and just follow through and

16  reaching out and giving Gizela, Gizela Evans, which

17  in this case was Braddy Prep, the -- Powers-Leavitt

18  knows Braddy Prep is a school and that this would be

19  Braddy Prep.

20      Q    Was, was Ms. Brooks ever informed that some

21  of the buildings on the East Point campus were not

22  going to be immediately used by Braddy Prep?

23      A    Yes.

24      Q    Do you recall which buildings she was told

25  were not going to be immediately used by Braddy Prep?

1       A     All of the buildings except for the gym,

2  old main/administration, the library.

3       Q     So when she was interacting with Gizela

4  Evans and the landlord, Lorraine knew that those

5  buildings were not going to be occupied and used by

6  Braddy Prep immediately?

7       A     I, I can't -- I don't know if she knew or

8  did not or was unaware of that.  You know, I knew

9  that what -- from what I shared with her was the

10 buildings that I just gave you, those were going to

11 be the immediate phase of our renovations and usage

12 as Braddy Prep and that we are in the process of

13 renovating.  We will be renovating the entire campus.

14           But to let Gizela know that the, the

15 buildings that we need immediately, which was in

16 April, were those buildings that I just listed,

17 which, which would be, in essence, four buildings,

18 but -- it's really three buildings, but an

19 additional.  One building has two addresses.  And

20 that was the library; the admin, which is old main;

21 and the gymnasium.  And that is what we needed for

22 April, beginning of April, while we continued to do

23 due diligence and also negotiate with the current at

24 the time owner of Point campus.

25      Q     During, during that period, late March

1  until late April or early May of 2018, did you

2  personally ever communicate any of that information

3  to anyone at Powers-Leavitt Insurance Agency?

4        A    I don't, I don't remember.

5        Q    We don't --

6        A    Yeah.

7        Q    You don't have --

8        A    Maybe Lorraine.  I don't, I don't, I

9  don't...

10       Q    Well, have you personally communicated any

11  of that to Powers-Leavitt?

12       A    I don't recall.  You know, however, I do

13  recall Lorraine following up with me saying, hey, we

14  have the insurance for -- she would still always

15  follow up to confirm, okay, we have the certificate,

16  you know, for the 30 days and it's been sent to, you

17  know, EPR.  And that's all I'd need from Lorraine.

18       Q    And how would she communicate that to you?

19       A    She'll call or -- yeah.

20       Q    Typically a phone call; not a forwarded

21  e-mail?

22       A    No.  She -- it's typically a phone call.

23  Or if I need her to forward it to me, then I'll say

24  just forward me that e-mail.  But typically I, I

25  don't because I don't like the e-mails to be flooded.

1    And I kind of -- that's her area.  It's her, you

2    know, department.  And she just makes sure that it's,

3    it's done.

4        Q    Did anyone else at Braddy Prep other than

5    Lorraine have any involvement whatsoever in obtaining

6    insurance for the East Point campus?

7        A    No.

8        Q    Okay.  So that was delegated completely to

9    Lorraine?

10       A    Yes.

11            MR. DOWLING:  Have we gone through all the

12       documents that I handed you?

13            MR. FORESTNER:  We've gone through

14       everything you handed me.

15       Q    (By Mr. Dowling) This is Exhibit 18.  Again,

16   just like we did before, I just want to make sure that

17   you weren't copied or otherwise contemporaneously

18   forwarded, you know, any of the messages that are

19   contained in Exhibit 18.

20       A    I'm familiar with, with, with, like, the --

21   all of this communication, the leases being

22   negotiated between Braddy Prep.  That's true triple

23   net lease, as I stated in the beginning.

24       Q    Well, and I'm just curious --

25       A    I'm familiar with every single one of

1   these.  I don't know if they were forwarded to me

2   during this process.  Maybe, maybe during discovery

3   that all of these, you know, were presented to me

4   because the, the actual e-mail I'm very familiar

5   with.  And the thread and the way it went from

6   beginning to end, I'm very familiar with.

7        Q    At the time of the negotiations, though.

8   You know, not sitting here with hindsight and having

9   reviewed stuff to get ready for depositions and, you

10  know, rehashing it as part of your life.  My question

11  is just limited to that, to that point in time.

12       A    I believe it was at the time.  This exhibit

13  that you just presented to me, this was, this was at

14  the time.

15       Q    How was the -- are you looking at 18 right

16  now?

17       A    Yes.

18       Q    How was that presented to you at the time?

19       A    I guess maybe -- I don't know.  I mean, it

20  was, it was -- it could have been forwarded to me.

21       Q    At any point when you may have been

22  involved in the substantive discussions, did you see

23  anything that gave you pause in terms of how the

24  coverage was being procured so that you would

25  instruct Lorraine to change what was happening or

1  that you would reach out to Powers-Leavitt on your

2  own?

3        A     No, not at all, because Powers-Leavitt made

4  it clear that they understood by saying, you know,

5  that makes sense.  And the clear up of the, the

6  entire campus, that was on April 30th at 7:12 from

7  corporate counsel of EPR informing Powers-Leavitt

8  that the lease was negotiated between Braddy Prep and

9  ECS is a true triple net and that we would be leasing

10  the entire property and has the contractual

11  obligation to carry property insurance.

12            And, of course, the response from

13  Powers-Leavitt was:  That makes sense.  I have listed

14  the properties, but some of the addresses are missing

15  on the attached along with building values.  Please

16  send me a copy of the triple net lease so I may send

17  to the carrier for, for their file.

18            And, of course, it continued and they

19  submitted the information that she requested, so I

20  did not see any -- this is how Powers-Leavitt has

21  operated in the past with, with Braddy Prep, you

22  know.

23        Q     If you can go back to Exhibit 37.  And this

24  is earlier.  This is beginning of these conversations

25  on April 2nd.  If you go to the third page, it has a

1    PL 46 down at the bottom.

2         A     Mm-hmm.

3               MR. WILDES:  What exhibit are you on?

4               MR. DOWLING:  37.  37, third page, PL 46.

5         Q     (By Mr. Dowling) See at the top:  Please

6    advise the address the insured is occupying; year

7    built, construction type.

8               Do you see that?

9         A     You said the third page?

10        Q     Yes.  It has a PL 46 at the very bottom,

11   right?

12        A     Mm-hmm.  I see.

13        Q     Heidi, please provide the address of the

14   manager landlord so the policy can be endorsed.  In

15   addition, please provide the address the insured is

16   occupying with the year built, construction type, et

17   cetera?

18        A     Yes.

19        Q     And so that's the predicate for these

20   dialogues we're talking about in Exhibit 18.  And you

21   can see on the front page of Exhibit 37 that the

22   addresses that are provided are for all of the

23   buildings on the campus save maybe a couple that were

24   obviously amended.  All right?

25               So those are the addresses?

1          MR. FORESTNER:  I'm trying to find it.

2          THE WITNESS:  Oh.

3          MR. FORESTNER:  I got it.

4          THE WITNESS:  Is that Exhibit 18?

5          MR. DOWLING:  Well, you were --

6          MR. FORESTNER:  We're on 37.

7          MR. DOWLING:  We're on 37.

8          THE WITNESS:  37.  Okay.  So you're

9    saying --

10    Q    (By Mr. Dowling) Right.

11    A    I'm sorry.

12    Q    Yeah.  No, no.

13         On, on page 3 of Exhibit 37 --

14    A    Yes.

15    Q    -- Gizela asked for the addresses that the

16    insured Braddy Prep would be occupying?

17    A    Mm-hmm.

18    Q    And then if you go to the front page of 37,

19    she's provided this list of multiple buildings.

20         MR. FORESTNER:  What's the question?

21         THE WITNESS:  Okay.

22    Q    (By Mr. Dowling) Right.

23         And so this was the list that was provided

24    to Gizela of the buildings that the insured Braddy

25    Prep was going to be occupying, right?

1          MR. FORESTNER:  Objection to the form of

2     the question.

3     Q    (By Mr. Dowling) You can answer.

4     A    This is the list of the buildings that

5 Braddy Prep would be occupying.  I'm sorry.  One

6 minute.

7          Okay.  I'm sorry, counsel.

8     Q    That's all right.  You were saying that you

9 were getting this correspondence contemporaneously.

10          At any point did you step in to say:  Hey,

11 wait a second, we're not going to be occupying some

12 of these buildings.  We're just going to be using the

13 gym, the library, and the admin building?

14     A    No, because that was already stated.  We

15 were, we were not going to be occupying all of these

16 buildings.  However, we were going to be renovating

17 these buildings and we were going to have total

18 control over these buildings within this -- within

19 that 30-day licensure period.  And so, thus, we

20 needed to have insurance on all of these buildings.

21          So I didn't, I didn't see any issue toward

22 the latter part of April that was explained via the

23 communication throughout the e-mail where once we

24 needed to solidify the lease, the true -- the lease

25 beginning May 1st, that's when Gizela asked about the

1   actual reason that she would have to insure all of

2   the properties, all of the buildings, and not just

3   the three buildings which she knew that we -- in

4   April that we were going to be occupying.

5          So that's the latter part of April Gizela

6   said -- stated via e-mail.  Okay.  Now, why do we

7   need to carry all of these buildings into this May

8   lease?  And they then explained this is a true triple

9   net lease.  And that's when Powers-Leavitt said, that

10  makes sense.

11      Q    After being provided this list on the front

12  of 37 of all the buildings that it was represented

13  Braddy Prep was going to be occupying?

14          MR. FORESTNER:  Objection to the form of

15      the question.

16          THE WITNESS:  When you say -- you're saying

17      that -- we, we were responsible for every single

18      building on this campus when we received that

19      license for 30 days.

20      Q    (By Mr. Dowling) Okay.

21      A    That is what was required.  Powers-Leavitt

22  received a copy of the license.  And Powers-Leavitt

23  read through it and they understood what we were

24  responsible for.  Even within that license it stated

25  what we would actually have access to relative to

1   occupy and relative to securing and due diligence.

2   However, in giving us the possession of the property

3   via the license, we were responsible for the

4   insurance of this entire campus.  And Powers-Leavitt

5   understood that.

6           Powers-Leavitt understood that we were only

7   going to be occupying three buildings; however, we

8   were responsible for all of the buildings while we

9   went through this process of due diligence.  Finally,

10  once we agreed to the contract and we agreed to our,

11  our phases and how we were going to work, we entered

12  into the lease toward the latter part of April in

13  which this insurance coverage was only for 30 days.

14  And we needed to expand to the true lease, which was

15  May.

16          And so Gizela reached back out -- because I

17  believe that this lease had an end -- this, this

18  certificate had an end date.  She reached back out to

19  further clarify that in this true lease for May, why

20  do we have to -- why would Powers-Leavitt have to

21  insure -- or Braddy Prep has to have insurance for

22  the entire campus when we're only utilizing the

23  three?  Once counsel for the landlord explained to

24  Powers-Leavitt, Gizela, she then said that makes

25  sense.

1      Q    I appreciate it.  I'm going to object to

2    the responsiveness of the answer to the extent you're

3    talking about what Powers-Leavitt or Gizela knew, but

4    I appreciate that.  Thank you.

5            Did you rely on Lorraine Brooks to, to

6    handle the insurance side of this part of the lease

7    and license transaction for you?

8      A    Yes.  I, I relied on Lorraine Brooks on my

9    end to, to do so.

10     Q    Did you ever -- were you ever during,

11   during this period -- late March, April, early May --

12   were you personally ever involved in a conference

13   call with Gizela Evans, Lorraine, and any

14   representatives from the landlord?

15     A    I don't, I don't recall.  I don't, I don't

16   recall.

17     Q    Did Lorraine ever tell you about any

18   conference calls that she had with Gizela or the

19   landlord?

20     A    I would -- I don't recall.

21          MR. DOWLING:  What exhibit are we up to?

22     This is going to be new.

23          THE REPORTER:  125.

24     Q    (By Mr. Dowling) Dr. Braddy, take your time

25   and read through this.  I represent to you that this is

1  Braddy Prep's responses and objections to

2  Powers-Leavitt's interrogatories.  These were written

3  questions that through counsel Powers-Leavitt submitted

4  to you; provided answers to your counsel which are

5  memorialized here.  If you would just go ahead and read

6  through, read through these.  I'd certainly appreciate

7  it if you would highlight anything that stands out as

8  improper.

9                    (Whereupon, the court reporter

10                   marked Plaintiff's Exhibit No. 125

11                   for identification.)

12         MR. FORESTNER:  Object to the form of the

13     question.

14         You can keep reading that.  I'm going to

15     step out.

16         (Whereupon, a brief recess was taken.)

17     Q    (By Mr. Dowling) Have you had a chance to

18  read through that?

19     A    Yes.

20     Q    And you see, right, like the very last

21  page -- or, I guess, maybe the last two pages there's

22  a verification.

23         Is that your signature on the very last

24  page?

25     A    Yes.

1          Q      And are all the statements and responses to

2    these interrogatories true and correct?

3          A      Yes.

4                  MR. DOWLING:  I don't have any other

5          questions right now.  Thank you very much.

6                  MR. WILDES:  Can I go to the restroom

7          before --

8                  MR. FORESTNER:  Sure.

9                  MR. WILDES:  -- I start doing follow-ups?

10                 (Whereupon, a brief recess was taken.)

11                     RECROSS-EXAMINATION

12   BY Mr. Wildes:

13         Q      So, Dr. Braddy, you said earlier that you

14   did have -- are we back on the record?

15                 THE REPORTER:  Yes.

16         Q      (By Mr. Wildes) You said earlier that you did

17   have a certificate of occupancy.

18                 Was that only to one address, one building?

19   What did the -- what was it a certificate of

20   occupancy of?

21         A      The certificate of occupancy was for the

22   gym.

23         Q      Okay.  That was the only building that it

24   applied to --

25         A      Right.

1      Q      -- as far as you know?

2      A      And that certificate of occupancy was in --

3  it was in use when we took over.

4      Q      Had, had, had Fulton Leadership --

5      A      Right.

6      Q      -- Academy been using --

7      A      Yes.

8      Q      -- the gym when you all took over?

9      A      Sure.  Yes.

10      Q      So they had a certificate of occupancy

11  previous to your lease or license --

12      A      Yes.

13      Q      -- of the property?

14          And did you ever obtain a certificate of

15  occupancy on any other building on the property?

16  Braddy Prep.

17      A      No.  No.  I applied.

18      Q      And do you know the status of that

19  application?

20      A      Well, we were in the process of obtaining

21  the certificate of occupancy for the various

22  buildings.

23      Q      Has your application been denied?

24      A      No.

25      Q      Okay.

1      A     No.

2      Q     Is it pending?

3      A     It's -- the application is -- the

4  application required additional updates and/or

5  renovations to be completed, so the application

6  process started and we received various inspections.

7  And, again, the fire reports, all those things, those

8  are the things that were required to be submitted for

9  the CO.

10     Q     But as far as the status of your

11  application, is it fair to say it's pending?  It

12  hasn't been denied, but it hasn't been granted; your,

13  your certificate?

14     A     We have not received a denial -- a letter

15  of denial from the City of East Point.

16     Q     Okay.  I don't know if you have the police

17  report handy.  I can't really recall off the top of

18  my head what exhibit this was, but it's the -- should

19  be the only exhibit in the record that is a police

20  report.

21           MR. DOWLING:  There you go.  122.

22           MR. WILDES:  122.

23     Q     (By Mr. Wildes) Okay.  If you want to flip

24  over to the back of the exhibit, just one question.

25  2640 Family House, in my notes I wasn't able to, to

1  locate a building with that, with that address or that

2  nickname, if you will.

3          Can you, can you explain to me what that

4  building is?

5      A    I don't -- it -- I'll have to get back with

6  you and let you know what, what that is.

7      Q    That's fine.

8      A    What house that is.

9      Q    The president's house, we spoke about that

10 briefly at the beginning of your deposition.

11     A    Mm-hmm.

12     Q    What was the condition of the president's

13 house when you -- when Braddy Prep licensed the

14 property in April of 2018?  I believe that would have

15 been included in you and Ms. Chapman's inspection of

16 the property.

17         MR. FORESTNER:  My fault.  I told him to

18     take a bite.

19         THE WITNESS:  I'm sorry.

20         MR. FORESTNER:  He was getting a little --

21     Q    (By Mr. Wildes) Take your time.  I was just

22 trying to get my question out before I forgot it.

23     A    The, the house was -- utilities were on:

24 Lights, water.  The -- it needed to be painted.

25 However, outside of that, that I recall, it was a

1  pretty nice small home that, that was actually in,

2  in -- that was operable.  And the only thing that it

3  needed was cosmetics.

4      Q    Are you aware of the last time that

5  somebody actually lived in the president's house?

6      A    No.

7      Q    Was there any signs of vandalism in the

8  president's house when you and Lorraine -- not

9  Lorraine, but you and Ms. Chapman looked at it in

10  April 2018?

11      A    No.

12      Q    Okay.  No graffiti on the walls or anything

13  like that?

14      A    It could have -- it possibly could have had

15  some graffiti on the wall, but I don't -- I wasn't, I

16  wasn't so focused on graffiti because our plans were

17  to paint anyway and to recarpet, you know.  So the

18  house was a brick house, so --

19      Q    Any signs of forced entry, broken windows;

20  anything like that?

21      A    No.

22      Q    When you first -- let me, let me start off

23  by asking this.  Matt asked you a question related to

24  your inspection of the property with Ms. Chapman

25  pre-lease and license.

1          And you said that you had -- before you
2    leased or licensed the property you had actually
3    inspected the property several times; just not, just
4    not that once --
5          A     Sure.
6          Q     -- around April, correct?
7          A     Sure.
8          Q     Okay.  During any of your inspections of
9    the property, did you, did you ever see anything that
10   looked like maybe the owner before you or the lessee
11   before you was doing any type of projects on the
12   property whether that be small-scale renovations or
13   anything bigger?
14         A     Not that I recall.
15         Q     Are you aware of whether Highmark did any
16   renovations or construction at the East Point campus?
17         A     I was made aware that they actually worked
18   on the gymnasium.
19         Q     Do you know what they did specifically?
20         A     The -- no, not specifically, but --
21         Q     Generally?
22         A     Generally, I would say they, they brought
23   it up to par in order for to meet the standards of
24   acquiring a certificate of occupancy.
25         Q     Okay.  And do you know what that entailed,

1  or you just generally know that that was their final

2  goal --

3       A    Right.

4       Q    -- to get a certificate of occupancy?

5       A    That was their final goal.

6       Q    Okay.  Are you aware of any construction,

7  renovation, improvements, anything like that done by

8  Highmark other than that involving the gym?

9       A    No.

10      Q    Are you aware whether Point University had

11 any ongoing construction projects when they moved out

12 of the property and when Highmark took possession of

13 the property?

14      A    No.  Not that I'm aware of.

15      Q    The, the e-mail that you received from

16 Donna that we talked about earlier in your deposition

17 in which she notified you that Great American was not

18 going to inspect your, your two claims that happened

19 after the August 2nd claim, do you know when about

20 she sent you that e-mail, or when you received that

21 e-mail?

22      A    As soon as I, you know, sent out -- I guess

23 as soon as she was notified.  It wasn't -- it didn't

24 take a long time for her to, to respond.  I don't

25 know exactly when, but it wasn't like a long time

1   before a response back to say that we're, you know,

2   we're not acknowledging anything; you know, we're in

3   litigation right now.

4        Q    Okay.  And this -- just to clarify, this

5   would have been after the series of e-mails that we

6   discussed where the independent adjuster actually

7   tried to go out to the East Point campus and inspect

8   the vandalism, but there was some scheduling --

9             MR. FORESTNER:  I'll object to the form of

10       the question.

11       Q    (By Mr. Wildes) -- but there was some

12   scheduling issues between the adjuster and Russ Hart?

13   Cause based on those e-mails, that occurred shortly

14   after Braddy Prep reported the claim.

15            So my question to you is when, when was

16   this later e-mail from Donna then refusing to do

17   anything related to your vandalism claim and tree

18   claim?

19       A    I, I think it was before.  I, I don't

20   recall.  I think it was before.  I know that Ty, the

21   Great American adjuster, independent adjuster, wasn't

22   available when Braddy Prep's public adjuster Mr. Hart

23   wanted to schedule something; a visit so that they

24   could actually go through the property and, and

25   inspect the property.  And both their schedules were

1    conflicting.  So to that regard, I don't know when --

2    where that plays into the timing of when Donna from

3    Great American stated that we're in litigation and

4    we're going to wait to, you know, to the end to see

5    if you're even covered for us to even, for us to even

6    process your claim.

7         Q    Okay.  Was that an e-mail directly to you,

8    or was it to Russ, or maybe to one of your other

9    attorneys and you were copied on it; do you recall?

10   Cause I'll represent to you I haven't seen an e-mail

11   to that effect.

12        A    It should be in the, it should be in the

13   exhibits.

14        Q    Okay.  But do you know if the e-mail was

15   sent directly to you, or whether you were just copied

16   on the e-mail, or maybe you were not copied in any

17   way on the e-mail and a copy of the e-mail was

18   forwarded to you, or it was actually a letter?

19        A    It -- I would have to -- I don't want to

20   speculate.

21        Q    Okay.

22        A    But I did receive -- Braddy Prep did

23   receive that communication from Great American,

24   Donna, stating that we are currently in litigation.

25   And, in essence, that would not be -- any, any claims

1  would not be, you know, adjusted.

2      Q    Okay.  I think this is maybe my last

3  question.  Matt was asking you questions earlier

4  about whether you notified Great American that Braddy

5  Prep was actually not occupying all the buildings in

6  that list; they were actually only occupying three

7  buildings in that list.  And you said that you didn't

8  because they understood that you were only occupying

9  three buildings.

10     A    Right.

11     Q    Okay.  How, how, how did they understand

12 that?

13     A    Lorraine informed them.

14     Q    Informed who?

15     A    Informed Powers-Leavitt.

16     Q    Okay.  How, how did she inform

17 Powers-Leavitt?

18     A    When she called via phone.

19     Q    Okay.  When did that telephone call take

20 place?

21     A    It took place on or around April the 1st or

22 2nd or...

23     Q    And do you know whether anybody else was

24 involved in that call other than Lorraine and -- I

25 assume it was Gizela at Powers-Leavitt?

1    A    Yeah.  Gizela.

2    Q    Was anybody else involved on that call?

3    A    No.

4    Q    Okay.  Were you involved on that call?

5    A    No.  I, I informed Lorraine exactly what we

6  needed.  And Gizela -- as a matter of fact, when we

7  called back afterwards, it was stated in the

8  deposition that Mr. Hart, Lorraine, myself, I guess,

9  or -- had a conference call with Gizela or something

10 like that along those lines.  Gizela explained to me

11 that our application -- I wanted to know -- I wanted

12 a copy of our application because I was pulling

13 documentation that I needed to be able to submit.

14 And Gizela informed me that there is no application;

15 that our application process is done via phone and,

16 and it's simply by contacting her and she then will

17 add whatever she needs to add to the, the policy

18 or -- and that's done just via phone.

19    Q    Okay.

20    A    So I didn't get an application or

21 anything --

22    Q    Okay.

23    A    -- from, from Powers-Leavitt.

24    Q    How did you learn about the conversation on

25 April 1st between Lorraine Brooks and Powers-Leavitt?

1    A    Lorraine follows up with me and gives me,
2  you know, a report.
3    Q    Okay.  So she called you after she had this
4  conversation and told you what was talked about
5  during the conversation?
6    A    She will give -- I'll -- it's more of kind
7  of an executive report where I will call and say,
8  hey, you know, Lorraine, how is everything going?
9  And just give me an update on all pending issues
10  relative to organization issues.  And then she'll
11  just go down the list and say, you know, we have
12  reached out to Gizela.  She's working on the, the
13  binder.  And that was it.  There was no questions
14  that Lorraine had posed to me from Gizela that would
15  suggest any type of communication that I would need
16  to have made or address.  It was all clear.
17    Q    Okay.  How did the topic of what buildings
18  Braddy was to be occupying and what buildings they
19  weren't going to be occupying, how did that come up
20  in you and Lorraine's conversation after she talked
21  to Powers-Leavitt?  Did you ask her specifically
22  about that?
23    A    No.  But I told her initially this is what
24  we, we need.  We need this to be added.
25    Q    What do you mean by "this"?

1          A       This policy.  We need, we need this

2    location to be added to our policy.  These are the

3    requirements.  I forwarded her the -- gave her the

4    licensure or license agreement.  These are the

5    requirements.  And within that agreement lists

6    exactly what Braddy Prep would be occupying and

7    working inside.  And it list what we would not be, if

8    I'm not mistaken, utilizing, but what we would

9    actually be working via through our due diligence

10   process to get things done and get feasibility

11   analysis and certain things like that.

12         Q       Okay.  I'm still a little unclear.

13             So did she, did she tell you that she told

14   Powers-Leavitt what buildings that Braddy Prep would

15   be occupying and what buildings they wouldn't be

16   occupying, or are you just assuming that she told

17   them that because it was in the license and lease?

18         A       No.  She told me.

19         Q       Okay.

20         A       She told me.

21         Q       And so then my question then was did you

22   ask her about that, or did she just come out and tell

23   you?

24         A       No.  I gave her a directive and, and it was

25   very clear, so she's -- she just went and she said we

1  have the certificate for the, the buildings; the

2  three, the three buildings that would be occupying,

3  and, also, the entire campus.  But it's only for 30

4  days, you know.  She did, thinking back, state that

5  it's only 30 days because Lorraine did -- she doesn't

6  know exactly the entire plan.

7          And so -- and I said, okay, that's fine.

8  That's all we need is for 30 days to see exactly how

9  we're going to, you know, proceed.  And so she read,

10 she read the license.  She knew exactly what it was

11 for.  She may not know the intricate pieces, but

12 that's not for her to know.  Toward the latter part

13 of April, of course, she, she, you know, was in the

14 loop of exactly what was, was going on relative to

15 the true lease.

16          MR. WILDES:  Okay.  I don't think I have

17     anything else.

18          MR. DOWLING:  Just a couple very quick

19     ones.

20              RECROSS-EXAMINATION

21 BY Mr. Dowling:

22     Q    Dr. Braddy, do any of your entities that

23 you're affiliated with -- we've run through them ad

24 nauseam in the course of these couple depositions --

25 still use Powers-Leavitt in any way as an insurance

1    agent?

2         A    Yes.

3         Q    Which, which entities?

4         A    I'm trying to think because I -- we

5    received a -- an e-mail from another insurance agent

6    due to the fact that Powers-Leavitt wanted to

7    transfer our business to another insurance, insurance

8    company/agent.

9         Q    Do you remember when you got that letter?

10        A    We got the letter maybe -- I'm thinking

11   maybe 90 -- less than -- maybe 90 days ago.

12        Q    All right.  Do you know if that -- has that

13   transfer gone through, like --

14        A    I mean, we, we been -- due to the pandemic

15   and all that's been going on, we -- we're looking

16   because we, we been using Powers-Leavitt for years.

17   So, so we're, we're looking:  Education System

18   Management, National Placement Corp, Braddy Prep.  So

19   we just -- we're, we're looking at figuring out how

20   to transition all of our various policies from

21   Powers-Leavitt to another agency, which is kind of

22   not good cause it puts us in a position where we have

23   to, where we have to get copies of every single

24   policy and then we have to begin to, I believe, shop

25   around to where we can have really a one-stop shop

1   who could become familiar with the logistics in what

2   we do.

3        Q     Sounds like a job for Lorraine.

4        A     Yes, it does.  She's -- and she is on it.

5        Q     And for Braddy Prep, the entity, do you

6   know how long Braddy Prep itself had been insured by

7   Great American policy?  Not necessarily this one

8   specifically, but, you know, going back historically.

9        A     I don't know, I don't know how long.  I do

10  know that Powers-Leavitt has been -- they've been

11  providing services for us since maybe two thousand

12  and -- probably over 15 years.

13       Q     Okay.

14       A     They were -- was it Ocoma, Ocoma Insurance

15  Company?  And then they were bought out and it became

16  Powers-Leavitt.  They've done all of our work for us

17  since.  We've never had any, you know, outside,

18  outside company that I know of.

19       Q     No issues with Powers-Leavitt in terms of

20  being your, your agent for all those years?

21       A     No.

22       Q     Had you previously renewed any Great

23  American policy specifically for Braddy Prep?

24       A     Great American refused to renew us.

25       Q     Before, before everything happened at the

 1  East Point campus.

 2       A     I think we renewed every year.  I believe,

 3  I believe we renewed every year.  Gizela would --

 4  Powers-Leavitt would take that -- actually, they

 5  would take that lead to make sure that we were

 6  insured and we had whatever; the policies in place.

 7  That's what Powers-Leavitt would, would do, so --

 8  relative to processing all that stuff.  It's, it's

 9  new to us.

10       Q     In terms of during, during your annual

11  renewals, just walk me through what --

12       A     Annual renewal?

13       Q     Yes.  Yeah.  The annual renewal.  Just kind

14  of walk me through what -- when I say "you," you

15  know, your personal involvement or what Braddy Prep

16  as an entity would have to do during the renewal

17  process.

18       A     So during the renewal process it depends.

19  Braddy Prep, to my knowledge, has only had within its

20  history maybe one, two claims.

21       Q     Okay.

22       A     There's been, I believe, maybe one

23  workman's comp claim.  So we only had the first claim

24  in 2017, and that was Hurricane -- Irma?  Irma or

25  Harvey; one of them.  And we needed to have an

1   emergency evacuation and so it led into, you know,

2   where we are now.

3           But -- so an annual would be a -- we'd get

4   a call from Gizela.  And sometimes Gizela would send

5   out a pre-populated, or she may ask questions via

6   phone.  So it's -- Powers-Leavitt, it's not like --

7   from my perspective, it's kind of uniform.  It was

8   very pick up the phone just like this policy:  Hey,

9   this is what we need.  Okay.

10          It's what we were -- I was informed by

11  Gizela it's just a phone application.  She has the

12  power to bind us and that's it.  And so we'll get on

13  that in 12 months the, the cost of what we've just

14  picked up the phone and said this is what we need.

15  So that's, that's how Powers-Leavitt has worked.

16          Now, there are some applications -- but I

17  don't see those applications.  Lorraine sees those

18  applications -- where it may ask if you've received

19  any losses.  And that's probably, you know, relative

20  to workman's comp, you know, issues or audits or

21  certain things like that.

22          But annually there is no, that I recall,

23  there is no full brand-new application to say, hey,

24  your, your, your insurance policy ends on this date.

25  Fill out this application so that we can reapply, we

1   can shop for better insurance coverage.  It's, it's

2   not -- that's not what Powers-Leavitt has presented

3   to, to our organization.

4        Q    And the policy incident that we're here

5   about, not that one, in the past -- let's back up to

6   2017, 2016, you know, 2015.

7             At any point, you know, in those windows

8   when Braddy Prep was operating largely out of the

9   Moreland location, as I understand it --

10       A    Mm-hmm.

11       Q    -- during the middle of policy period did

12  you have to move locations and add buildings?

13       A    Yes.

14       Q    And did you have any issue with, with that

15  process at that time?

16       A    No.

17       Q    Something you were familiar with and pretty

18  straight through?

19       A    Well, just say when Hurricane Harvey or

20  Irma, whichever one, and we had to evacuate, we

21  went -- in order to get -- it's the middle of the

22  school year.  In order to get a policy -- in order to

23  get a lease, lease once the, the landlord would want

24  to see the lease -- I mean, would want to see a copy

25  of your insurance listing them as a holder.

1          So we had -- we'd just pick up the phone
2    and say this is Washington Road -- I believe someone
3    mentioned that in this deposition, Washington Road --
4    and we need this added as a location.  That happened
5    to be a location; however, we decided not to pursue
6    that lease.  We had, we had -- we received -- we were
7    able to get a better lease that was closer to
8    Moreland Avenue with the school district.
9          But to, to share with you, that's how easy
10   or -- I don't know if it's -- "easy" is the right
11   term, but that is how liberal it has been.  We don't
12   know any other way relative to dealing with
13   Powers-Leavitt.  It was explained to us, to me
14   personally by Gizela, you just pick up the phone and
15   you just tell -- give me the location and the square
16   footage and I can add it as a location as long as
17   it's within the period of the policy.  And it just --
18   it -- there's no signature required; that I
19   immediately go in and bind and she shoots out the
20   certificate, Great American.
21        Q    Okay.
22        A    Okay?  So --
23        Q    No.  That makes sense.  Let me -- so for
24   this one, the policy that we're here talking about,
25   litigating for --

1      A      Sure.

2      Q      -- many months now --

3      A      Mm-hmm.

4      Q      -- did you -- you yourself, Dr. Braddy --

5   read that insurance policy --

6      A      Yes.

7      Q      -- when you got it?

8      A      I did.

9      Q      The whole thing?

10     A      Yes.  Which is quite a difficult read, but

11   I did.

12          MR. DOWLING:  I don't have anymore

13       questions.  Thank you.

14          MR. WILDES:  Okay.  Just a couple more.

15       Sorry.

16              FURTHER RECROSS-EXAMINATION

17   BY Mr. Wildes:

18     Q      So the, the other part of the campus that

19   wasn't -- that isn't owned by AUC, it's owned by

20   D-A-W, or DAW, correct?

21     A      Mm-hmm.

22     Q      Is Braddy Prep any further along in

23   deciding what they're going to do with that portion

24   of the campus?

25     A      Braddy Prep, Braddy Prep has no --

1        Q        Well, sorry.  I'll reask that.

2                 Has DAW decided what they're going to do

3       with that portion of the campus?

4        A        No.

5        Q        Is it going to be used for Braddy Prep in

6       any way?

7        A        Right now it's everything is based on

8       conceptualization and the changes that we've

9       encountered.  We're, we're right now in litigation

10      for two years plus, I feel, you know, and Braddy Prep

11      is -- every day is being, you know, hindered.  And so

12      at some point Braddy Prep will probably have to do --

13      because of this litigation, form its vision to, to

14      grow again --

15       Q        Okay.  But back --

16       A        -- in lieu of, you know, just utilizing an

17      entire campus because of where we are.  We have to

18      now figure out exactly what, what we're going to do

19      and, and how we're going to move forward relative to

20      our expansion.

21       Q        Okay.  But back to my question.

22                 Does Braddy Prep have any plans to use that

23      portion of the campus for anything at this point?

24       A        No.  As I stated, we have to develop a --

25       Q        A "no" is good.

1      A    -- plan to be able to utilize that portion

2   of the campus now because we have been so under

3   duress and strain, so we have to be able to grow.

4   And so I know that that may not -- you're probably

5   wanting a yes-or-no answer to -- but I would have to

6   give you an answer of I don't know at this point

7   because of where we are with this ongoing litigation.

8      Q    Okay.  Makes sense.

9           The last question looking through my notes

10  here, it appears that you were going to look into

11  who -- what Braddy Prep was staffed for the, the

12  after-school program at the gym.  You believed that

13  some Braddy Prep was staffed for that program in some

14  way and you agreed to look into it.

15          Did you find out if any Braddy Prep was

16  staffed for that after-school program?  And, if so --

17     A    The entire Braddy Prep staff would be

18  staffed for that after-school program.  Braddy Prep

19  was slated to have at least 350 to 400 students on

20  that -- on the campus.

21          MR. FORESTNER:  But that never, but that

22      never occurred?

23          THE WITNESS:  Never occurred, so --

24          MR. FORESTNER:  So there was no staff for

25      an after-school program?

1          THE WITNESS:  No.  But the staff that was

2     going to go was --

3     Q     (By Mr. Wildes) Okay.

4     A     -- there, there -- they could not.  Braddy

5  Prep is still on Moreland Avenue.

6          MR. FORESTNER:  Right.

7          THE WITNESS:  So that staff would clearly

8     be a part of the after-school program.  But,

9     however, it's -- the trajectory has changed.

10    Q     (By Mr. Wildes) So just to clarify, I'm only

11 asking about an actual after-school program that

12 actually happened.  And if this helps jog your memory,

13 Mike asked you during your -- the first part of your

14 deposition whether Braddy Prep conducted any programs

15 in the after-school program.  And you said, it was

16 academic enrichment.  And Mike asked, what does that

17 mean?  You said, tutorial, math, science, English, and

18 social studies.  And you said that it lasted for two to

19 three weeks and that it occurred from 3 to 6.  And Mike

20 asked you who was staffed from Braddy Prep in that

21 program.  And you said that you would check on that.

22    A     Okay.

23    Q     So my question to you is did you check on

24 that?  And if you did, what did you find out?

25    A     If it was staffed, it would have been the

1  staff of Braddy Prep.

2      Q    Okay.  But are you unaware whether it was

3  staffed or not?  That seems -- it seems like you kind

4  of are.

5      A    If it was -- no.  I'm not -- if it was

6  staffed, it was staffed by Braddy Prep staff.

7      Q    Okay.

8      A    It wasn't staffed by any others.

9      Q    Okay.  But you're unsure whether it was

10  staffed or not?  Cause you're saying if it was

11  staffed, like there's a possibility that it wasn't.

12      A    No.  It was staffed by Braddy Prep.

13      Q    Okay. So it was --

14          MR. FORESTNER:  Was the staff at Braddy

15      Prep on Moreland Avenue, or was it at the gym?

16          THE WITNESS:  It depends on when.

17      Q    (By Mr. Wildes) After you leased the East

18  Point campus.

19      A    We were still, we were still on Moreland

20  Avenue.

21      Q    Okay.  So was an after-school program ever

22  conducted at East Point campus?

23      A    Yes.  We had -- it, it was, it was a -- it

24  was summer.  It was a summer camp program.

25      Q    Okay.  So it wasn't an after-school

1  program; it was a summer camp program?

2      A     Right.

3      Q     Okay.  And was -- were employees or agents

4  from Braddy Prep staffed at that summer program?

5      A     Yes.

6      Q     Okay.  Who specifically was staffing it?

7      A     Should be on the -- that's what I'll have

8  to get.

9             MR. FORESTNER:  Okay.

10     Q     (By Mr. Wildes) So you're still unaware about

11 staff?

12     A     Yeah.  I would have to -- I don't want to

13 give you any information that's not -- that's, that's

14 incorrect.  I'm even concerned about the after-school

15 program.  I have to go back and, and see exactly what

16 was stated and -- because of the time frame and a

17 time lapse of everything that, you know, that's

18 happened between my last deposition to date, I need

19 to be able to speak to that.

20            MR. FORESTNER:  We'll look into it.

21            MR. WILDES:  Okay.

22            THE WITNESS:  So...

23            MR. WILDES:  I think that's all I got.

24                   RECROSS-EXAMINATION

25 BY Mr. Dowling:

1      Q    Gregory Bryant with Guyco.

2      A    Mm-hmm.

3      Q    Spell his name G-R-E-G-O-R-Y; Bryant,

4   B-R-Y-A-N-T?

5      A    Yes.

6           MR. FORESTNER:  And I think it maybe

7      G-U-Y-C-O; is that correct?

8           THE WITNESS:  G-U-Y-C-O.  Yes.

9           MR. WILDES:  Oh, yeah.

10           MR. DOWLING:  Thank you.  That's all I

11      have.

12           THE WITNESS:  It's in the --

13           MR. FORESTNER:  He'll read and sign.

14           (Deposition concluded at 6:09 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              E R R A T A   P A G E

 2   Pursuant to Rule 30(e) of the Federal Rules of Civil
     Procedure and/or Georgia Code Annotated 9-11-30(e), any
 3   changes in form or substance which you desire to make
     to your deposition testimony shall be entered upon the
 4   deposition with a statement of the reasons given for
     making them.
 5

 6   To assist you in making any such corrections, please
     use the form below.  If supplemental or additional
 7   pages are necessary, please furnish same and attach
     them to this errata sheet.
 8
     I, the undersigned, DR. CARROLL HARRISON BRADDY, hereby
 9   certify under penalty of perjury that I have read the
     foregoing deposition and that said deposition is true
10   and accurate, with the exception of the changes noted
     below, if any.
11

12   Page / Line /        Change        /      Reason

13   ____ / ____ / _____ / _____

14   ____ / ____ / _____ / _____

15   ____ / ____ / _____ / _____

16   ____ / ____ / _____ / _____

17   ____ / ____ / _____ / _____

18   ____ / ____ / _____ / _____

19   ____ / ____ / _____ / _____

20   ____ / ____ / _____ / _____

21   ____ / ____ / _____ / _____

22   ____ / ____ / _____ / _____

23   ____ / ____ / _____ / _____

24   ____ / ____ / _____ / _____

25   ____ / ____ / _____ / _____
```

```
 1   Page / Line /        Change        /        Reason
 2   ____ / ____ / _____ / _____
 3   ____ / ____ / _____ / _____
 4   ____ / ____ / _____ / _____
 5   ____ / ____ / _____ / _____
 6   ____ / ____ / _____ / _____
 7   ____ / ____ / _____ / _____
 8   ____ / ____ / _____ / _____
 9   ____ / ____ / _____ / _____
10   ____ / ____ / _____ / _____
11   ____ / ____ / _____ / _____
12   ____ / ____ / _____ / _____
13   ____ / ____ / _____ / _____
14   ____ / ____ / _____ / _____
15   ____ / ____ / _____ / _____
16   ____ / ____ / _____ / _____
17
18                           _____
                             DR. CARROLL HARRISON BRADDY
19
20   Sworn to and subscribed before me
21   _____,
22   Notary Public, this _____ day of
23   _____, 2020.
24   My commission expires: _____
25
```

Regency-Brentano, Inc.

```
1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF DEKALB:

5              I hereby certify that the foregoing

6         transcript was taken down as stated in the

7         caption, that the witness was first duly sworn,

8         and the questions and answers thereto were

9         reduced to typewriting under my direction; that

10        the foregoing pages 1 through 164 represent a

11        true, correct, and complete transcript of the

12        evidence given upon said hearing, and I further

13        certify that I am not of kin or counsel to the

14        parties in the case; am not in the regular

15        employ of counsel for any of said parties; nor

16        am I in anywise interested in the result of said

17        case.  The witness did reserve the right to read

18        and sign the transcript.

19              This, the 26th day of August, 2020.

20

21

22        _____
                 LOUISE GRIFFITH, CCR-B-2121
23
                 Certified Court Reporter
24

25
```

COURT REPORTER DISCLOSURE


        Pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosure:

        I am a Georgia Certified Court Reporter.  I am here
as a representative of Regency-Brentano, Inc.

        I am not disqualified for a relationship of
interest under the provisions of O.C.G.A. §9-11-28 $^{©}$.

        Regency-Brentano, Inc. was contacted by the offices
of Drew Eckl & Farnham, LLP to provide court reporting
services for this deposition.

        Regency-Brentano, Inc. will not be taking this
deposition under any contract that is prohibited by
O.C.G.A. §15-14-37 (a) and (b).

        Regency-Brentano, Inc. has no exclusive contract to
provide reporting services with any party to the case,
any counsel in the case, or any reporter or reporting
agency from whom a referral might have been made to
cover this deposition.

        Regency-Brentano, Inc. will charge its usual and
customary rates to all parties in the case, and a
financial discount will not be given to any party to
this litigation.


_E. Louise Griffith_

_____
Louise Griffith, CCR-B-2121

**Regency-Brentano, Inc.**

**$**

**$50,000 (1)**
66:17

**A**

**AAU (1)**
97:23
**able (16)**
6:11;21:21;68:12,
13;74:21;80:21,23;
96:5;100:16;110:1;
140:25;148:13;157:7;
160:1,3;163:19
**above (1)**
46:22
**absolutely (1)**
113:20
**AC (12)**
10:1,5,8,9,12,15;
11:9;13:1,12;22:2;
43:22;102:6
**academic (1)**
161:16
**Academy (6)**
4:3;43:13;73:12,12;
77:15;139:6
**Academy's (1)**
100:1
**access (2)**
96:5;134:25
**accreditation (13)**
87:4,19,23;88:10,
16,16,17,24;89:2,12,
20,23;90:4
**Accrediting (1)**
88:3
**accurate (8)**
18:14;47:21;48:21;
59:19,22;60:5;96:18;
108:18
**acknowledge (1)**
11:6
**acknowledged (2)**
9:25;80:11
**acknowledging (2)**
80:1;145:2
**acquiring (1)**
143:24
**acronym (1)**
86:9
**action (5)**
56:9,14,18;79:3,6
**actively (10)**
41:22;81:6;83:14;
85:4,6,9,13,15,15;
90:11
**activities (1)**
97:22
**actual (7)**
27:10,10;81:1;

**123:8;129:4;134:1;
161:11**
**actually (54)**
10:24;11:7;18:6;
20:14;21:2;30:20;
32:1,10;36:6;40:25;
52:5,14,21;53:2;55:3;
57:22;58:4,5;60:24;
61:1;65:4;66:12;
70:16;71:16;75:12;
83:19,21;86:16;
91:24;94:4,5,10,10;
95:18;98:25;102:17;
103:13;106:17;
109:18,22;124:17;
134:25;142:1,5;
143:2,17;145:6,24;
146:18;147:5,6;
150:9;154:4;161:12
**ad (1)**
151:23
**add (8)**
27:1;78:8;121:17;
124:11;148:17,17;
156:12;157:16
**added (6)**
117:9,9,18;149:24;
150:2;157:4
**adding (1)**
124:12
**addition (1)**
131:15
**additional (17)**
21:23;27:2,2;28:17;
34:18;52:4;56:10;
59:18;60:13;117:10,
18,24;118:10;124:12,
15;126:19;140:4
**address (16)**
14:18;51:25;52:2,7,
12;54:2,3;57:1;66:15;
120:2;131:6,13,15;
138:18;141:1;149:16
**addresses (5)**
126:19;130:14;
131:22,25;132:15
**adequate (1)**
48:1
**adjusted (1)**
147:1
**adjuster (14)**
8:14;9:3,16;11:13;
12:3;27:10;41:9;
57:22;58:5;145:6,12,
21,21,22
**admin (6)**
49:16;54:17;
109:15,16;126:20;
133:13
**administration (4)**
34:1,8;35:3;53:10
**administrative (1)**
124:24

**Advanced (1)**
88:5
**advise (1)**
131:6
**advised (1)**
47:19
**affidavit (5)**
56:6;60:3,4;79:11,
14
**affiliated (8)**
29:16,20;66:23;
68:17;95:13;107:6;
114:13;151:23
**after-school (26)**
95:4,7,9,12,16,18,
22,24;96:1,14,15,20;
97:11,24;98:18,19;
160:12,16,18,25;
161:8,11,15;162:21,
25;163:14
**afterwards (5)**
43:11;72:5;80:12;
114:19;148:7
**again (10)**
5:4;15:23;106:18;
119:21;120:3;121:19;
122:3;128:15;140:7;
159:14
**against (2)**
30:18;79:2
**agencies (1)**
87:24
**Agency (4)**
4:4;114:14;127:3;
152:21
**agent (3)**
152:1,5;153:20
**agents (2)**
57:8;163:3
**ago (2)**
46:3;152:11
**agree (2)**
60:6;68:14
**agreeable (1)**
4:17
**agreed (11)**
65:8;80:11,14,18;
84:18;87:7,8;90:2;
135:10,10;160:14
**agreement (4)**
4:9;102:24;150:4,5
**ahead (8)**
28:5;31:15;108:25;
117:11,12,21;119:21;
137:5
**alerted (1)**
108:5
**aligns (1)**
99:20
**allow (2)**
27:2;74:25
**allowed (9)**
73:13,18;81:23;

**96:13;97:6,10,14;
99:19;106:1**
**almost (1)**
107:11
**along (7)**
41:1;89:16;92:11;
94:9;130:15;148:10;
158:22
**although (2)**
33:1;60:25
**always (3)**
69:21,21;127:14
**amended (1)**
131:24
**American (65)**
4:2,24;8:14,23;9:1,
16;10:13,18;11:10;
21:2;22:16,21;27:10;
38:10,12,20,24,25;
39:9,18;40:12,17,24,
25;42:8;54:15,16;
56:16,19,20;57:5;
58:14;59:6,17,21,24,
24;60:10,12,22,25;
62:5;64:15,16,17;
65:5;68:15;77:12;
79:1;84:3;85:7;87:18;
94:9,13,20;110:3;
144:17;145:21;146:3,
23;147:4;153:7,23,
24;157:20
**American's (2)**
58:1;100:17
**amount (5)**
21:9,13;30:15;65:3;
74:10
**analysis (1)**
150:11
**and/or (2)**
38:3;140:4
**annual (4)**
154:10,12,13;155:3
**annually (1)**
155:22
**anymore (2)**
23:23;158:12
**apartment (14)**
18:5;25:2,12,13,16;
27:14;32:25;36:10;
37:9;47:18,25;48:5,7,
8
**apartments (10)**
26:3,6;33:14,22,25;
37:19;48:10,11;
49:24;109:17
**appears (7)**
15:1,5,24;38:23;
45:9;80:14;160:10
**application (14)**
139:19,23;140:3,4,
5,11;148:11,12,14,15,
20;155:11,23,25
**applications (3)**

**155:16,17,18**
**applied (2)**
138:24;139:17
**appreciate (5)**
112:3,10;136:1,4;
137:6
**approval (1)**
89:6
**approvals (1)**
108:20
**approximately (4)**
21:8;70:3;74:13;
104:9
**April (41)**
13:10;97:1,2;98:4;
101:21;102:7,8,19,23;
109:3;110:12,13;
113:14;119:5,10,14;
120:5,7,20;121:12;
122:22,22;123:8;
124:4;126:16,22,22;
127:1;130:6,25;
133:22;134:4,5;
135:12;136:11;
141:14;142:10;143:6;
147:21;148:25;
151:13
**area (2)**
19:1;128:1
**around (10)**
13:9,9;15:19;16:9,
12,13;122:21;143:6;
147:21;152:25
**arrived (2)**
62:19,22
**ASAP (1)**
103:18
**assess (2)**
14:9;92:8
**assessment (2)**
92:16,17
**assist (1)**
75:13
**assistance (1)**
65:6
**associated (1)**
96:4
**Association (1)**
88:7
**assume (2)**
72:16;147:25
**assumed (2)**
11:1;83:21
**assuming (2)**
59:20;150:16
**Assurance (2)**
4:2,24
**attach (2)**
16:23;23:8
**attached (7)**
18:13;22:7;23:6;
26:11;46:25;47:10;
130:15

**attachment (1)**
81:2
**attachments (1)**
16:22
**attempted (3)**
56:9;57:22;58:6
**attempts (1)**
58:1
**attorney (7)**
4:25;8:1;59:11;
61:7;64:15;79:23;
95:1
**attorneys (1)**
146:9
**AUC (5)**
99:1,19,20,24;
158:19
**audits (1)**
155:20
**August (14)**
7:2;40:23;41:18,23;
42:4;92:25;98:17;
104:23;105:9,19;
108:8,10;109:5;
144:19
**auspices (1)**
68:15
**auxiliary (1)**
97:22
**available (1)**
145:22
**Avenue (4)**
157:8;161:5;
162:15,20
**avoid (3)**
5:12;6:6;28:17
**aware (20)**
9:4,13;20:4;40:7;
41:9,15;42:20;43:18;
44:6;59:6,10;72:10;
79:1;123:24;142:4;
143:15,17;144:6,10,
14

**B**

**back (36)**
5:25;16:19;21:16;
33:1,14;35:8;46:18;
49:4;55:7;60:18;
71:15;72:4;78:1;81:1;
86:7;105:13;107:19;
114:22;117:24;118:8;
119:22;121:9;130:23;
135:16,18;138:14;
140:24;141:5;145:1;
148:7;151:4;153:8;
156:5;159:15,21;
163:15
**Bagley (2)**
8:1,1
**ball (1)**
7:16
**barrel (1)**
74:22
**based (11)**
16:2;26:4;38:23;
45:9;68:11;72:21;
73:19;88:19;111:5;
145:13;159:7
**basis (1)**
56:15
**basketball (2)**
96:21;97:23
**bathrooms (1)**
77:22
**BCC (1)**
115:10
**BCC'd (1)**
122:4
**became (2)**
116:20;153:15
**become (2)**
30:21;153:1
**began (7)**
9:6;13:25;31:5;
42:12,23;43:7;119:6
**begin (1)**
152:24
**beginning (8)**
10:10;65:5;126:22;
128:23;129:6;130:24;
133:25;141:10
**behalf (2)**
106:15;112:21
**behavioral (4)**
99:5,7,7,9
**behind (1)**
50:19
**bell (1)**
65:20
**Besides (1)**
43:22
**best (2)**
5:12;6:6
**better (4)**
15:17;101:19;
156:1;157:7
**beyond (12)**
35:13,23,25;36:12,
18,24,25;37:5,15,18,
22;38:1
**bids (1)**
64:21
**big (2)**
50:17;74:18
**bigger (1)**
143:13
**bind (2)**
155:12;157:19
**binder (2)**
117:25;149:13
**bit (3)**
63:12;71:11;90:17
**bite (1)**
141:18
**blind (1)**
121:21
**blue (1)**
28:1
**board (7)**
21:21;27:1,1,5;
31:17,22;32:14
**boarded (7)**
28:15;31:1,14,16;
32:15;33:4,12
**boarding (1)**
124:19
**boards (4)**
31:3,6,10,14
**body (5)**
6:9;35:11,12;116:1,
25
**booklet (1)**
89:17
**booklets (1)**
87:17
**both (6)**
5:12;34:8;58:11;
79:17;97:7;145:25
**bottom (5)**
48:20;50:9;100:24;
131:1,10
**bought (1)**
153:15
**Braddy (105)**
4:3,5,18,23;6:24,
25;14:15;36:19;37:1,
23;38:19;39:8,19;
40:11;41:5;43:12,19,
23;44:8,23;49:6;56:9;
61:3;66:21;68:17,17,
22;72:16;77:2;78:6;
79:2;87:16,21;93:21;
99:16,19,20,21,25;
100:12;106:13;107:6;
113:15;117:20;118:1,
13;120:15;123:18;
125:17,18,19,22,25;
126:6,12;128:4,22;
130:8,21;132:16,24;
133:5;134:13;135:21;
136:24;137:1;138:13;
139:16;141:13;
145:14,22;146:22;
147:4;149:18;150:6,
14;151:22;152:18;
153:5,6,23;154:15,19;
156:8;158:4,22,25,25;
159:5,10,12,22;
160:11,13,15,17,18;
161:4,14,20;162:1,6,
12,14;163:4
**brand-new (1)**
155:23
**break (4)**
6:15,19;49:1;100:7
**breakdown (1)**
93:14
**breaking (1)**
108:7
**Brick (3)**
63:15,16;142:18
**brief (4)**
49:3;100:9;137:16;
138:10
**briefly (2)**
5:4;141:10
**broken (3)**
78:13,18;142:19
**broker (2)**
12:18;40:18
**Brooks (11)**
68:25,25;69:5;
70:24;71:3;114:10;
124:6;125:20;136:5,
8;148:25
**Brooks' (1)**
79:14
**brought (4)**
70:7,8,12;143:22
**Bryant (3)**
110:20;164:1,3
**B-R-Y-A-N-T (1)**
164:4
**Bryant's (2)**
111:3;112:19
**bucket (1)**
77:20
**buckets (1)**
74:21
**buckle (1)**
76:19
**budget (2)**
93:22,22
**building (41)**
21:18,20;25:12,25;
27:14;28:16;31:23,
25;34:1,7,8;44:2;
49:16;51:15;52:5,13;
53:11;54:18,25;
62:23;63:6,6,12,13;
64:3;71:15,16,18,22;
90:2,12;108:12;
126:19;130:15;
133:13;134:18;
138:18,23;139:15;
141:1,4
**buildings (116)**
7:21,23;8:16,20;
9:24;10:4,24;11:22,
23,25;12:14;13:3;
18:5,11;23:3;24:25;
25:2,10,14,16,22;
26:4;28:19,22;29:15;
31:2,9,12,13,20;32:1,
2,4,5,7,8,10,11,11,12,
13,16,20,22,23,24;
33:1,6;36:9,10;47:16,
20,22;48:17;49:14;
51:17,21;52:1;53:14,
15,20;54:22;65:2;
66:18;71:12;78:3;
87:3;92:22;93:15,23;
102:14;103:2;108:3,
7;109:8,12,14,22,23;
117:18;118:10;
125:21,24;126:1,5,10,
15,16,17,18;131:23;
132:19,24;133:4,12,
16,17,18,20;134:2,3,
7,12;135:7,8;139:22;
147:5,7,9;149:17,18;
150:14,15;151:1,2;
156:12
**built (2)**
131:7,16
**bulk (1)**
100:18
**Burns (8)**
32:25;33:13;49:9;
50:24;53:8,8,9,10
**business (1)**
152:7

**C**

**call (11)**
127:19,20,22;
136:13;147:19,24;
148:2,4,9;149:7;
155:4
**called (12)**
8:12;18:1,7;41:2;
67:2;71:1;84:11;
103:16;117:3;147:18;
148:7;149:3
**calling (1)**
113:18
**calls (1)**
136:18
**came (23)**
28:13,14;29:14,14;
30:4;31:1,15;36:5;
48:13;55:18;58:5;
65:16,24;66:12;69:9;
70:18,21;77:4;84:10;
86:2;93:3;103:9;
110:17
**camera (1)**
17:5
**camp (3)**
95:19;162:24;163:1
**campus (86)**
8:3,4;18:10;21:18;
25:14;33:6;40:19;
43:19;44:2;45:11;
50:12;51:4,25;52:3,7,
8,10;53:7,12;54:5;
72:10;82:2,5;83:9,19;
84:17;89:11;92:8;
95:10,21;96:20;
97:25;98:19;99:9,10,
21;101:11,20;102:3,
19;103:7,10,17;104:4,

10,14;106:9;107:10,
12,23;108:12;110:12;
113:7,19,23;114:1,8;
115:1;117:21;118:15;
124:5;125:2,7,12,21;
126:13,24;128:6;
130:6;131:23;134:18;
135:4,22;143:16;
145:7;151:3;154:1;
158:18,24;159:3,17,
23;160:2,20;162:18,
22
**can (63)**
6:1,17,22;7:6,8;
15:23;16:18;25:10;
26:4;28:3;30:1,15;
32:19,21,24;35:6,6;
39:13;40:3;45:5;48:1,
1;49:1;53:15;55:1;
58:2;61:18,18,20;
62:21;71:11;73:22,
24;74:21,22;80:15;
82:4;87:5,18;94:16,
16;95:1;96:6,7,16;
100:21;110:5;112:2;
117:13;120:17;
121:17;130:23;
131:14,21;133:3;
137:14;138:6;141:3,
3;152:25;155:25;
156:1;157:16
**candidacy (1)**
88:16
**captured (1)**
122:23
**car (1)**
51:11
**carbon (1)**
121:21
**card (1)**
52:19
**care (4)**
75:24;99:5,8;
106:21
**caretaker (1)**
105:1
**carpet (2)**
73:18;77:21
**carrier (4)**
8:7;72:3,7;130:17
**CARROLL (4)**
4:18;6:24;46:21;
47:19
**carry (2)**
130:11;134:7
**carryout (1)**
124:10
**case (9)**
4:2;20:3;51:8;
52:15,18;59:19;
70:12;124:11;125:17
**cash (1)**
111:24

**category (1)**
90:1
**cause (12)**
30:14;42:3;61:14;
71:19;86:8;88:19;
116:6;121:15;145:13;
146:10;152:22;
162:10
**caused (4)**
63:7;76:18;77:15,
25
**CC'd (1)**
122:24
**CE (1)**
89:6
**ceiling (3)**
19:2,3;46:23
**ceilings (7)**
19:15;20:1;26:23;
27:5,9;54:6,24
**cell (5)**
17:4,6,7,11;24:2
**center (1)**
106:2
**certain (3)**
106:2;150:11;
155:21
**certainly (4)**
112:3,10;121:9;
137:6
**certificate (19)**
89:7;101:6;108:20;
117:25;118:17;
127:15;135:18;
138:17,19,21;139:2,
10,14,21;140:13;
143:24;144:4;151:1;
157:20
**cetera (7)**
85:24;97:21;99:13;
108:24;109:1;114:22;
131:17
**chain (1)**
72:15
**chance (1)**
137:17
**change (1)**
129:25
**changed (2)**
91:23;161:9
**changes (1)**
159:8
**changing (1)**
14:6
**Chapman (14)**
12:19;13:18,21;
15:4;17:21;22:4;24:5;
41:8;44:1,15;101:11;
103:17;142:9,24
**Chapman's (1)**
141:15
**check (10)**
23:25;107:11;

110:4;111:23,24;
112:2,10;121:10;
161:21,23
**City (1)**
140:15
**Civil (1)**
4:8
**claim (44)**
7:22;8:6;11:5,10;
20:12;21:1,1;27:12,
13;30:7,9;39:10,15,
18;41:6;56:15;57:23;
58:6,15;60:11,11;
61:2;66:7;67:13,20,
22,22;68:20,20;70:13,
24;71:3;72:3,11;
77:12,12;101:22;
144:19;145:14,17,18;
146:6;154:23,23
**claims (16)**
56:10,13,17;59:7,
18,22,25;60:13,13;
61:10;68:23,24;
70:10;144:18;146:25;
154:20
**clarify (12)**
27:19;37:16;55:9;
86:1;100:20;101:13,
21;122:19;123:2;
135:19;145:4;161:10
**clarifying (1)**
117:16
**clarity (3)**
118:9;120:4;121:20
**classes (1)**
97:19
**classrooms (1)**
97:21
**clean (4)**
28:10;29:14;77:19;
111:13
**cleaned (3)**
27:7;28:13;30:23
**cleanup (1)**
26:22
**clear (10)**
6:14;11:3;19:6,7;
79:21;96:15;130:4,5;
149:16;150:25
**clearance (2)**
89:7,8
**clearly (3)**
6:11;75:22;161:7
**clip (4)**
82:19;90:20,21,23
**clips (1)**
91:2
**close (4)**
18:6;103:17;
119:18;123:20
**closer (1)**
157:7
**Cloud (2)**

17:14,15
**clue (1)**
113:20
**CO (4)**
101:4,5,7;140:9
**code (1)**
108:21
**Colleges (1)**
88:7
**coming (4)**
51:10;85:23,23;
92:14
**Commission (1)**
88:3
**committee (2)**
106:6,12
**committees (1)**
105:25
**communicate (5)**
57:8;66:25;70:23;
127:2,18
**communicated (4)**
11:14;57:9;66:19;
127:10
**communicating (1)**
116:17
**communication (7)**
57:14;117:9;
122:18;128:21;
133:23;146:23;
149:15
**communications (2)**
79:22,25
**comp (2)**
154:23;155:20
**companies (10)**
64:25;66:4,11,19;
67:1,18;68:17;85:23;
93:18;109:14
**Company (27)**
4:2,24;29:1,2,3,17,
20;36:5,7;37:7;39:11;
51:9;65:8,10;66:23;
68:13;84:16;91:23;
99:16;110:19;111:3,
3,8;112:5,20;153:15,
18
**company/agent (1)**
152:8
**company's (1)**
94:15
**competent (2)**
124:21;125:14
**completed (5)**
34:13;38:3;55:4;
94:5;140:5
**completely (3)**
5:16;114:9;128:8
**component (1)**
124:25
**comprehensive (1)**
65:4
**computer (1)**

17:12
**conceptualization (1)**
159:8
**concerned (2)**
101:3;163:14
**concluded (1)**
164:14
**conclusion (1)**
85:20
**condition (3)**
14:6,9;141:12
**conditional (2)**
24:19;43:4
**conduct (3)**
41:3;75:18;99:25
**conducted (4)**
12:19;89:23;
161:14;162:22
**conference (3)**
136:12,18;148:9
**confirm (3)**
115:9;122:6;127:15
**confirmed (1)**
80:4
**conflicting (1)**
146:1
**conjunction (1)**
87:3
**considered (1)**
44:4
**Considering (2)**
46:3,16
**Construction (14)**
29:11;84:9,17;
93:18;110:18;111:1,
2,13;112:20;131:7,
16;143:16;144:6,11
**consultant (2)**
84:9,18
**contact (4)**
67:17,20;68:16;
76:6
**contacted (5)**
81:13,16,18;85:2;
103:13
**contacting (1)**
148:16
**contain (1)**
44:10
**contained (5)**
24:21;71:20;82:18;
116:2;128:19
**containing (1)**
75:4
**containment (1)**
75:3
**contemporaneously (7)**
119:10;122:9,14,
16;123:20;128:17;
133:9
**continuation (1)**
4:4
**Continued (4)**

4:21;102:18;
126:22;130:18
**contract (4)**
117:1;124:21;
125:15;135:10
**contractor (6)**
63:21,21;64:22;
106:14;109:18;112:6
**contractors (5)**
67:18;76:7;85:22;
93:19;110:11
**contractual (1)**
130:10
**control (3)**
106:13;112:22;
133:18
**conversation (7)**
5:7;7:18;125:4;
148:24;149:4,5,20
**conversations (5)**
96:11;114:24;
124:7;125:1;130:24
**copied (25)**
15:5;26:15;38:21;
57:10;115:8,13,17;
117:8;118:3,6,20,21;
119:11;120:2,13,17;
121:20,21;122:9,14;
123:5;128:17;146:9,
15,16
**copies (4)**
115:11;121:22;
123:22;152:23
**copper (2)**
46:23;54:6
**copy (20)**
54:11,14,14,16;
56:2;79:12,13;
115:21,22;118:16,24;
119:17;122:5,15,17;
130:16;134:22;
146:17;148:12;
156:24
**corner (1)**
45:14
**Corp (1)**
152:18
**corporate (1)**
130:7
**correctly (1)**
75:25
**correspondence (18)**
11:17;14:17;67:4;
71:7;96:4;115:6,15,
19;118:3,5,21;
119:23;120:12,22;
121:22;122:16;
123:11;133:9
**COs (1)**
89:6
**cosmetics (1)**
142:3
**cost (6)**

66:16;67:8,11,15;
93:23;155:13
**counsel (3)**
61:4;80:7;100:17;
117:15,19;130:7;
133:7;135:23;137:3,4
**counsel/Great (1)**
22:16
**count (1)**
80:7
**County (2)**
34:11,12
**couple (10)**
12:3;30:12;38:22;
100:14,19;107:23;
131:23;151:18,24;
158:14
**course (6)**
83:22;119:5;
130:12,18;151:13,24
**court (10)**
5:8;6:10;14:19;
39:3;44:20;58:20;
72:17;97:8;107:19;
137:9
**coverage (6)**
124:5,15;125:6;
129:24;135:13;156:1
**covered (4)**
74:15,18;100:18;
146:5
**cracked (1)**
78:16
**cranking (1)**
109:9
**create (1)**
83:1
**creating (3)**
108:17,18,19
**crew (6)**
26:22,24;27:4;28:9;
29:1,12
**CROSS-EXAMINATION (2)**
4:21;100:10
**crosstalk (1)**
5:10
**curious (2)**
118:20;128:24
**current (6)**
30:19;36:8;56:14,
18,25;126:23
**currently (8)**
30:17;36:7;37:4;
38:2,2;56:21;118:10;
146:24
**customary (1)**
100:1
**cut (3)**
5:14;34:25;91:8

**D**

**damage (63)**

7:19,22;8:15,23,25;
9:4;18:15,19;21:23;
23:13;27:3,12,12,13;
28:12;29:25;30:24;
41:1,1;44:2,13,14;
46:23;54:9;56:11;
61:5,23;62:21;63:1,5,
12,14,15,16;64:2,7,
18;65:1;70:11;71:5,8;
72:12,22;73:2,9,15,
17;75:1,1;76:8;77:15,
18,22,24;78:9,11,21;
92:8,24,25,25;93:5,12
**damaged (6)**
42:22,23;43:11;
46:22;48:17;54:24
**damaged/broken (1)**
63:8
**damages (14)**
28:18;48:19,22;
54:4;60:23,25;65:9;
68:14,23;72:9,11;
75:22;92:16,17
**date (31)**
4:9;11:24;15:19;
16:3,9,10;39:14,23;
40:11,16,23;45:23,24,
25;51:4,5,5;62:1,5;
69:16,17;71:25;
103:24;119:16,19;
120:5,20;121:25;
135:18;155:24;
163:18
**date/time (1)**
45:14
**dated (1)**
119:5
**dates (3)**
15:22;103:25;
122:23
**Dave (4)**
4:11;56:1;110:6;
122:10
**DAW (2)**
158:20;159:2
**D-A-W (1)**
158:20
**day (9)**
40:8,16;55:13;
61:25;62:16,22;
107:11;119:25;
159:11
**days (11)**
40:9;52:21;102:20;
111:12;127:16;
134:19;135:13;151:4,
5,8;152:11
**deal (1)**
55:8
**dealing (1)**
157:12
**dealt (1)**
68:3

**debris (5)**
26:23;27:8,17;
28:10,11
**deceased (1)**
111:6
**December (1)**
60:3
**decided (3)**
83:15;157:5;159:2
**deciding (1)**
158:23
**declaration (2)**
80:2,4
**declaratory (1)**
79:2
**deeded (2)**
98:25,25
**defining (1)**
78:12
**definitely (1)**
53:12
**delegated (3)**
114:9;124:4;128:8
**Democratic (1)**
106:23
**denial (2)**
140:14,15
**denied (2)**
139:23;140:12
**dent (1)**
34:24
**department (3)**
52:11;89:9;128:2
**depends (2)**
154:18;162:16
**depict (1)**
42:21
**depicting (1)**
25:17
**depose (1)**
5:15
**deposition (33)**
4:5,8;5:1,3,22;6:4,
25;55:12;80:10,12,
17;81:20;82:9;84:9,
14,15;85:8,19;86:12,
15,23;87:6,7;88:19;
92:10;95:5;141:10;
144:16;148:8;157:3;
161:14;163:18;
164:14
**depositions (2)**
129:9;151:24
**describe (4)**
7:6;54:21;62:21;
73:22
**described (10)**
36:18;37:1,18,19,
20,22;38:5;55:11;
67:19;80:17
**description (2)**
48:2;66:14
**design (1)**

34:22
**desk (2)**
109:9,10
**detail (1)**
7:8
**determine (1)**
37:17
**develop (1)**
159:24
**development (4)**
99:12;125:1,11,14
**diagram (5)**
53:7,11,18;55:2,5
**dialogue (6)**
119:12;120:24;
121:3,8,14;123:23
**dialogues (1)**
131:20
**dialoguing (1)**
120:15
**differ (1)**
21:11
**differed (1)**
21:12
**different (9)**
6:1;19:8;36:13;
41:4;51:20;88:2;
97:17;113:2,2
**difficult (1)**
158:10
**diligence (4)**
126:23;135:1,9;
150:9
**direction (1)**
106:12
**directive (3)**
121:16;124:20;
150:24
**directly (6)**
26:16;57:7,10,12;
146:7,15
**director (3)**
70:9,22;96:12
**disclosure (1)**
10:20
**discovered (2)**
11:18;111:14
**discovery (4)**
4:6;79:7;101:23;
129:2
**discuss (1)**
125:13
**discussed (2)**
95:5;145:6
**discussion (1)**
114:5
**discussions (1)**
129:22
**dispatched (1)**
53:2
**displayed (3)**
46:21;47:2,4
**district (1)**

157:8
**document (5)**
22:20;43:4,6,9;59:3
**documentation (22)**
13:16;35:18;37:13,
14;38:11;42:6,11,15,
16,17,20;64:21;
75:10;76:2;77:6;
84:21,23;85:12,17;
86:4,5;148:13
**documented (2)**
35:22;37:6
**documents (14)**
38:14,17;43:1;
80:10,13;84:18;85:5,
6,10,14,16;90:1;
112:6;128:12
**Dodson (5)**
32:25;33:13;47:16;
49:23;50:1
**done (30)**
34:13,15;43:12,12,
15,16,17;72:22;73:9;
75:16;76:2,13,15;
78:9,11;81:9;84:24;
87:12;92:23;93:4;
94:7;97:20;110:25;
123:17;128:3;144:7;
148:15,18;150:10;
153:16
**Donna (8)**
57:5,6,14;60:16;
144:16;145:16;146:2,
24
**dorm (1)**
50:19
**dormitories (7)**
25:11,12;26:6;
33:15;49:18,24;60:18
**dormitory (7)**
10:24;25:2,3,18,22;
26:3;33:6
**double-sided (1)**
28:3
**DOWLING (39)**
4:17;100:7,11,12;
101:18,20;106:5;
107:17,22;110:5;
114:3,7;116:12;
117:11;119:8;122:1,
13;123:16,18;128:11,
15;131:4,5;132:5,7,
10,22;133:3;134:20;
136:21,24;137:17;
138:4;140:21;151:18,
21;158:12;163:25;
164:10
**down (11)**
5:9;6:11;26:24;
55:1;63:9;76:18;
101:14;103:22;110:6;
131:1;149:11
**Dr (24)**

4:5,18,23;6:25;
14:15;15:4;16:5;
38:19;39:8;44:23;
49:6;70:17,19;72:16;
78:6;92:6;100:12;
104:25;106:14;
123:18;136:24;
138:13;151:22;158:4
**drawing (2)**
91:1;109:9
**Drawings (10)**
33:22;83:2,2,23;
90:24;108:17,19;
109:21,21,25
**drip (2)**
73:18;75:1
**dripped (1)**
76:18
**dripping (2)**
74:8;76:17
**drive (1)**
106:17
**driving (1)**
107:23
**drone (2)**
33:22;82:12,13,17,
17;83:7,20
**drywall (2)**
46:23;54:6
**due (11)**
7:20;35:5;60:17;
63:18;65:1;126:23;
135:1,9;150:9;152:6,
14
**duly (1)**
4:19
**duress (1)**
160:3
**during (55)**
5:3;6:25;12:7,24;
13:3,12;14:3,4;21:10,
17,20;22:3;23:7;20;
24:3;42:8;55:12,17;
69:18;70:2;73:10;
80:9,17;82:25;84:8,
14;86:15;87:7;92:9;
95:5;104:11;106:16;
110:12;114:14,21,23,
25;116:15;120:10;
124:3,3;126:25,25;
129:2,2;136:10,11;
143:8;149:5;154:10,
10,16,18;156:11;
161:13

**E**

**earlier (13)**
14:4;44:9;47:1;
76:24;79:11;101:10;
102:2;104:3;130:24;
138:13,16;144:16;
147:3

early (3)
41:22;127:1;136:11
**easier (1)**
55:1
**East (28)**
8:3;43:19;44:2;
45:10;66:7;72:10;
84:16;89:11;92:8;
95:10;101:11;113:18,
22;114:1,8;115:1;
124:5;125:2,7,11,21;
128:6;140:15;143:16;
145:7;154:1;162:17,
22
**easy (3)**
53:16;157:9,10
**ECS (1)**
130:9
**Ed (1)**
88:5
**edited (1)**
91:8
**education (7)**
73:14;88:15;97:6,
19,20,20;152:17
**effect (1)**
146:11
**effort (1)**
74:24
**efforts (1)**
38:11
**egress (1)**
63:4
**either (6)**
9:6,19;24:13;67:21;
112:5,21
**election (4)**
105:24,25;106:6,11
**electrical (3)**
20:1;35:1,2
**elevator (1)**
34:10
**elevators (1)**
34:12
**else (35)**
5:15;12:13;13:20;
19:19;26:14,19;27:6;
29:23,24;34:21;35:4;
41:7;48:12,15;63:10,
17;66:21;68:5,22;
69:1,3;76:21;78:22;
81:9;87:20;88:4,6;
90:4;91:24;107:6;
121:6;128:4;147:23;
148:2;151:17
**e-mail (74)**
11:15,17;14:16,18,
23;15:1,5,7,11,15,24;
16:3,22,22,24;17:20;
18:14;21:3,5,6;23:6,
8;26:11,11,15;35:13;
37:22,24,25;39:17;
47:1;57:9,11;60:15;

67:3;70:25;71:2,7;
72:15,22;73:4;80:25;
82:18,19;96:3;115:6,
14;118:15;119:3,3,5,
17;120:1;121:10;
122:3;123:8,11,25;
127:21,24;129:4;
133:23;134:6;144:15,
20,21;145:16;146:7,
10,14,16,17,17;152:5
**e-mailed (1)**
60:18
**e-mailing (1)**
114:21
**e-mails (22)**
38:20,21,23;57:20,
25;65:7;81:1,11;85:1;
96:9,10;116:1;118:8,
21,23;120:18;122:10,
21;123:21;127:25;
145:5,13
**emergency (1)**
155:1
**employees (3)**
106:13;111:10;
163:3
**encompasses (1)**
99:8
**encountered (1)**
159:9
**end (15)**
6:3;46:20,21;97:3,
4;98:1,4,6;108:10;
117:24;129:6;135:17,
18;136:9;146:4
**endorsed (1)**
131:14
**ends (3)**
58:11;98:14;155:24
**engaged (2)**
41:22;112:19
**engineering (1)**
34:11
**English (1)**
161:17
**enough (1)**
53:17
**enrichment (1)**
161:16
**ensure (1)**
21:21
**entail (1)**
109:7
**entailed (2)**
108:17;143:25
**enter (1)**
4:11
**entered (1)**
135:11
**entire (13)**
18:10;40:19;
117:21;118:14;
126:13;130:6,10,

135:4,22;151:3,6;
159:17;160:17
**entities (3)**
112:22;151:22;
152:3
**entity (2)**
153:5;154:16
**entry (2)**
108:3;142:19
**EPR (10)**
24:13;81:15,16;
117:15,19;118:1,18;
119:13;127:17;130:7
**essence (2)**
56:23;126:17;
146:25
**estimate (11)**
65:4,9;66:6,17;
67:8,10,11;68:11,12;
92:21;104:19
**estimates (2)**
64:20;85:24
**estimating (1)**
111:16
**estimator (1)**
92:20
**et (7)**
85:24;97:21;99:13;
108:24;109:1;114:22;
131:16
**evacuate (1)**
156:20
**evacuation (1)**
155:1
**Evans (6)**
114:17;117:2,2;
125:16;126:4;136:13
**Even (10)**
5:13;52:3;86:8,8;
109:21;134:24;146:5,
5,5;163:14
**everybody (2)**
5:15;121:6
**evidence (3)**
36:4;43:7,10
**exact (5)**
39:22;40:3;69:16,
17;71:25
**Exactly (23)**
7:13;18:4;25:21;
28:13;33:20;36:3;
39:25;48:6;63:15;
73:9;86:19;93:20;
96:16;124:22;144:25;
148:5;150:6;151:6,8,
10,14;159:18;163:15
**examined (1)**
4:19
**example (1)**
36:5
**except (2)**
4:12;126:1
**exception (1)**

48:4
**exchange (1)**
67:3
**exchanged (1)**
123:22
**exchanges (2)**
71:2,7
**executive (2)**
96:12;149:7
**Exhibit (64)**
14:14,16,20;22:7,
19;23:19;24:24;
26:12;27:9,16,16,20,
23,24;28:3,8;35:9,12;
38:18,19;39:4;44:5,7,
10,13,18,21,24;46:18;
47:1,11;49:4;55:25;
57:17;58:17,21;59:2;
72:14,18;79:14;
100:22;115:4;116:2;
118:22;119:21;
121:18,25;122:3,10,
16;128:15,19;129:12;
130:23;131:3,20,21;
132:4,13;136:21;
137:10;140:18,19,24
**exhibits (4)**
22:17;85:21;121:4;
146:13
**exist (1)**
83:15
**expand (1)**
135:14
**expansion (1)**
159:20
**expert (3)**
92:6,7,12
**experts (1)**
92:14
**explain (2)**
117:22;141:3
**explained (5)**
133:22;134:8;
135:23;148:10;
157:13
**explaining (1)**
118:11
**extent (7)**
9:8,9,10;60:20;
73:23;76:9;136:2
**extracurricular (1)**
97:22
**eye (1)**
106:16

## F

**face (2)**
96:11,11
**facilitate (3)**
73:13;96:13;97:6
**facilitated (2)**
95:18;97:24

**facilitating (2)**
95:25;99:22
**facilities (3)**
70:9,21;113:2
**fact (4)**
54:12;60:14;148:6;
152:6
**failed (1)**
34:17
**fair (4)**
113:21,24;125:2;
140:11
**fairly (2)**
31:13;77:8
**faith (1)**
68:11
**fall (2)**
26:21;110:15
**fallen (1)**
62:24
**falling (3)**
7:20;56:12;61:17
**false (1)**
80:5
**familiar (6)**
128:20,25;129:4,6;
153:1;156:17
**family (3)**
47:17;99:12;140:25
**far (8)**
13:8;39:16;40:13;
63:21;87:4;112:6;
139:1;140:10
**faucets (1)**
77:25
**fault (1)**
141:17
**feasibility (1)**
150:10
**Federal (1)**
4:7
**fee (1)**
65:3
**feel (2)**
5:13;159:10
**feet (3)**
77:9,10,10
**fell (1)**
60:17,17;70:16
**few (1)**
78:15
**figure (2)**
120:8;159:18
**figuring (1)**
152:19
**file (3)**
55:21;56:9;130:17
**filed (3)**
61:1;79:2,6
**files (1)**
112:1
**filing (1)**
56:8

**Fill (1)**
155:25
**filled (1)**
55:18
**filling (1)**
105:8
**final (2)**
144:1,5
**Finally (1)**
135:9
**find (9)**
68:8,9;81:1;84:23;
87:13;96:7;132:1;
160:15;161:24
**fine (4)**
5:17;6:16;141:7;
151:7
**finish (2)**
5:1;117:13
**fire (18)**
7:11,12,22,22;8:5,
6;34:14,18,20;71:10,
19,20;72:12;89:6,9,9;
108:21;140:7
**first (30)**
4:19;5:6;9:4,8,12;
12:7;22:3;31:19,23;
33:2;41:24,24;42:4;
55:13;61:16,21;68:2,
4;80:9,16;84:15;
85:18;86:15,22;
92:10;101:15;102:16;
142:22;154:23;
161:13
**five (1)**
72:1
**fix (4)**
67:9,15;74:5,5
**fixed (1)**
34:10
**fixing (1)**
36:8
**FLA (1)**
73:5
**flip (1)**
140:23
**flood (1)**
73:23
**flooded (7)**
73:8,20,21,23;74:6,
10;127:25
**flooding (2)**
73:20;74:2
**floor (9)**
27:8,18;31:20,23;
33:2;63:8;71:13,17;
75:2
**FOCC (12)**
84:11,13,15,25;
85:10,12,14,17;86:3,
6,8,19
**focused (1)**
142:16

**folks (5)**
85:23;109:11;
110:17;119:13;
120:17
**follow (3)**
100:19;125:15;
127:15
**following (5)**
47:19;61:17,22,22;
127:13
**follows (2)**
4:20;149:1
**follow-up (1)**
21:20
**follow-ups (1)**
138:9
**footage (11)**
33:22;82:12,14,17,
18;83:7,20;91:7,9;
92:2;157:16
**force (1)**
52:4
**forced (2)**
108:3;142:19
**FORESTNER (64)**
4:16;7:10,14;20:19,
22;23:9;25:20;27:23,
25;28:5;29:6,8;39:6,
21;42:13;45:1;47:2,
13;49:1;58:23;60:1,7;
61:12;81:4,19,23;
82:13;86:25;87:8;
89:11;91:6;100:8;
101:17;105:20;
107:14,16,18;110:4;
117:5;118:25;121:24;
122:12;123:14,17;
128:13;132:1,3,6,20;
133:1;134:14;137:12;
138:8;141:17,20;
145:9;160:21,24;
161:6;162:14;163:9,
20;164:6,13
**forgot (1)**
141:22
**form (13)**
4:13;20:19;39:6;
42:13;60:1,7;115:14;
120:2;133:1;134:14;
137:12;145:9;159:13
**forth (3)**
114:22;117:24;
118:8
**Fortunately (1)**
100:16
**forward (6)**
57:15;98:17;
116:10;127:23,24;
159:19
**forwarded (14)**
82:23;83:2;110:3;
115:25;118:17,24;
119:3;121:22;127:20;

128:18;129:1,20;
146:18;150:3
**found (9)**
81:4,5;82:10,17;
83:8;88:9;90:5;110:1,
17
**four (10)**
21:8,8;70:3;72:1;
77:9;104:6,6,9;
112:23;126:17
**frame (3)**
20:20;107:1;163:16
**Frazier (6)**
15:4;16:5;70:19;
92:6;104:25;106:14
**Frazier's (1)**
70:17
**Friday (1)**
122:21
**front (4)**
16:19;131:21;
132:18;134:11
**full (3)**
36:6;88:16;155:23
**Fulton (9)**
34:11;73:12;75:13;
77:15;96:12,13,19;
98:17;139:4
**further (5)**
30:24;75:1;135:19;
158:16,22

## G

**gallon (1)**
77:20
**gathered (1)**
24:1
**gave (15)**
22:21;40:12;46:24;
52:15,18;66:14;
84:10;94:8;108:6,6;
116:23;126:10;
129:23;150:3,24
**general (5)**
29:13;48:21;52:6;
93:7,10
**generally (4)**
7:9;143:21,22;
144:1
**Georgia (1)**
88:3
**georgiadoctors@yahoocom (1)**
14:18
**gets (2)**
94:7;124:22
**Gilbert (3)**
47:17;49:23;50:1
**given (5)**
47:3;62:6;64:14;
66:5;116:18
**gives (1)**
149:1

**giving (5)**
6:7;85:24;96:17;
125:16;135:2
**Gizela (39)**
114:17;116:3;
117:2,2,9,17,22,25;
118:9,9,11,15;119:12;
125:16,16;126:3,14;
132:15,24;133:25;
134:5;135:16,24;
136:3,13,18;147:25;
148:1,6,9,10,14;
149:12,14;154:3;
155:4,4,11;157:14
**Glenn (5)**
14:23;21:5;26:9;
39:17;73:4
**goal (2)**
144:2,5
**goes (1)**
86:2
**gonna (1)**
5:12
**Good (4)**
55:8;68:11;152:22;
159:25
**grades (1)**
99:13
**graffiti (8)**
20:4,4,6,11;25:25;
142:12,15,16
**granted (1)**
140:12
**Great (67)**
4:2,24;8:14,22;9:1,
16;10:13,17;11:10;
21:2;22:21;27:10;
38:10,12,20,24,24;
39:9,18;40:12,16,24,
25;42:8;54:15,15;
56:16,19,20;57:5;
58:1,14;59:6,17,21,
24,24;60:10,12,21,25;
62:5;64:15,16,17;
65:5;68:15;77:12;
79:1;84:2;85:7;87:18;
94:9,12,19;95:3;
100:17;110:3;144:17;
145:21;146:3,23;
147:4;153:7,22,24;
157:20
**Gregory (3)**
110:20;111:3;164:1
**G-R-E-G-O-R-Y (1)**
164:3
**ground (1)**
5:2
**group (1)**
24:14
**groups (1)**
99:11
**grow (2)**
159:14;160:3

**guess (15)**
25:9,20,24;42:3;
45:20;46:20;48:1;
52:21;59:19;68:18;
99:23;129:19;137:21;
144:22;148:8
**guessing (1)**
42:5
**gutter (1)**
63:9
**guy (1)**
74:5
**Guyco (13)**
29:2,3,9,10,11,22;
30:3,25;110:18;
111:2,13;112:19;
164:1
**G-U-Y-C-O (2)**
164:7,8
**gym (33)**
33:14;72:23;73:5,9,
14,14,16,17;75:7;
77:16,23;78:2,4,9,11,
21;96:25;97:3,4,5,7,
13,15,16,21,21;126:1;
133:13;138:22;139:8;
144:8;160:12;162:15
**gymnasium (12)**
33:1,2,3,18,19;
34:9;63:4;75:2;89:8;
109:16;126:21;
143:18

## H

**Hall (26)**
32:25,25;33:13,13,
14;47:17,17,17,18;
49:9,11,22,23,23,23;
50:1,1,3,4,24;53:8,8,
9,10;62:25;71:23
**halls (1)**
49:21
**Hand (2)**
115:3;119:20
**handed (4)**
80:3;121:18;
128:12,14
**handful (1)**
100:18
**handle (1)**
136:6
**handles (1)**
124:24
**hands (1)**
6:9
**handy (1)**
140:17
**happen (4)**
27:3;96:2;97:10,14
**happened (28)**
7:2,4;8:10;39:25;
40:2,2,4,8,8,21,21;

41:25;43:7;44:8;61:5;
66:15;71:19;73:3;
78:15;104:14;105:10;
119:4;121:11;144:18;
153:25;157:4;161:12;
163:18
**happening (4)**
120:11;121:23;
122:6;129:25
**hard (1)**
116:6
**Harrison (3)**
4:5,18;6:24
**Hart (29)**
8:13,13;9:2,14;
11:12,21;12:14;15:9,
12;23:12,16;26:18;
27:11;38:21;41:2,9;
46:10;58:10;64:24;
66:4;67:15,22;68:9;
70:3;92:15;114:19;
145:12,22;148:8
**Harvey (2)**
154:25;156:19
**hazard (1)**
30:21
**head (11)**
6:7;32:25;33:13;
47:17;62:24;69:14;
71:23;94:21;109:6;
110:7;140:18
**heading (1)**
16:21
**health (5)**
97:20;99:5,7,7,9
**hear (1)**
111:7
**hearing (1)**
116:7
**heavy (3)**
106:25;107:2,4
**Heidi (2)**
116:3;131:13
**held (1)**
114:5
**help (1)**
122:19
**helps (1)**
161:12
**Here's (1)**
121:25
**hey (5)**
127:13;133:10;
149:8;155:8,23
**hide (1)**
7:15
**highlight (1)**
137:7
**Highmark (7)**
26:10;80:16;81:14,
16;143:15;144:8,12
**Highway (1)**
113:3

**Hileman (2)**
14:23;15:3
**hindered (1)**
159:11
**hindsight (1)**
129:8
**hire (4)**
14:8;29:12,23;
75:17
**hired (4)**
27:4;28:9;36:5;
93:20
**historically (1)**
153:8
**history (1)**
154:20
**hoarder (1)**
71:13
**hold (3)**
118:13,14,14
**holder (1)**
156:25
**home (1)**
142:1
**hopefully (1)**
100:16
**hour (1)**
63:25
**hours (4)**
21:15,16;94:8;
123:10
**house (12)**
26:1,3;47:17;
140:25;141:8,9,13,23;
142:5,8,18,18
**Hughes (3)**
69:2;105:3;113:6
**Hurricane (2)**
154:24;156:19
**HVAC (24)**
19:16,16,17;20:1;
33:24;34:1,3,5,5;36:5,
8;37:7,10,19,20;74:2,
5,7;75:20,20;76:20,
22;108:21;109:13

## I

**idea (2)**
15:17;39:25
**identification (7)**
14:21;35:19;39:5;
44:22;58:22;72:19;
137:11
**identified (3)**
26:2;35:14;36:1
**identify (4)**
24:25;25:10;26:4;
40:19
**immediate (3)**
26:22;117:15;
126:11
**immediately (6)**

103:16;125:22,25;
126:6,15;157:19
**impacted (1)**
63:13
**impede (1)**
30:18
**impeding (1)**
63:3
**important (1)**
5:9
**improper (1)**
137:8
**improvements (1)**
144:7
**inaudible (1)**
116:4
**incident (5)**
45:18;51:4,5;53:1;
156:4
**incidents (5)**
73:10,11;75:7,8,19
**include (5)**
36:17,21,25;37:4;
63:12
**included (7)**
22:20;49:13;50:5,
25;77:11;78:2;141:15
**incorrect (2)**
45:22;163:14
**increase (1)**
101:4
**incur (2)**
54:4,5
**incurred (1)**
68:14
**indeed (2)**
41:4,5
**independent (9)**
8:14;9:3,16;11:13;
12:3;41:9;58:4;145:6,
21
**independently (1)**
101:12
**indicate (1)**
14:5
**individual (5)**
24:18;25:11;28:16;
99:12;108:12
**Individually (1)**
54:25
**individuals (3)**
29:17,18;66:5
**industrial (1)**
74:22
**inform (1)**
147:16
**informal (1)**
66:9
**information (5)**
48:16;67:6;127:2;
130:19;163:13
**informed (11)**
15:8;40:16;54:1;

58:10;125:20;147:13,
14,15;148:5,14;
155:10
**informing (1)**
130:7
**ingress (1)**
63:3
**in-house (3)**
75:17,21;77:5
**initial (4)**
21:19;34:15;88:15;
116:19
**initially (1)**
149:23
**inside (8)**
9:11,14,20;102:12;
109:14,17,20;150:7
**insides (1)**
13:2
**inspect (17)**
13:23;16:7;20:17;
21:18;57:22;58:2,6,
13;59:7,18,21,25;
61:10;108:11;144:18;
145:7,25
**inspected (17)**
8:19;11:22,23,25;
13:3;15:8,20;17:23;
21:19;33:25;34:10;
43:25;44:15;65:16;
89:12,14;143:3
**inspecting (2)**
8:11;9:15
**inspection (18)**
13:12,21;22:3;24:4;
34:16,20;36:6,9;
40:18;41:3;58:8;89:3,
5;90:7,12,15;141:15;
142:24
**inspections (12)**
10:21;87:3,6,13;
88:10,22,22;89:19,22;
90:3;140:6;143:8
**inspector (1)**
14:8
**installations (1)**
108:22
**installed (1)**
77:4
**installment (1)**
77:7
**instance (1)**
6:10
**instant (1)**
56:9
**instead (2)**
56:13;83:19
**instruct (1)**
129:25
**instructed (5)**
56:13,17;108:11;
124:14;125:6
**Insurance (44)**

4:4;8:7;10:12,17;
29:3;51:9;56:20;
68:13;72:6;114:8,14,
16;116:16,25;117:1;
118:1,17;120:11,15,
21;121:17;124:5,7,11,
23;125:6;127:3,14;
128:6;130:11;133:20;
135:4,13,21;136:6;
151:25;152:5,7,7;
153:14;155:24;156:1,
25;158:5
**insurance-related (1)**
114:24
**insure (2)**
134:1;135:21
**insured (7)**
117:19;131:6,15;
132:16,24;153:6;
154:6
**intact (2)**
31:13;108:14
**intended (2)**
99:4,8
**interacting (1)**
126:3
**interactions (1)**
114:13
**interested (2)**
60:23;61:4
**internal (1)**
19:17
**interrogatories (2)**
137:2;138:2
**into (29)**
7:8;8:16;18:6;
27:13;51:17,18;
59:16;60:20;70:18;
71:12,14;86:25;
89:25;91:8,25;108:7;
109:23,23;119:12;
120:24;121:2,8;
134:7;135:12;146:2;
155:1;160:10,14;
163:20
**intricate (1)**
151:11
**intruders (1)**
27:2
**inundated (1)**
85:22
**investigate (5)**
56:12,17;58:15;
60:10,12
**investigating (2)**
60:23;61:5
**investigation (1)**
53:25
**invoice (3)**
111:18;112:5,9
**invoices (4)**
38:9;90:25;92:19;
110:8

**involved (14)**
79:10,16,18,19,20;
80:1;84:16;123:3,23;
129:22;136:12;
147:24;148:2,4
**involvement (3)**
84:19;128:5;154:15
**involving (1)**
144:8
**Irma (3)**
154:24,24;156:20
**irrespective (1)**
44:12
**issue (2)**
133:21;156:14
**issues (6)**
58:11;145:12;
149:9,10;153:19;
155:20
**item (2)**
82:1;87:2

**J**

**jeopardy (1)**
101:4
**job (3)**
109:9,10;153:3
**jog (1)**
161:12
**judgment (1)**
79:2
**June (10)**
59:9,9,9,24;60:21;
61:3;73:3,4;98:9,12
**Junior (1)**
6:24

**K**

**keep (4)**
100:16;106:16;
116:5;137:14
**Keith (16)**
69:2,8,9,9,12,21,22;
70:7,12,12,17,21;
71:6;105:3,5;113:6
**Kelsy (2)**
14:24;15:3
**kick (1)**
119:6
**kids (3)**
99:10;100:2,3
**kind (19)**
15:22;30:23;51:20;
52:24;63:1;71:21;
83:1;93:14;100:17;
109:19;112:8;115:4;
117:7;128:1;149:6;
152:21;154:13;155:7;
162:3
**knew (9)**
36:3,4;46:17;126:4,

7,8;134:3;136:3;
151:10
**knowledge (2)**
70:13;154:19
**known (1)**
110:23
**knows (1)**
125:18

**L**

**label (1)**
48:11
**laborers (4)**
29:13,23;30:4,25
**landlord (13)**
114:22,24;117:19;
118:9,11,14;120:16;
126:4;131:14;135:23;
136:14,19;156:23
**landscapers (1)**
106:21
**Landscaping (1)**
34:22
**Lang (10)**
64:24;65:11,13,16,
24;66:4;67:24;68:2,6;
92:15
**lapse (4)**
35:6;45:23;62:11;
163:17
**large (1)**
51:4
**largely (1)**
156:8
**last (27)**
4:25;5:3;6:25;
11:22,24;72:1,1,1;
73:3,19;78:8;81:20;
82:9;84:8,14;85:8;
86:11;87:6;100:14,
20;137:20,21,23;
142:4;147:2;160:9;
163:18
**lasted (1)**
161:18
**late (11)**
105:9,9,19;108:9;
109:5;110:15;124:3,
4;126:25;127:1;
136:11
**later (5)**
5:22;61:3;70:12;
119:1;145:16
**latish (1)**
103:21
**latter (13)**
14:3;42:4;52:3;
104:1,2,22,23,23;
119:4;133:22;134:5;
135:12;151:12
**lawn (1)**
106:21

**Lawrence (1)**
65:19
**lawsuit (1)**
79:1
**lead (2)**
89:25;154:5
**Leadership (8)**
73:12;75:13;77:15;
96:12,13,19;98:17;
139:4
**leagues (1)**
97:23
**learn (1)**
148:24
**learning (2)**
99:9,10
**lease (43)**
8:4;9:6;10:17;
12:23;13:7,8,25;31:6;
42:12,23;43:8;82:3,6;
83:9;113:22;114:2,
15;116:15,18,20,21;
117:20;118:12;
128:23;130:8,16;
133:24,24;134:8,9;
135:12,14,17,19;
136:6;139:11;150:17;
151:15;156:23,23,24;
157:6,7
**leased (11)**
14:10,11;24:12,21;
43:20,23;44:8,16;
84:1;143:2;162:17
**leases (1)**
128:21
**leasing (2)**
41:18;130:9
**least (3)**
51:7;105:14;160:19
**leave (1)**
54:10
**led (1)**
155:1
**left (3)**
70:19;113:18,20
**less (1)**
152:11
**lessee (1)**
143:10
**lessor (1)**
10:22
**letter (10)**
59:1,11,21;60:15;
61:3,8;140:14;
146:18;152:9,10
**liability (1)**
101:4
**liberal (1)**
157:11
**library (20)**
34:2,9,10,14,20,23;
35:2;37:20;49:7;
50:22;105:25;106:1,

6,9,12;109:15,16;
126:2,20;133:13
**license (14)**
9:7;102:19,24;
116:19;134:19,22,24;
135:3;136:7;139:11;
142:25;150:4,17;
151:10
**licensed (2)**
141:13;143:2
**licensure (2)**
133:19;150:4
**lieu (1)**
159:16
**life (3)**
89:8;99:11;129:10
**Lights (1)**
141:24
**limit (3)**
20:25;21:2,22
**limited (3)**
75:14;120:16;
129:11
**Linda (1)**
116:3
**line (1)**
107:20
**lines (3)**
89:16;92:11;148:10
**list (19)**
48:19;49:14;50:9,
25;53:15,16;55:1;
78:2;80:13;118:13,
14;132:19,23;133:4;
134:11;147:6,7;
149:11;150:7
**listed (2)**
126:16;130:13
**Listen (1)**
107:14
**listing (1)**
156:25
**lists (2)**
47:16;150:5
**literally (1)**
106:8
**litigating (1)**
157:25
**litigation (12)**
56:24,25;59:16;
60:19,21;70:8;145:3;
146:3,24;159:9,13;
160:7
**little (5)**
71:11;90:17;101:9;
141:20;150:12
**lived (1)**
142:5
**LLC (1)**
90:18
**locate (3)**
80:21,23;141:1
**located (2)**

22:11;95:10
**location (11)**
117:10;121:17;
124:12,15;125:7;
150:2;156:9;157:4,5,
15,16
**locations (4)**
46:22;113:1,4;
156:12
**logistics (1)**
153:1
**Lolethia (12)**
12:18;17:21,22;
101:11,17,18;102:10;
103:8,9,16;104:7,10
**long (9)**
30:14;45:7;46:12;
63:23;144:24,25;
153:6,9;157:16
**longer (4)**
22:2;60:4;91:11;
113:25
**look (26)**
14:15;27:8,15;37:8;
45:6,13;52:23;55:5,
24;56:1,5;57:21;
71:15;80:18;86:25;
87:8;90:2;96:6,7,8;
115:5,8;121:4;
160:10,14;163:20
**looked (16)**
18:3,3,37:6;51:23;
66:13;85:1;87:10,22;
91:25;92:22;93:15;
96:6;103:15;116:24;
142:9;143:10
**looking (29)**
8:14;22:24;27:11;
47:16;53:4;57:16;
78:1;81:7,10;83:14;
85:4,6,9,13,15,16,21;
88:11,13,14;90:11;
115:19;119:22;
123:17;129:15;
152:15,17,19;160:9
**looks (3)**
72:22;73:2,19
**loop (1)**
151:14
**looped (6)**
119:11,15;120:7,
24;121:2,7
**looping (1)**
117:15
**Lorraine (38)**
68:25;69:1,5;114:9;
115:25;116:10,17,23;
119:12;121:16;124:6,
10;125:6,14;126:4;
127:8,13,17;128:5,9;
129:25;136:5,8,13,17;
142:8,9;147:13,24;
148:5,8,25;149:1,8,

14;151:5;153:3;
155:17
**Lorraine's (1)**
149:20
**loss (7)**
7:2,9;38:25;40:11,
16;62:1;93:1
**losses (6)**
7:3,6,7;8:2;68:19;
155:19
**lost (1)**
101:9
**lot (6)**
30:22;31:11,12;
64:3;77:19;91:11
**Lothia (1)**
101:16

# M

**magnitude (1)**
65:1
**main (7)**
34:8;35:3;49:9;
50:24;54:2;109:16;
126:20
**main/administration (1)**
126:2
**maintained (1)**
104:18
**maintenance (4)**
47:18;50:8,14;
70:22
**major (1)**
103:19
**majority (1)**
96:10
**makes (11)**
19:6;32:13;117:23;
118:16;128:2;130:5,
13;134:10;135:24;
157:23;160:8
**making (2)**
108:13;109:9
**man (1)**
108:6
**management (2)**
91:23;152:18
**manager (3)**
93:25;94:3;131:14
**manual (3)**
29:23;30:4,25
**many (14)**
18:20,23;20:16;
21:4;22:24;52:21;
65:23,25;107:23;
111:10,12,12;112:19;
158:2
**March (3)**
124:3;126:25;
136:11
**Mark (2)**
44:18;58:19

**marked (15)**
14:16,20;27:16;
38:19;39:4;44:21,23;
55:25;58:21;59:1;
72:18;79:14;115:3;
119:21;137:10
**marshal (1)**
89:9
**math (1)**
161:17
**Matt (3)**
100:12;142:23;
147:3
**matter (3)**
52:20;60:14;148:6
**max (1)**
21:13
**may (19)**
19:4;54:14;72:23,
24;97:2;98:7;105:9;
127:1;129:21;130:16;
133:25;134:7;135:15,
19;136:11;151:11;
155:5,18;160:4
**maybe (50)**
5:23;15:18;20:10,
11;21:8;34:24;40:22;
43:17,17;54:19;
57:19;63:25;71:13;
74:13,14,14,14;77:9,
9;92:15;104:23;
105:5,6;109:20;
111:15,15,16,16;
112:23,23;117:2,4;
121:14;127:8;129:2,
2,19;131:23;137:21;
143:10;146:8,16;
147:2;152:10,11,11;
153:11;154:20,22;
164:6
**mean (44)**
8:22;19:10;22:15;
26:11;30:11;33:21;
34:3;39:13;42:2;50:2,
16;51:12;52:13;54:7;
55:3;60:15;63:15,17,
18;73:22;74:6;80:6,6;
82:18;88:12;91:4;
92:25;95:23;98:7;
99:18;103:21,25;
107:3;109:8,20;
120:23;122:17,19;
123:24;129:19;
149:25;152:14;
156:24;161:17
**meaning (1)**
107:4
**means (1)**
95:25
**media (1)**
91:25
**mediation (1)**
112:18

**meet (4)**
18:8;58:12;103:18;
143:23
**memorialized (1)**
137:5
**memory (1)**
161:12
**mention (1)**
49:6
**mentioned (4)**
86:14;90:3;95:6;
157:3
**message (1)**
100:25
**messages (5)**
115:9;116:2;
122:24;123:5;128:18
**met (4)**
18:9;68:4;100:15,
20
**mid (6)**
104:22,23;105:8,
19;108:9;109:5
**middle (2)**
156:11,21
**might (7)**
5:16;14:5;16:6;
19:9,11;95:13;108:7
**Mike (5)**
7:1;8:1;161:13,16,
19
**mine (1)**
79:19
**minimal (1)**
77:18
**minute (4)**
35:24;45:6;58:3;
133:6
**mispronounce (1)**
57:3
**missed (4)**
52:25,25,25;53:5
**missing (17)**
9:25;10:5,7,9,12,16,
23;11:9;13:1,12;
43:22;44:3;47:24;
53:15,16;102:6;
130:14
**mission (1)**
99:22
**mistaken (2)**
75:12;150:8
**misunderstood (1)**
5:23
**Mm-hmm (27)**
14:22;16:1,4,17;
35:10,17;45:16;
57:18;72:20;73:1;
80:20;83:6;89:18;
94:12;100:3,23;
110:10;112:12;
119:25;131:2,12;
132:17;141:11;

156:10;158:3,21;
164:2
**Mo (3)**
90:17;91:3,19
**month (4)**
30:12;97:4;104:11,
13
**months (3)**
72:2;155:13;158:2
**more (12)**
18:18;22:6,9;35:9;
59:22;66:1;73:10;
90:12;100:6;119:23;
149:6;158:14
**Moreland (5)**
156:9;157:8;161:5;
162:15,19
**most (2)**
105:14;109:18
**mostly (1)**
77:19
**move (4)**
35:8;57:15;156:12;
159:19
**moved (1)**
144:11
**Mrs (4)**
15:4;17:21;44:1;
79:14
**Mt (1)**
113:3
**much (14)**
20:2;36:3;67:8,10,
14;74:6,9;80:3;
101:18;108:13;
112:15;115:5;119:18;
138:5
**multiple (5)**
13:24;14:1;25:13;
40:9;132:19
**myriad (1)**
112:22
**myself (4)**
5:18;12:18;105:12;
148:8

**N**

**name (20)**
4:23;6:22;28:25;
29:2;57:4;65:22;72:8;
84:16;86:3;92:6,9,18;
94:14,15;99:15,17,18;
100:12;110:20;164:3
**named (1)**
49:19
**names (4)**
29:18,19;32:24;
51:20
**narrative (4)**
51:3;52:6,16,24
**national (4)**
106:22,22,24;

152:18
**nauseam (1)**
151:24
**necessarily (4)**
20:13;70:20;89:22;
153:7
**necessary (2)**
6:2;89:6
**need (19)**
37:12;86:18;115:6;
116:24,25;126:15;
127:17,23;134:7;
149:15,24,24;150:1,1;
151:8;155:9,14;
157:4;163:18
**needed (18)**
36:3;51:7,9;77:19;
92:23;93:4;94:5;
104:16;116:18;
126:21;133:20,24;
135:14;141:24;142:3;
148:6,13;154:25
**needing (6)**
35:14,20;36:1,16;
117:18,18
**needs (2)**
99:10;148:17
**ne'er-do-wells (1)**
107:9
**negotiate (1)**
126:23
**negotiated (6)**
95:17,22,23;114:1;
128:22;130:8
**negotiating (6)**
82:2,6,83:9;95:17;
113:22;114:15
**negotiation (1)**
102:17
**negotiations (4)**
96:2;116:15,18;
129:7
**Nelson (1)**
65:19
**net (6)**
117:20;118:12;
128:23;130:9,16;
134:9
**new (6)**
14:3;31:13;55:16;
125:7;136:22;154:9
**next (10)**
19:3;36:10;82:1;
87:2;89:25;90:1,16;
92:5;103:7,12
**nice (1)**
142:1
**nickname (1)**
141:2
**nobody (1)**
86:2
**nodding (1)**
6:6

**nods (3)**
69:14;109:6;110:7
**none (1)**
83:15
**nonverbal (1)**
6:8
**normal (2)**
5:7;124:10
**notate (2)**
51:24;52:2
**notes (2)**
140:25;160:9
**notice (22)**
4:10;8:23;9:1;10:3,
7;12:14;15:20;16:6;
17:24;20:17;22:1,2;
38:25;39:9;55:13,14,
16;59:17;60:15,21;
61:22;70:4
**noticed (22)**
8:11,16,16,21,22,
23,25;9:3,13,14,18,
21;11:21;12:6,24;
13:11;15:3,9,12;
27:14;40:25;54:22
**noticing (1)**
39:15
**notified (7)**
8:13,18;15:18;18:1;
40:24;123:7,10;
124:1;144:17,23;
147:4
**November (4)**
62:2;105:6,21;
106:4
**Number (2)**
38:18;52:15,18;
55:25;80:10;88:1
**numbered (1)**
27:21

**O**

**Object (6)**
20:19;42:13;60:7;
136:1;137:12;145:9
**Objection (4)**
39:6;60:1;133:1;
134:14
**objections (2)**
4:12;137:1
**obligation (1)**
130:11
**observe (3)**
14:2,4;63:2
**observed (10)**
18:16;19:20,25;
20:3;26:20;42:7;
44:11;48:22;62:22;
107:9
**obtain (2)**
89:2;139:14
**obtained (2)**

64:20,24
**obtaining (10)**
87:19;89:6,7,8,9;
108:19,20;124:4;
128:5;139:20
**obvious (1)**
78:25
**obviously (1)**
131:24
**occasion (1)**
100:15
**occupancies (1)**
89:7
**occupancy (11)**
101:6;108:20;
138:17,20,21;139:2,
10,15,21;143:24;
144:4
**occupied (2)**
118:11;126:5
**occupy (2)**
113:15;135:1
**occupying (20)**
114:1;131:6,16;
132:16,25;133:5,11,
15;134:4,13;135:7;
147:5,6,8;149:18,19;
150:6,15,16;151:2
**occur (4)**
12:22;13:8;71:24;
89:4
**occurred (16)**
13:7;38:1;40:14;
41:17;42:7,11;43:19;
64:23;71:10;86:12;
104:20,22;145:13;
160:22,23;161:19
**occurring (2)**
70:8;113:9
**Ocoma (2)**
153:14,14
**October (3)**
39:1;45:15;106:4
**off (9)**
5:6;6:15;15:22;
94:21;114:3,5;119:6;
140:17;142:22
**offered (2)**
59:7,17
**offering (3)**
59:12,21;61:10
**office (1)**
103:17
**officer (14)**
46:25;47:6,12;
48:16;49:7;51:2,7,10,
11,17;53:3,21;54:1,10
**officer's (1)**
53:25
**official (4)**
66:8;88:14;103:12;
124:21
**often (2)**

104:14;106:5
**old (7)**
34:8;35:3;49:9;
50:24;109:16;126:2,
20
**once (15)**
5:16;18:2,2;36:2;
66:1;68:12;102:24;
104:11,13;116:19;
133:23;135:10,23;
143:4;156:23
**one (54)**
7:20,23;8:16;13:23;
14:3;18:4;19:9,11;
20:3,5;23:20;25:6;
29:12;35:9,24;40:8;
43:4,15;50:19;51:10,
10;52:10;55:7,22;
56:10;57:8;60:18;
70:3;71:12,18,18;
79:13;80:16;90:16;
92:5;97:4;100:21;
108:15;109:20;
121:18;126:19;
128:25;133:5;138:18,
18;140:24;146:8;
153:7;154:20,22,25;
156:5,20;157:24
**ones (5)**
10:1;22:19;26:10;
47:10;151:19
**one's (2)**
75:24,24
**one-stop (1)**
152:25
**ongoing (5)**
14:5;111:8;119:12;
144:11;160:7
**online (1)**
87:23
**only (34)**
6:17;12:11;13:1;
19:9,11;24:20;28:19;
29:12;43:6;52:15;
59:20;66:4;68:19;
79:12,13;81:12;
90:20,22;98:1;
113:11;135:6,13,22;
138:18,23;140:19;
142:2;147:6,8;151:3,
5;154:19,23;161:10
**on-site (1)**
93:17
**open (1)**
19:1
**operable (1)**
142:2
**operated (1)**
130:21
**operating (1)**
156:8
**operations (1)**
100:1

**opinion (6)**
66:6;67:14;84:11;
92:13;93:4;94:4
**opinions (2)**
66:8,9
**opportunity (1)**
6:3
**order (5)**
31:18;143:23;
156:21,22,22
**organization (2)**
149:10;156:3
**original (2)**
66:3;121:15
**others (1)**
162:8
**otherwise (6)**
119:11;121:21;
122:5,15;123:22;
128:17
**out (93)**
12:2;13:24;14:1,9;
15:7;16:7;18:11;
20:17;21:10,14;
26:23,24,25;27:4;
28:9,13,14;29:14,15,
24;30:4;31:1;32:24;
36:6;37:8;41:3;48:13;
52:4;53:13,20;55:18;
56:19;58:1,2,5;63:23;
64:25;65:8,8,16,24;
66:12,12;67:19;68:8,
10;69:5,9;77:20;
84:10;85:23,23;86:2,
16,18;87:14,15,16,20;
91:18;92:12,14;93:3;
102:25;109:9,20;
110:17;113:23;117:7;
120:8;121:16;124:1;
125:16;130:1;135:16,
18;137:7,15;141:22;
144:11,22;145:7;
149:12;150:22;
152:19;153:15;155:5,
25;156:8;157:19;
159:18;160:15;
161:24
**outdoor (1)**
9:24
**outdoors (1)**
10:2
**outlining (1)**
89:19
**outpatient (1)**
99:5
**outside (11)**
9:20,21;10:4,23;
20:1;22:2;102:6;
109:22;141:25;
153:17,18
**over (11)**
5:2,4,10,13;14:15;
28:6;40:8;45:6;47:1;

56:25;67:6,7;70:25;
73:5;79:11;93:22,23;
96:3;100:14;103:18;
105:3;117:2,25;
133:18;139:3,8;
140:24;153:12
**overall (1)**
70:12
**oversight (1)**
85:25
**overwhelmed (1)**
18:25
**own (3)**
52:10,10;130:2
**owned (4)**
99:1,24;158:19,19
**owner (2)**
126:24;143:10

**P**

**page (17)**
28:1,4,8;46:19;
47:15;73:3,19;
100:24;107:20;
130:25;131:4,9,21;
132:13,18;137:21,24
**pages (3)**
16:19;28:2;137:21
**paid (7)**
77:1,2,3;90:25;
92:8,19;112:15
**pail (1)**
77:20
**Paint (5)**
73:5,18;75:14;
77:21;142:17
**painted (1)**
141:24
**painting (2)**
20:14;35:1
**pamphlet (1)**
89:17
**pandemic (1)**
152:14
**par (1)**
143:23
**paragraph (6)**
46:20;56:5,16;
57:16,17;59:23
**paraphrase (1)**
56:23
**parking (1)**
64:3
**part (35)**
6:9;11:4,10;24:18;
34:23,23;42:4;52:3;
70:16;80:9,23,24;
84:15;86:15;89:5;
92:10;104:1,2,22,23,
23;105:14;109:18;
116:20;119:4;121:12;
129:10;133:22;134:5;

135:12;136:6;151:12;
158:18;161:8,13
**participated (1)**
79:7
**particular (11)**
7:25;18:4,4,24;
19:5;20:5;25:24;32:4;
37:9;71:20;123:25
**particularly (2)**
31:19;72:24
**parties (3)**
67:21;75:18;76:7
**Party (1)**
106:23
**passing (1)**
34:19
**past (2)**
130:21;156:5
**Paul (1)**
4:23
**pause (1)**
129:23
**pay (3)**
68:12,14;111:21
**paying (1)**
93:22
**payment (1)**
111:25
**pending (3)**
140:2,11;149:9
**people (5)**
26:15;106:20;
107:4,5;109:8
**per (2)**
20:13;54:25
**perceived (5)**
9:22,23;44:14;
78:21,22
**performed (2)**
37:23;88:23
**period (13)**
42:8;106:16;
107:22;108:9;110:12;
114:25;119:24;124:3;
126:25;133:19;
136:11;156:11;
157:17
**periodically (1)**
103:10
**permit (1)**
109:10
**permits (3)**
90:2,5,12
**permitted (1)**
4:7
**person (2)**
71:14;105:7
**personal (1)**
154:15
**personally (7)**
104:4;112:21;
114:12;127:2,10;
136:12;157:14

**perspective (1)**
155:7
**phase (12)**
24:19;33:11;36:10;
37:8;43:3,4,11,14,15;
80:16;84:5;126:11
**phases (1)**
135:11
**phone (25)**
11:15,16;17:4,6,7;
24:2;46:21;47:7;
64:12;67:2,7,7;70:25;
114:18;127:20,22;
147:18;148:15,18;
155:6,8,11,14;157:1,
14
**phones (1)**
17:11
**photographs (14)**
42:21;43:2;82:1,5,
10,12;83:5,8,15,19,
20,22,25;84:4
**photos (26)**
18:13,18;22:6,7,9,
10,13,14,18;23:3,5,7,
13,16,17,19,23;46:21,
24,25;47:6,10,11;
51:23;64:6;77:14
**physical (2)**
73:13;97:19
**physically (5)**
106:9;109:8,12;
112:25;120:17
**pick (5)**
52:14,22;155:8;
157:1,14
**picked (1)**
155:14
**picture (6)**
18:25;19:2,5,10,11;
28:10
**pictures (32)**
8:20,20;16:16,23;
17:1,12,18;18:5,20,
23;19:8,9;20:7,15;
22:25;23:1;24:1,3,6,7,
11,18,20;25:1,6,17;
26:5,10,14;51:19;
64:18;83:21
**pieces (1)**
151:11
**pin (1)**
103:21
**pipes (1)**
19:23
**PL (3)**
131:1,4,10
**place (12)**
4:9;13:6;27:10;
73:6;74:21;81:12;
101:3;102:24;115:1;
147:20,21;154:6
**Placement (1)**

152:18
**plaintiff (2)**
56:10,12
**Plaintiff's (6)**
14:20;39:4;44:21;
58:21;72:18;137:10
**plan (2)**
151:6;160:1
**planning (1)**
20:14
**plans (7)**
108:18,19;124:16;
125:1,11;142:16;
159:22
**play (1)**
99:13
**plays (1)**
146:2
**pleadings (1)**
79:6
**please (12)**
6:18,22;61:19;
73:11;110:6;122:2,6;
123:16;130:15;131:5,
13,15
**plethora (1)**
52:1
**Plumbing (10)**
19:21,22;20:2;
29:11;54:7;110:18,
25;111:2,13;112:20
**plus (1)**
159:10
**pm (1)**
164:14
**Point (58)**
8:3;23:14;37:15;
41:7,11;43:19;44:2;
45:11;52:10;53:13,
20;66:7;72:10;84:16;
89:11;92:8;95:10;
101:7,11;103:4,15;
104:25;105:4;106:6;
113:17,19,22,23,25;
114:1,8;115:1;
116:15;118:23;
119:15;121:1;123:2;
124:5;125:2,7,12,21;
126:24;128:6;129:11,
21;133:10;140:15;
143:16;144:10;145:7;
154:1;156:7;159:12,
23;160:6;162:18,22
**pointing (1)**
6:9
**police (42)**
45:5,10,18,19;46:7,
13,14,19,24;47:6,12,
15;48:6,13,16,20;
49:5,7;50:6;51:8,9,
17;52:10,11,13,15,20,
22;53:2,4;54:9,12,16,
23;55:3,11,18,18,21;

78:1;140:16,19
**policies (3)**
115:1;152:20;154:6
**policy (18)**
42:8;56:21,24;
131:14;148:17;150:1,
2;152:24;153:7,23;
155:8,24;156:4,11,22;
157:17,24;158:5
**populated (1)**
53:1
**portion (9)**
74:16,17,18;98:24;
99:24;158:23;159:3,
23;160:1
**portions (2)**
42:22;122:24
**posed (1)**
149:14
**position (5)**
60:9;70:18,21;86:1;
152:22
**possession (5)**
7:5;10:13;17:17;
135:2;144:12
**possibility (1)**
162:11
**possible (15)**
8:15;9:3,5;10:4;
12:14;15:18;18:15;
22:1;23:2,3;24:25;
41:16;54:21;83:24;
96:18
**possible/reasonable (1)**
46:16
**Possibly (5)**
22:9;31:17;46:11;
69:2;142:14
**post (8)**
92:24;93:2;99:14;
101:22,24;102:1;
113:11,14
**post-inspection (1)**
12:20
**power (1)**
155:12
**Powers-Leavitt (42)**
4:3;100:13;114:14;
120:16;121:16;
125:17;127:3,11;
130:1,3,7,13,20;
134:9,21,22;135:4,6,
20,24;136:3;137:3;
147:15,17,25;148:23,
25;149:21;150:14;
151:25;152:6,16,21;
153:10,16,19;154:4,7;
155:6,15;156:2;
157:13
**Powers-Leavitt's (1)**
137:2
**pre (5)**
24:10;92:24;

101:22,24;102:1
**predicate (1)**
131:19
**pre-inspection (6)**
12:19,21,25;13:3,6,
17
**pre-lease (2)**
24:4;142:25
**premises (2)**
8:19;20:23
**Prep (81)**
36:19;37:1,23;
39:19;40:12;41:5;
43:12,19,23;44:8;
56:9;66:21;68:17,18,
23;77:2;79:2;87:16,
21;93:21;99:16,19,20,
21;106:13;107:6;
113:15;117:20;118:1,
13;120:15;125:17,18,
19,22,25;126:6,12;
128:4,22;130:8,21;
132:16,25;133:5;
134:13;135:21;
139:16;141:13;
145:14;146:22;147:5;
150:6,14;152:18;
153:5,6,23;154:15,19;
156:8;158:22,25,25;
159:5,10,12,22;
160:11,13,15,17,18;
161:5,14,20;162:1,6,
12,15;163:4
**Preparatory (2)**
4:3;100:1
**preparing (5)**
79:10,16,18,19,21
**pre-populated (1)**
155:5
**Prep's (3)**
61:4;137:1;145:22
**present (5)**
45:10;65:14;69:19,
22,24
**presented (5)**
103:16;129:3,13,
18;156:2
**preserve (1)**
31:18
**president (1)**
47:17
**president's (6)**
26:1,3;141:9,12;
142:5,8
**pretty (7)**
20:2;36:3;80:3;
100:17;108:13;142:1;
156:17
**previous (7)**
59:11;61:6,7;68:1,
2;107:20;139:11
**previously (3)**
115:3;119:20;

153:22
**primarily (1)**
7:1
**primary (2)**
99:5,8
**printed (1)**
115:11
**prior (4)**
70:13;110:21;
112:18;113:7
**privilege (1)**
4:14
**pro (1)**
90:17
**probably (18)**
13:9;45:3;52:14;
53:9;56:2;66:17;
69:17;74:14,20;77:9;
78:7;91:11;98:10;
107:25;153:12;
155:19;159:12;160:4
**problem (3)**
94:24;95:2;103:19
**Procedure (1)**
4:8
**proceed (2)**
45:7;151:9
**proceeded (1)**
41:3
**process (19)**
32:9;33:23,23;
106:19;113:22;
116:16;120:11;124:8;
126:12;129:2;135:9;
139:20;140:6;146:6;
148:15;150:10;
154:17,18;156:15
**processing (1)**
154:8
**procured (1)**
129:24
**procurement (3)**
116:16;120:11;
124:8
**procuring (3)**
114:7,15;120:15
**produce (9)**
64:15;65:4;80:11,
15;82:11;84:18;
89:15;94:25;96:5
**produced (13)**
81:13,15;84:2,22;
87:5;90:6,8,9;91:13;
94:11;109:24;112:8,8
**production (2)**
22:20;91:25
**professional (1)**
63:21
**program (33)**
95:4,7,9,12,15,16,
18,19,23,24;96:1,14,
15,20;97:12,24;98:18,
20;160:12,13,16,18,

25;161:8,11,15,21;
162:21,24;163:1,1,4,
15
**programs (1)**
161:14
**project (2)**
93:24;94:3
**projects (2)**
143:11;144:11
**proper (1)**
4:10
**properly (1)**
21:22
**properties (6)**
9:11,14;48:2;113:4;
130:14;134:2
**property (140)**
7:4,4,5;8:10,11;9:6,
7,15,19;10:14,17;
11:1,8,14,19;12:2,15;
13:17,23;14:6,9,10;
15:3,8,13,19,20;16:7;
17:24;18:8,9;20:17;
21:4,14,25;22:4;
23:14,17,20,22;24:4,
7,11,21,21,25,25;
26:20;28:17;29:24;
30:20,24;31:6,23,25;
36:2,19;37:2,5;40:1,
6;41:18,21,22;42:1,7,
12,22,24;43:8,11,25;
44:8,11,15;47:22;
48:13;55:14,19;58:2,
5,7,13;61:17,22,24;
62:16,18,22;64:23;
65:13,17,24;66:13;
69:6,22;71:10;75:24;
82:7;83:10,25;84:1,2,
10,11;86:2,4,16,18;
92:13,15,16;93:3,5;
94:6;98:24;99:24;
105:1,13,17;106:16,
18,20;117:10;124:16;
130:10,11;135:2;
139:13,15;141:14,16;
142:24;143:2,3,9,12;
144:12,13;145:24,25
**provide (11)**
34:17;48:15;65:9;
68:11;75:1;93:16,17;
121:10;124:11;
131:13,15
**provided (19)**
67:6,7,14;82:13,16;
83:23;110:8;112:6;
115:21;120:18;122:5,
15,17;123:22;131:22;
132:19,23;134:11;
137:4
**provides (1)**
99:11
**providing (1)**
153:11

**provisional (2)**
88:15,15
**proximity (1)**
123:21
**public (1)**
145:22
**puddled (1)**
74:20
**pull (2)**
24:1;100:21
**pulled (1)**
66:16
**pulling (1)**
148:12
**purchase (3)**
82:3,6;83:10
**purchased (1)**
84:1
**purpose (2)**
4:6,15
**purposes (1)**
4:7
**pursuant (1)**
4:10
**pursue (1)**
157:5
**put (21)**
8:22,25;15:20;16:5;
17:24;20:16;22:1;
28:1,3,6,9;31:2;38:24,
24;39:9;52:7;55:14;
61:22;70:4;71:15;
91:8
**puts (1)**
152:22

**Q**

**quadruple (1)**
121:10
**quick (4)**
100:7,17;115:5;
151:18
**quickly (1)**
54:10
**quietly (1)**
100:14
**quite (3)**
25:23;110:23;
158:10
**quote (2)**
37:9;56:22

**R**

**rather (1)**
60:13
**raw (2)**
91:9;92:2
**re (1)**
28:15
**reach (5)**
65:8;87:15,20;

121:16;130:1
**reached (10)**
  56:19;64:25;66:12;
  67:19;87:14,16;
  91:18;135:16,18;
  149:12
**reaching (1)**
  125:16
**read (14)**
  52:16;58:3;107:19;
  125:15;134:23;
  136:25;137:5,6,18;
  151:9,10;158:5,10;
  164:13
**reading (5)**
  15:1;80:14;88:20;
  116:9;137:14
**reads (1)**
  124:21
**ready (4)**
  33:24;45:6;52:20;
  129:9
**realize (1)**
  5:23
**really (5)**
  25:8;108:16;
  126:18;140:17;
  152:25
**reapply (1)**
  155:25
**reask (1)**
  159:1
**reason (6)**
  6:16;45:21;46:12;
  62:9,13;134:1
**reasonable (2)**
  30:15;39:14
**recall (74)**
  10:19,20;11:15;
  14:7;16:5,9;21:9,15;
  22:5;23:10;26:9,13,
  18;30:1;31:2,4;32:3,
  4,21;39:8,12;43:21,
  24;47:13,14;48:18;
  49:8,10,17;50:23;
  51:1,1,10;55:20,23;
  56:22;59:13;61:12,
  14;62:11;63:19;
  65:18;66:8;73:24;
  74:1;76:14,16;84:12;
  86:6;92:9,14;107:25;
  113:5;114:20;115:2,
  19,24;123:12,13;
  124:1,9;125:3,24;
  127:12,13;136:15,16,
  20;140:17;141:25;
  143:14;145:20;146:9;
  155:22
**recarpet (1)**
  142:17
**receive (4)**
  57:13;118:23;
  146:22,23

**received (26)**
  24:13;34:16;59:16;
  60:14,15,20;80:19;
  90:10,15,22,23,24,25;
  91:2,16;116:19;
  118:16;134:18,22;
  140:6,14;144:15,20;
  152:5;155:18;157:6
**recess (4)**
  49:3;100:9;137:16;
  138:10
**recognize (1)**
  44:25
**reconvened (1)**
  80:12
**record (18)**
  4:1;6:2,12,14,15,
  23;11:4;27:19;77:18;
  84:21;102:16;111:25;
  114:3,6;119:17;
  120:19;138:14;
  140:19
**records (11)**
  84:25;87:2,5;88:9,
  21;89:22;90:17;92:5;
  95:6;110:9;112:13
**RECROSS-EXAMINATION (4)**
  138:11;151:20;
  158:16;163:24
**reference (1)**
  46:22
**referred (1)**
  15:11
**referring (17)**
  10:1;19:14,15,17;
  20:6;27:20;35:12;
  37:17,21,24,25;50:11;
  65:10;76:24;88:1,1,
  18
**refusal (1)**
  57:14
**refuse (1)**
  58:14
**refused (7)**
  56:12,16;59:25;
  60:10,12;61:1;153:24
**refusing (1)**
  145:16
**regard (3)**
  63:11;117:14;146:1
**regarding (13)**
  11:18;57:14;67:14,
  19,21;68:19;87:3,5,
  18;88:10,22,22;
  103:13
**regards (2)**
  101:22,24
**regularly (2)**
  11:23;108:11
**regulates (1)**
  34:12
**regulation (1)**
  34:12

**rehashing (1)**
  129:10
**reinforce (1)**
  21:22;33:3
**reinforced (1)**
  28:15
**related (27)**
  13:16;28:10;29:25;
  64:1,22;66:6;68:23;
  75:7,18,23;76:2,2,7;
  77:6,14;84:19;86:4;
  88:10;91:25;92:2;
  93:4,10,11;95:6;
  112:13;142:23;
  145:17
**relation (3)**
  15:9;90:3,4
**relationship (2)**
  68:2;110:21
**relative (18)**
  18:6,23;21:23;
  30:17;37:7,10;53:24;
  61:2;65:6;119:6;
  134:25;135:1;149:10;
  151:14;154:8;155:19;
  157:12;159:19
**relied (1)**
  136:8
**relief (1)**
  61:2
**rely (1)**
  136:5
**remainder (1)**
  33:5
**remember (24)**
  6:2;28:25;30:3;
  31:9;32:19,21;35:7;
  39:16;48:14;63:23;
  65:21,23;66:10;
  94:14,22;110:19;
  111:22,23;112:15;
  120:23;121:2;125:9;
  127:4;152:9
**remind (2)**
  5:17,18
**remodeled (5)**
  35:15,20;36:17
**removal (1)**
  75:14
**remove (3)**
  26:23,25;64:2
**removed (2)**
  11:7;60:24
**renew (1)**
  153:24
**renewal (4)**
  154:12,13,16,18
**renewals (1)**
  154:11
**renewed (3)**
  153:22;154:2,3
**renovate (1)**
  93:23

**renovated (4)**
  33:7,8,9;34:1
**renovating (10)**
  32:8,9,11,17;
  106:19,21;109:12;
  126:13,13;133:16
**renovation (10)**
  18:7;30:19;33:11,
  15;34:17;37:8;38:4,
  11;83:1;144:7
**renovations (15)**
  30:18;33:20;34:18;
  36:18;93:7,10;
  108:15,21;109:2,7,19;
  126:11;140:5;143:12,
  16
**repair (5)**
  26:19;27:5,7;75:14,
  15
**repairs (6)**
  64:3;75:6,11,16,18;
  76:2
**repeat (3)**
  5:21,25;82:4
**rephrase (4)**
  5:22;6:1;10:14;
  61:18
**replace (1)**
  34:25
**replaced (10)**
  34:2,4,5;35:15,20;
  36:1,16;76:11;77:1;
  78:16
**replacement (3)**
  34:22;35:1;77:11
**report (45)**
  43:15;45:5,9;46:13,
  17,19;47:15;48:6,20;
  49:5;50:6;51:6,8,9,
  11;52:13,15,20,22;
  53:1,4;54:3,10,12,16,
  23;55:3,11,18;78:2;
  80:16,18,19,21,23;
  81:7,10,14,17;84:5;
  94:11;140:17,20;
  149:2,7
**reported (11)**
  16:8;21:1;39:18;
  45:14,18,46:7,10;
  53:22;57:23;58:6;
  145:14
**reporter (13)**
  5:8;6:10;14:19;
  39:3;44:20;58:18,20;
  72:17;107:19;116:5;
  136:23;137:9;138:15
**reporting (1)**
  15:2
**reports (7)**
  42:21;55:22;90:7,9,
  12,15;140:7
**represent (6)**
  45:4;100:13;121:5,

6;136:25;146:10
**representation (3)**
  18:14;47:21;48:22
**representatives (1)**
  136:14
**represented (3)**
  24:7;61:11;134:12
**representing (2)**
  4:24;39:10
**request (1)**
  89:16
**requested (8)**
  54:11,14,14;61:2;
  85:7,7;91:6;130:19
**requests (1)**
  82:11
**require (3)**
  52:4;65:1,2
**required (11)**
  54:16;75:13;89:2;
  117:16;118:13;124:2,
  22;134:21;140:4,8;
  157:18
**requirement (1)**
  117:1
**requirements (6)**
  87:19;88:14;
  117:16,22;150:3,5
**research (1)**
  86:18
**researched (1)**
  87:23
**reservation (1)**
  59:8
**resolved (2)**
  56:14,18
**respond (1)**
  144:24
**responded (2)**
  117:22;118:15
**responding (1)**
  79:7
**response (3)**
  6:8;130:12;145:1
**responses (3)**
  6:5;137:1;138:1
**responsible (5)**
  117:21;134:17,24;
  135:3,8
**responsive (1)**
  82:10
**responsiveness (2)**
  4:14;136:2
**rest (1)**
  18:19
**restate (1)**
  51:14
**restroom (1)**
  138:6
**result (2)**
  34:15;74:4
**resulted (1)**
  34:19

**retain (1)**  
92:12  
**retract (4)**  
51:14,16;53:9;  
84:22  
**revealed (1)**  
84:8  
**review (3)**  
115:6;118:25;122:2  
**reviewed (2)**  
79:5;129:9  
**right (72)**  
12:4;14:12;15:22;  
21:7;22:11;29:22;  
32:18;37:16,16;  
41:12;46:4;52:16;  
57:19;63:22;64:14;  
68:21;70:18;72:25;  
75:6;76:25;79:12,16;  
84:7;86:20,24;90:9;  
91:20;96:17;98:15;  
99:3;100:6;101:14,  
21,25;102:11;104:8,  
8;107:18;109:4,8,12;  
113:8,9,13;114:10;  
115:18,20;116:22;  
119:8;120:6,9;  
122:11;129:15;  
131:11,24;132:10,22,  
25;133:8;137:20;  
138:5,25;139:5;  
144:3;145:3;147:10;  
152:12;157:10;159:7,  
9;161:6;163:2  
**right-hand (1)**  
45:14  
**rights (1)**  
59:8  
**ring (1)**  
65:19  
**rise (2)**  
43:10;108:6  
**Riverdale (1)**  
113:3  
**Road (4)**  
113:3,15;157:2,3  
**roaming (1)**  
107:9  
**Roberts (5)**  
49:11,22,23;50:3,4  
**rock (1)**  
78:14  
**role (2)**  
105:4,8  
**roof (2)**  
27:13;70:11  
**room (6)**  
19:1,4,5;20:11;  
71:20;109:23  
**rooms (2)**  
50:19;71:18  
**rotation (1)**  
105:14

**rough (3)**  
66:17;67:8,10  
**rude (1)**  
6:13  
**Rules (2)**  
4:7;5:2  
**run (3)**  
5:5;77:25;151:23  
**rundown (1)**  
118:7  
**Russ (31)**  
8:13,13;9:2,14;  
11:12,21;12:1,13;  
15:9,12,18;17:25;  
20:16;22:1;23:12,16;  
41:8;46:10;55:15;  
58:7,10;67:15,22;  
68:9,18,19;70:3;  
92:15;114:19;145:12;  
146:8

## S

**safe (3)**  
33:5;98:12,16  
**safety (1)**  
89:8  
**salvage (1)**  
74:25  
**same (23)**  
17:7;19:4;29:6;  
32:12;34:2,3;46:25;  
47:10,15;50:14;  
58:12;59:12;61:25;  
76:23;97:18;119:23,  
25;120:5;121:15,25;  
122:1;123:19,19  
**sat (1)**  
124:18  
**save (1)**  
131:23  
**saw (9)**  
11:14;24:8;41:4;  
44:13;69:12,24;70:2;  
102:3;113:11  
**saying (13)**  
7:25;31:24;36:11,  
12,12,14;86:17;  
127:13;130:4;132:9;  
133:8;134:16;162:10  
**scene (1)**  
53:23  
**schedule (1)**  
145:23  
**schedules (1)**  
145:25  
**scheduling (3)**  
58:11;145:8,12  
**school (16)**  
87:4;96:24;97:3,5,  
11;98:5,6,14,18,19;  
100:2,3;124:19;  
125:18;156:22;157:8

**Schools (1)**  
88:8  
**science (1)**  
161:17  
**scope (8)**  
35:14,23,25;36:12;  
37:4,5,15;44:5  
**se (1)**  
20:13  
**search (2)**  
81:10;84:24  
**second (9)**  
12:7;46:20;63:8;  
71:13,17;100:24;  
101:2;114:4;133:11  
**secondary (1)**  
99:14  
**secure (4)**  
21:22;71:16;  
104:17,18  
**securing (1)**  
135:1  
**security (2)**  
28:15;104:18  
**seeing (1)**  
94:22  
**seems (3)**  
97:18;162:3,3  
**sees (1)**  
155:17  
**send (5)**  
23:17;26:14;  
130:16,16;155:4  
**sending (2)**  
21:5,6  
**sense (9)**  
32:13;117:23;  
118:16;130:5,13;  
134:10;135:25;  
157:23;160:8  
**sent (23)**  
14:23;15:7,15,24;  
16:3;21:3;26:9,16,17;  
39:17;54:15;59:11,  
21;80:8;82:21;117:2,  
25;123:21,25;127:16;  
144:20,22;146:15  
**sentence (1)**  
101:2  
**separate (1)**  
116:20  
**September (15)**  
15:16,25;16:13;  
39:17,20;42:4;  
103:21;104:1,2,24;  
105:9,19;106:3;  
108:10;109:5  
**series (2)**  
57:20;145:5  
**service (1)**  
93:18  
**services (4)**  
91:1;99:6;100:4;

153:11  
**several (12)**  
9:24;10:23,24;  
16:22;21:15,16;25:3;  
32:23;47:16;92:22;  
107:25;143:3  
**shaking (1)**  
6:7  
**shape (2)**  
115:14;120:2  
**share (1)**  
157:9  
**shared (5)**  
51:6,23;65:5;80:6;  
126:9  
**shed (1)**  
50:17  
**sheetrock (2)**  
34:25;35:1  
**shoots (1)**  
157:19  
**shop (3)**  
152:24,25;156:1  
**short (1)**  
5:15  
**shortly (7)**  
30:6,7,9,11;54:9;  
125:5;145:13  
**shoulders (1)**  
6:8  
**show (4)**  
42:21;51:19;58:7;  
115:10  
**showed (4)**  
22:8;47:6,12;51:22  
**showing (1)**  
35:19;42:11  
**shrugging (1)**  
6:8  
**side (2)**  
98:12;136:6  
**sign (1)**  
164:13  
**signature (2)**  
137:23;157:18  
**signed (1)**  
80:8  
**significance (2)**  
40:12,15  
**significant (2)**  
65:3,3  
**signing (1)**  
80:2  
**signs (3)**  
108:3;142:7,19  
**similar (4)**  
25:23;61:8;70:18,  
20  
**simply (1)**  
148:16  
**single (8)**  
19:1;31:16,21,22;  
52:5;128:25;134:17;

152:23  
**sinks (3)**  
19:23;54:7;77:25  
**sites (4)**  
87:14,15,25;88:2  
**sitting (5)**  
30:22;100:14;  
115:18,20;129:8  
**skill (1)**  
99:11  
**skills (1)**  
99:11  
**slated (1)**  
160:19  
**small (3)**  
77:8;91:22;142:1  
**small-scale (1)**  
143:12  
**smoke (1)**  
71:21  
**smoothly (1)**  
5:5  
**so- (1)**  
52:16  
**soccer (1)**  
97:7  
**social (1)**  
161:18  
**solidify (1)**  
133:24  
**somebody (8)**  
38:24;39:10,19;  
58:2;65:24;68:5;  
108:6;142:5  
**somehow (2)**  
121:21;122:4  
**someone (8)**  
68:10;71:12;  
105:13,17;106:8,11,  
15;157:2  
**Sometime (2)**  
13:9;40:22  
**sometimes (1)**  
155:4  
**somewhere (3)**  
17:12;76:21;112:1  
**soon (4)**  
8:18;39:16;144:22,  
23  
**sorry (21)**  
7:25;13:5;17:10;  
27:24;57:17;96:25;  
101:21;102:1,1;  
107:16;108:25;111:7;  
116:8;117:11;122:10;  
132:11;133:5,7;  
141:19;158:15;159:1  
**sort (7)**  
34:24;61:23;64:21;  
66:5;92:12;93:25;  
94:11  
**sound (4)**  
45:17;46:5;62:3,8

sounded (2)
88:19,20
**Sounds (1)**
153:3
**Southern (1)**
88:7
space (1)
74:25
speak (8)
49:24;53:24;61:9;
68:22;75:17;91:9;
123:6;163:19
speaking (7)
8:2;23:6;49:25;
53:2,23;55:12;114:20
speaks (2)
99:10
special (1)
99:10
specialized (1)
100:4
specific (3)
30:5;45:25;103:24
specifically (13)
54:4;73:15;83:4;
87:25;93:13;96:9;
118:20;143:19,20;
149:21;153:8,23;
163:6
speculate (2)
117:5;146:20
**Spell (1)**
164:3
spelled (1)
29:6
spent (1)
94:8
spilled (1)
77:21
spoke (3)
110:19;114:17;
141:9
sports (3)
96:21;97:11,24
spot (1)
70:17
square (1)
157:15
staff (9)
70:16;160:17,24;
161:1,7;162:1,6,14;
163:11
staffed (14)
160:11,13,16,18;
161:10,25;162:3,6,6,
8,10,11,12;163:4
staffing (1)
163:6
**Stage (15)**
73:8,20,21,21;
74:11,13,13;75:4;
76:10,18;77:1,4,6,8,
11

standards (4)
53:25;87:17,23;
143:23
stands (1)
137:7
start (3)
116:16;138:9;
142:22
started (9)
5:2;6:23;8:3;10:16;
34:16;41:17;102:19;
105:5;140:6
state (5)
6:22;52:11;106:24;
113:12;151:4
stated (28)
38:3;51:18,24;52:3,
9;53:8,8;54:6,7;
55:16;56:20,23;
60:16;77:17;84:21;
93:15;94:10;117:17,
19;118:7;128:23;
133:14;134:6,24;
146:3;148:7;159:24;
163:16
statement (1)
59:20,23
statements (1)
138:1
stating (4)
60:22;61:4;117:15;
146:24
status (2)
139:18;140:10
stay (1)
99:19
stayed (3)
21:10,14;63:23
staying (1)
93:21
**Stella (1)**
24:14
stemming (1)
56:11
step (2)
133:10;137:15
steward (2)
105:1,4
steward/caretaker (1)
105:7
still (24)
17:7,17;20:22;
24:15,15;60:9;81:6;
83:14;85:4,9;88:11,
13,14;99:15;104:25;
106:19,19;127:14;
150:12;151:25;161:5;
162:19,19;163:10
stipulations (1)
4:12
store (1)
17:11
storm (3)

7:20;27:12;60:17
straight (1)
156:18
strain (1)
160:3
**Strike (2)**
10:14;112:17
strong (2)
74:10,12
structural (2)
63:12,14
structure (2)
46:23;54:9
student (1)
106:2
students (1)
160:19
studies (1)
161:18
studio (1)
90:17
study (2)
24:19,22
stuff (3)
79:8;129:9;154:8
style (1)
74:22
submit (2)
87:18;148:13
submitted (31)
22:12,12,14,15,15,
16,25,25;23:3,25;
30:7,10;37:13;38:10,
12;41:6;43:5;60:14;
61:3;82:15;90:13,19;
92:3,18,19;94:9,12,
19;130:19;137:3;
140:8
subsequent (3)
55:17;59:22,25
substance (3)
79:25;123:11,23
substantive (4)
124:6,25;125:3;
129:22
substantively (1)
125:10
successful (1)
75:3
suggest (1)
149:15
summer (7)
95:15,19;104:11;
162:24,24;163:1,4
summer/early (1)
110:15
support (1)
105:16
sure (38)
5:4,6;15:24;19:18;
30:16;33:3;46:17;
51:7;52:2,7,12;54:2;
72:6,8;93:17,18;94:6,

18;95:14;96:16;
100:8;101:13;103:1,
3;104:16;108:13;
112:14;115:12;
116:13;120:13;128:2,
16;138:8;139:9;
143:5,7;154:5;158:1
suspected (2)
51:5;54:20
suspicious (2)
107:7,13
switch (1)
17:11
sworn (1)
4:19
system (9)
33:24;34:1,5,14,19;
74:2;92:1;109:13;
152:17
systems (1)
36:9

**T**

table (1)
121:6
talk (5)
5:10;7:3;12:21;
80:15;125:10
talked (5)
7:1;18:10;144:16;
149:4,20
talking (12)
5:13;7:11;57:25;
63:5;81:19;89:1;92:7;
101:10;122:20;
131:20;136:3;157:24
team (1)
96:22
tear (2)
75:23;77:24
telephone (1)
147:19
term (2)
53:9;157:11
terms (5)
108:15;114:7;
129:23;153:19;
154:10
testified (3)
4:19;44:9;84:14
testify (1)
92:11
testimony (2)
83:17;88:20
testing (1)
34:15
**Thanks (1)**
55:8
that'll (1)
89:25
therapeutic (1)
124:19

therapy (2)
99:12,13
**Thereafter (2)**
20:18;54:9
thinking (2)
151:4;152:10
third (8)
12:8,8;67:21;75:17;
76:7;130:25;131:4,9
third-party (1)
14:8
thorough (4)
51:2,13,15;53:22
though (2)
56:2;129:7
thought (4)
23:1;83:18;104:20;
107:17
thousand (1)
153:11
thread (4)
119:17;121:14,15;
129:5
threads (1)
122:3
three (16)
7:7;46:9,15;111:16;
112:23,23,23;126:18;
134:3;135:7,23;
147:6,9;151:2,2;
161:19
throughout (6)
57:25;71:21;78:15;
106:20,25;133:23
throw (1)
32:24
thrown (1)
78:14
thumb (1)
16:15
thus (1)
133:19
till (1)
97:4
timeline (1)
101:9
times (18)
12:3;13:24;14:1;
20:16;21:4,8;23:23;
65:23,25;100:14;
104:6,9;105:14;
107:24;108:1;112:19;
122:23;143:3
timing (4)
35:5;62:11;86:11;
146:2
tin (1)
50:17
today (5)
30:2;86:12;100:19,
21;115:21
together (2)
24:1;108:17

**told (12)**
11:12;52:19;57:2;
116:24;125:24;
141:17;149:4,23;
150:13,16,18,20
**took (22)**
4:25;10:13;18:9,20,
22;19:2,8;22:9;23:12,
16;31:5;47:7;51:11;
63:9;64:18;70:17;
83:21;111:15;139:3,
8;144:12;147:21
**top (6)**
45:13;72:21;76:10;
94:21;131:5;140:17
**topic (1)**
149:17
**torn (1)**
26:24
**torn-out (6)**
19:2,3,15,16,16,23
**total (1)**
133:17
**touched (1)**
90:16
**toward (3)**
133:21;135:12;
151:12
**track (1)**
110:6
**traffic (3)**
106:25;107:2,4
**training (4)**
99:11,12;105:23,23
**trainings (1)**
106:2
**trajectory (1)**
161:9
**transaction (1)**
136:7
**transcript (2)**
4:15;80:14
**transfer (2)**
152:7,13
**transition (1)**
152:20
**trash (3)**
74:21,22;77:19
**trashed (1)**
73:5
**tree (30)**
7:19,19,20;56:12;
60:11,16,17,17,24;
61:17;62:24;63:3,7,9,
13,18;64:2,2,6,18;
67:13,22;68:20;
69:10;70:15,16,24;
72:11;93:12;145:17
**tree-related (1)**
61:23
**tried (1)**
145:7
**triple (6)**

117:20;118:12;
128:22;130:9,16;
134:8
**trips (1)**
108:2
**trouble (1)**
94:22
**true (12)**
80:4,5;117:20;
118:12;128:22;130:9;
133:24;134:8;135:14,
19;138:2;151:15
**try (7)**
5:14;6:2,5,14;
87:12;101:13;114:25
**trying (11)**
6:13;7:15;37:17;
103:21;120:3,8,13;
122:24;132:1;141:22;
152:4
**turn (1)**
73:3
**turning (2)**
35:8;49:4
**tutorial (1)**
161:17
**two (33)**
7:3,6;12:11;37:8;
46:3;56:10;59:7,18,
22,25;60:13;66:4;
68:19,19,23;71:8;
73:10;75:7,7,19;
102:24;104:6;111:16,
16,17;122:23;126:19;
137:21;144:18;
153:11;154:20;
159:10;161:18
**Ty (3)**
58:4,10;145:20
**type (25)**
6:7;9:19;10:3;11:5;
14:6;19:10,10,11,19,
22;28:12;30:19;
54:19;63:9;71:14;
87:6,17;88:21;91:2;
95:12;117:3;131:7,
16;143:11;149:15
**types (9)**
18:21,22,24;19:9,
13,24;20:2;97:23;
109:2
**typical (1)**
20:10
**Typically (4)**
125:13;127:20,22,
24
**typing (1)**
5:8

**U**

**Uh-uh (1)**
72:8

**unable (1)**
92:6
**unaware (4)**
45:25;126:8;162:2;
163:10
**unclear (1)**
88:2;150:12
**uncut (2)**
91:2,4
**under (9)**
4:7;33:15;59:8;
68:15;74:24;99:15,
16,18;160:2
**undergoing (1)**
38:3
**underlined (1)**
100:25
**understood (23)**
130:4;134:23;
135:5,6;147:8
**uniform (1)**
155:7
**unit (2)**
20:5;37:11
**units (26)**
9:24;10:1,1,5,8,9,
12,15,23;11:2,4,6,9;
13:1,12;19:17;22:2;
34:2,3,5;37:9,10,12;
43:22;44:4;102:6
**universe (1)**
120:14
**university (5)**
52:8;54:2;113:18,
25;144:10
**unsure (1)**
162:9
**up (36)**
14:18;21:21;27:5,7;
28:10,13;30:23;31:1,
16,17,22;32:14,15;
37:10,12;52:14,22;
58:7;66:16;91:8;
100:21;111:13;
115:10;116:5;127:13,
15;130:5;136:21;
143:23;149:1,19;
155:8,14;156:5;
157:1,14
**up/reinforce (1)**
27:1
**update (1)**
149:9
**updated (6)**
34:6,15;35:15,20;
36:1,17
**updates (2)**
34:18;140:4
**updating (1)**
36:8
**upgrades (1)**
108:21
**ups (1)**

**100:19**
**usage (1)**
126:11
**use (8)**
4:15;32:1;43:4;
96:19;113:1;139:3;
151:25;159:22
**used (15)**
68:6;96:25;97:3,4;
98:17;99:4,9,15,16,
18,25;125:22,25;
126:5;159:5
**using (4)**
106:6;133:12;
139:6;152:16
**usual (1)**
4:11
**usually (1)**
23:17
**utilities (1)**
141:23
**utilize (4)**
20:12;102:19;
106:1;160:1
**utilized (1)**
106:24
**utilizing (12)**
32:6,7,12,14,16;
33:2,19;105:24,25;
135:22;150:8;159:16

**V**

**vacant (1)**
125:8
**values (1)**
130:15
**vandalism (131)**
7:11,19;8:10,12,17;
9:3,5,5,10,13,15,19,
21,22,23;10:4;11:10,
13,18,21;12:7,14,24;
14:5;15:2,9,10,11,18;
16:6,8;17:24;18:2,3,
15,15,19,21,24;19:10,
12,13,20,22,24;20:3,
13;21:1,24;22:1;
23:13;26:20;28:20;
29:25;35:13;38:1,25;
39:9,18,25;40:4,8,13;
41:1,5,8,17,25;42:7,
11,18;43:7,18;44:1,4,
10,13,14;45:18;50:2,
4,21;54:17,20,22;
55:10,14,17;56:11;
57:22;58:6,15;60:11;
64:22;66:7;67:20,21;
68:20;69:6,11,12,15,
25;70:2,10,24;71:3,5,
8;72:11;78:4,10,12,
13,24;93:11;101:22;
102:4;103:5,13;
104:14,20,22;105:9;

110:18;111:14;
112:18;113:9;142:7;
145:8,17
**vandalized (8)**
27:15;28:23;47:20,
22;48:3,4,10;113:11
**Vargo (2)**
14:24;15:4
**various (7)**
18:23;65:2,7;93:15;
139:21;140:6;152:20
**vendor (1)**
64:22
**verbal (1)**
6:5
**verification (2)**
117:3;137:22
**versus (3)**
4:2,3;101:12
**via (14)**
46:21;57:9;60:15;
114:18,21;118:15;
133:22;134:6;135:3;
147:18;148:15,18;
150:9;155:5
**video (3)**
91:7,9,12
**vision (3)**
99:20,20;159:13
**visions (1)**
99:19
**visit (16)**
12:7,8,8,9;14:4;
21:19;23:20;69:18;
86:4;102:9,14,23;
103:10,12;113:7;
145:23
**visited (11)**
15:12;21:4,25;
23:13,22;45:10;
55:13;62:15;65:13;
104:4,14
**visits (10)**
14:3;21:10,14,17,
20,21;23:7;55:17;
70:3;104:7
**voice (1)**
116:5
**voided (1)**
37:14
**volleyball (1)**
97:8

**W**

**wait (5)**
56:13,17,25;
133:11;146:4
**waited (1)**
46:12
**waiving (1)**
4:12
**walk (4)**

40:18;116:14;
154:11,14
**walked (5)**
8:19;36:2;41:21;
103:2;104:10
**wall (3)**
25:25;34:23;142:15
**walls (4)**
20:5,14,15;142:12
**warehouse (5)**
47:18;50:8,12,13,
16
**Washington (3)**
113:15;157:2,3
**water (14)**
73:24;74:6,9,11,16,
19,24;75:4;76:17,20,
20,22,23;141:24
**waving (1)**
6:9
**way (16)**
15:10;35:22;36:15;
42:10,19;55:16;
84:17;101:3;115:14;
120:2;129:5;146:17;
151:25;157:12;159:6;
160:14
**wear (2)**
75:23;77:24
**week (1)**
107:24
**weeks (6)**
30:12;46:10,15;
111:16,17;161:19
**weren't (6)**
32:5,16,22;122:7;
128:17;149:19
**wet (1)**
30:22
**whatnot (1)**
38:9
**What's (9)**
21:13;44:12;47:24;
56:15;101:5,5;
113:17;124:22;
132:20
**whatsoever (2)**
114:13;128:5
**whenever (4)**
40:23,23;98:8,14
**whereabouts (1)**
30:4
**Whereupon (12)**
14:19;39:3;44:20;
49:3;58:20;72:17;
100:9;107:19;114:5;
137:9,16;138:10
**whichever (2)**
34:11;156:20
**Whitaker (2)**
58:4,10
**whole (3)**
74:15;120:10;158:9

**WILDES (55)**
4:1,22,23;7:13,15;
20:25;23:12;26:2;
28:2,8;29:9;39:8,24;
42:19;44:18,23;45:4;
47:4,15;49:2,4;58:17,
19;59:1;60:4,9;61:16;
81:6,21;82:1,16;87:2,
10;89:15;91:7;100:5;
131:3;138:6,9,12,16;
140:22,23;141:21;
145:11;151:16;
158:14,17;161:3,10;
162:17;163:10,21,23;
164:9
**willing (1)**
68:10
**wind (6)**
27:11,12;92:24,24,
25;93:11
**window (6)**
31:16,21,22;63:7;
78:14,17
**windows (13)**
27:5;31:1,7,13,19;
32:14,15,21;33:4;
78:13,18;142:19;
156:7
**wind-related (1)**
72:11
**windstorm (4)**
7:21;8:15;27:12;
70:10
**wires (2)**
19:2,3
**wiring (1)**
19:16
**within (20)**
30:11,12,13,13,14;
39:13;70:11;71:20,
25;72:1,1;93:21;
116:25;123:10;
133:18,18;134:24;
150:5;154:19;157:17
**without (1)**
102:3
**WITNESS (43)**
20:21,24;23:10;
25:21;27:24;28:7;
29:7;39:22;40:19;
42:15;45:3;47:14;
58:25;61:14;69:14;
81:5,22,25;82:15;
87:1,9;89:13;105:22;
107:15,21;109:6;
110:7;116:8;117:7;
119:2;132:2,4,8,21;
134:16;141:19;
160:23;161:1,7;
162:16;163:22;164:8,
12
**wood (2)**
71:15;76:19

**word (2)**
74:10,12
**work (15)**
28:19;29:12;30:16,
19,19;37:19,20,23;
94:5,6;111:1,19;
112:20;135:11;
153:16
**worked (5)**
28:22;74:5;109:19;
143:17;155:15
**working (6)**
85:24;106:20;
114:25;149:12;150:7,
9
**workman's (2)**
154:23;155:20
**written (6)**
11:17;67:4;71:7;
96:3,3;137:2
**wrong (2)**
12:2;83:17

## Y

**year (10)**
61:6;97:3,5;98:5,6;
131:6,16;154:2,3;
156:22
**year/spring (1)**
98:2
**years (6)**
46:3;112:24;
152:16;153:12,20;
159:10
**yes-or-no (1)**
160:5
**YMCA (2)**
95:14;96:1
**YouTube (5)**
82:19;90:20,21,23;
91:9

## Z

**Zion (1)**
113:3

## 1

**1 (1)**
102:19
**107 (1)**
107:20
**11 (2)**
39:1;119:21
**110 (1)**
55:25
**12 (2)**
99:13;155:13
**120 (16)**
14:14,16,20;22:7,
19;23:19;24:24;

26:12;27:23,24;
35:12;44:5,8,10,13;
47:1
**121 (4)**
38:18,20;39:4;
57:19
**122 (9)**
44:19,21,24;49:4;
57:16,17,17;140:21,
22
**123 (4)**
58:18,19,21;59:2
**124 (3)**
72:14,18;100:22
**125 (3)**
113:2;136:23;
137:10
**13 (2)**
107:20;121:19
**138 (1)**
113:3
**14 (3)**
28:2;77:9,10
**14x14 (1)**
74:14
**15 (3)**
28:2;77:10;153:12
**15th (1)**
45:15
**16 (1)**
123:14
**16th (1)**
62:2
**17 (3)**
56:5,16;59:23
**1706 (1)**
113:15
**18 (7)**
102:8;110:13;
128:15,19;129:15;
131:20;132:4
**18-015152 (1)**
52:18
**1st (3)**
133:25;147:21;
148:25

## 2

**2 (3)**
46:19;59:9;79:14
**2015 (2)**
43:17;156:6
**2016 (2)**
43:17;156:6
**2017 (2)**
154:24;156:6
**2018 (23)**
26:21;39:1;41:18;
45:15;55:4;60:3;
61:10;62:2;72:24;
73:5;93:1;97:1;98:2;
101:21;104:12;

110:15;113:14;
122:22,22;124:4;
127:1;141:14;142:10
**2019 (4)**
59:9,24;60:21;61:3
**20-second (1)**
91:12
**24 (1)**
123:10
**24/7 (3)**
106:7,9,10
**26 (5)**
15:16,25;16:13;
39:17,20
**2640 (1)**
140:25
**27th (3)**
121:24;122:22;
123:8
**2nd (13)**
7:2;92:25;119:5,10,
14;120:5,7,20;
121:12;122:22;
130:25;144:19;
147:22

## 3

**3 (7)**
47:18,25;48:5,7,8;
132:13;161:19
**30 (8)**
66:17;102:20;
127:16;134:19;
135:13;151:3,5,8
**30-day (1)**
133:19
**30-second (1)**
91:12
**30th (1)**
130:6
**350 (1)**
160:19
**37 (13)**
115:4;116:2;
118:22;130:23;131:4,
4,21;132:6,7,8,13,18;
134:12
**3rd (2)**
59:9;60:21;61:3;
73:3,4

## 4

**4 (5)**
47:18,25;48:5,7,8
**40 (3)**
121:25;122:12,16
**400 (1)**
160:19
**46 (3)**
131:1,4,10

### 5

**5 (4)**
    47:18;48:5,7,8
**5-gallon (1)**
    77:20

### 6

**6 (1)**
    161:19
**6:09 (1)**
    164:14
**6:25 (1)**
    123:7

### 7

**7:12 (1)**
    130:6
**7265 (1)**
    113:3

### 8

**8th (1)**
    72:24

### 9

**90 (2)**
    152:11,11
**9th (1)**
    59:24

| | |
|---|---|
| **From:** | Georgia Doctors <georgiadoctors@yahoo.com> |
| **Sent:** | Wednesday, September 26, 2018 4:38 PM |
| **To:** | Glenn Hileman; Kelsy Vargo |
| **Cc:** | LOLETHIA CHAPMAN; rfrazier@edsystem.org |
| **Subject:** | Fw: Vandalism |
| **Attachments:** | IMG_0191.jpg; IMG_0221.jpg; IMG_0226.jpg; IMG_0227.jpg; IMG_0228.jpg; IMG_0229.jpg; IMG_0233.jpg; IMG_0235.JPG; IMG_0242.jpg; IMG_0249.jpg; IMG_0253.jpg; IMG_0281.jpg; IMG_0282.jpg; IMG_0283.jpg; IMG_0284.jpg; IMG_0285.jpg; IMG_0286.jpg; IMG_0287.jpg; IMG_0288.jpg; IMG_0289.jpg; IMG_0292.jpg; IMG_0293.jpg; IMG_0294.jpg; IMG_0295.jpg; IMG_0296.jpg; IMG_0297.jpg; IMG_0298.jpg; IMG_0299.jpg; IMG_0300.jpg; IMG_0301.jpg; IMG_0302.jpg |

Greetings, =/div>

I trust all is well.  This email is to =nform you that several buildings have been recently vandalized.  Lole=hia and I walked the buildings and noticed this on last week.  One bu=lding had "Drug Crack Pipe" on the floor.  This is beyond the scope o= what we had identified as needing to be replaced and updated and remodele=.  We have been in the process of renovations and obtaining permits a= well as drawings, and noticed the major damage.  I am calling our in=urance company to submit the claim.  I will keep you updated.

Best regards,

Dr= Braddy

<=r>

=br>



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
120
8.19.20

1

<=r>

Sent from my iPhone
































































Russ Hart *770.785.6244 voice/fax*
678.230.1039 cell

NOTICE: The information contained in this email is confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, you are asked to please reply to the sender and destroy all copies of the message including any attachments. You may feel free to contact me directly at any of the above phone numbers.

---

**From:** "Szydlo, Donna" <dszydlo@GAIG.COM>
**To:** "russok2@bellsouth.net" <russok2@bellsouth.net>
**Cc:** Georgia Doctors <georgiadoctors@yahoo.com>; Ty Whitaker <ty.whitaker@mclarens.com>
**Sent:** Monday, October 15, 2018 11:28 AM
**Subject:** RE: Re: Braddy Preparatory Academy Claim # 577558820 DOL 10/12/18

Hi Mr. Hart
Thanks for your email.
I just talked with Ty Whitaker. Not sure what happened, but he said that you did not show up for the scheduled inspection this morning at 10am. He said that he tried calling and texting and waited over an hour but is heading out at this time. As you know, he'll be away until next week so we'll need to reschedule the inspection for when he returns. As discussed in our conversation on Friday, you were trying to gather additional information on when the claimed damage occurred, the police report, and were trying to reach an employee of Dr. Braddy's who apparently had more information. Please update us when you have more information.

Thank You

Donna Szydlo, AIC-M, AINS
Senior Claim Technical Director
Specialty Human Services
Great American Insurance Group
P.O. Box 1997
Cincinnati OH 45201-1997
877-202-9902 toll free
855-254-4089 FAX
dszydlo@gaig.com

Donna



**From:** russok2@bellsouth.net <russok2@bellsouth.net>
**Sent:** Friday, October 12, 2018 4:32 PM
**To:** Szydlo, Donna <dszydlo@GAIG.COM>
**Cc:** Georgia Doctors <georgiadoctors@yahoo.com>; Ty Whitaker <ty.whitaker@mclarens.com>; Russ Hart <russok2@bellsouth.net>
**Subject:** [External] Re: Braddy Preparatory Academy Claim # 577558820 DOL 10/12/18

Ms. Szydlo, this will confirm our talking together this evening to your below email.
Yes, Ty and I have scheduled Mon 10am. I have no problem with his departing the rest of the week as I familiarize myself with the claim.
No, we are not saying that the loss happen on 10/11/18, that's the date reported. Indeed it could have been on multiple occasions. As presented to you... Ty and I saw at least a couple of units that had the appearance of vandalism.
Yes, a police report is being filed. I will provide that number once received.

Todate: Ty and I suspected vandalism during our walk-through for the wind loss; at some point I reported the same to Doc Braddy and he was to have someone inspect but I did not hear back; as of yesterday Doc Braddy says that guy is no longer with the organization but will reach out and have that person contact me; I last visited the site yesterday with Doc Braddy and an agent of the Owner. We inspected a couple of properties and like Doc Braddy she was adamant that these were new damages; I inquired of a police report and that is being attained. Since Ty is the adjuster, All requested info that is received will be provided to Ty unless directed otherwise

Thanks,
Russ Hart *770.785.6244 voice/fax*
678.230.1039 cell

NOTICE: The information contained in this email is confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, you are asked to please reply to the sender and destroy all copies of the message including any attachments. You may feel free to contact me directly at any of the above phone numbers.

---

From: "Szydlo, Donna" <dszydlo@GAIG.COM>
To: "russok2@bellsouth.net" <russok2@bellsouth.net>
Cc: Georgia Doctors <georgiadoctors@yahoo.com>; Ty Whitaker <ty.whitaker@mclarens.com>
Sent: Friday, October 12, 2018 10:42 AM
Subject: Braddy Preparatory Academy Claim # 577558820 DOL 10/12/18

Mr. Hart
Just following up on my message left on your voice mail this morning. We've received the new claim for Braddy Prep Academy involving theft/vandalism. Please contact me at your earliest convenience to further discuss this new claim and provide additional loss details and the police report number. I've also reached out to Ty Whitaker @ McLarens. He is already familiar with the properties so makes the most sense that he is also involved in this claim, and he will assist on our claim review. I understand that he is available to complete an initial inspection on Monday but then will be in Florida the rest of the week assisting with Hurricane Michael claims. Hopefully you are also available on Monday for the initial inspection.

Thank You

Donna Szydlo, AIC-M, AINS
Senior Claim Technical Director
Specialty Human Services
Great American Insurance Group
P.O. Box 1997
Cincinnati OH 45201-1997
877-202-9902 toll free
855-254-4089 FAX
dszydlo@gaig.com

---

The content of this e-mail message and any attachments are confidential and may be legally privileged, intended solely for the addressee. If you are not the intended recipient, be advised that any use, dissemination, distribution, or copying of this e-mail is strictly prohibited. If you receive this message in error, please notify the sender immediately by reply email and destroy the message and its attachments.

---

The content of this e-mail message and any attachments are confidential and may be legally privileged, intended solely for the addressee. If you are not the intended recipient, be advised that any use, dissemination, distribution, or copying of this e-mail is strictly prohibited. If you receive this message in error, please notify the sender immediately by reply email and destroy the message and its attachments.

The content of this e-mail message and any attachments are confidential and may be legally privileged, intended solely for the addressee. If you are not the intended recipient, be advised that any use, dissemination, distribution, or copying of this e-mail is strictly prohibited. If you receive this message in error, please notify the sender immediately by reply email and destroy the message and its attachments.

| | | | |
|---|---|---|---|
| **Agency Name** | | | **Case#** _18-015152_ |
| _East Point Police Department_ | | | **Date / Time Reported** _10/15/2018 14:10 Mon_ |
| **ORI** _GA0600200_ | | | **Last Known Secure** _10/15/2018 14:10 Mon_ |
| | | | **At Found** _10/15/2018 14:10 Mon_ |

**INCIDENT DATA**

**Location of Incident**: _2605 Ben Hill Rd, East Point GA 30344-_  
**Premise Type**: _School/college/university_  
**Zone/Tract**: _Z5_

| | Crime Incident(s) | (Com) | Weapon / Tools _NOT APPLICABLE NONE_ | | | Activity |
|---|---|---|---|---|---|---|
| #1 | _Criminal Trespass - Property Damage_ _028_ | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

**# of Victims** _1_  **Type:** INDIVIDUAL( NON LE)   **Injury:** None   **Domestic:** N

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| **V1** | _BRADDY, CARROLL JR_ | _1_ | _09/08/1981_ Age _37_ | _B_ | _M_ | _UN_ | | |

**Home Address** _7265 MOUNT ZION BLVD , Jonesboro, GA 30236-_   **Home Phone** _678-485-6055_

**Employer Name/Address**   **Business Phone**   **Mobile Phone**

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

**OTHERS INVOLVED**

**CODES:** V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

**Type:**   **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| | | | Age | | | | | |

**Home Address**   **Home Phone**

**Employer Name/Address**   **Business Phone**   **Mobile Phone**

**Type:**   **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| | | | Age | | | | | |

**Home Address**   **Home Phone**

**Employer Name/Address**   **Business Phone**   **Mobile Phone**

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Officer/ID#** _TRIMBLE, J. N. (FOD, PAT) (7545)_

**Invest ID#** _TYSVER, T. M. (DET, CID) (1470)_   **Supervisor** _GARRETT, Q. N. (DET, CID) (3968)_

**Status**   **Complainant Signature**   **Case Status** _Active_ _10/15/2018_   **Case Disposition:**   Page 1

PLAINTIFF'S EXHIBIT
122
8·19·20
PENGAD 800-631-6989

# INCIDENT/INVESTIGATION REPORT

*East Point Police Department*

Case # 18-015152

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |
|---|---|---|---|---|---|---|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

## NARRATIVE

On 10-15-2018 I Cpl Trimble was dispatched to Point University 2605 Bell Hill Rd East Point Ga, 30344 Fulton County in reference to a theft call.

Upon arrival this officer met with Carroll Braddy Jr.
Carroll advised as of 10-15-2018 the following buildings have been vandalized:
2531 Dodson Hall
Head Hall
2640 Family House
00010 Gilbert Hall
President House
Apt 3
Apt 4
Apt 5
Maintenance
Warehouse

Carrol displayed photos via phone in reference to the above locations damaged ceiling, drywall, cooper and other structure damage. After gathering information Carrol was given a copy of this case number.

Nothing further at this time.

## DECLARATION OF C. HARRISON BRADDY

My name is Dr. C. Harrison Braddy, and I am over the age of 18, suffer from no legal disabilities, and base this Declaration on my own personal knowledge.

1.

I am the CEO of Braddy Preparatory Academy, Inc. (hereafter "Braddy Prep."). As CEO, I asked Ms. Lorraine Brooks to obtain insurance coverage for fifteen (15) buildings Braddy Prep. intended to lease with the option to purchase (hereafter the "Lease"). These buildings were known as the "East Point Campus."

2.

While negotiating the Lease with Education Capital Solutions, LLC (hereafter "Education Capital"), Education Capital agreed to grant Braddy Prep. a license throughout the month of April so we could use the properties while each party finalized negotiations for the Lease.

3.

On March 29, 2018, I asked Ms. Brooks to secure insurance coverage for the East Point Campus per the terms of the license.

4.

On April 2, 2018, Braddy Prep. received a Certificate of Property Insurance for the East Point Campus, issued by Great American Assurance Company (hereafter



"Great American") from Powers-Leavitt Insurance Agency, Inc. (hereafter "Powers-Leavitt"), agreeing to provide various insurance coverage for the East Point Campus for approximately 30 days, or the duration of the license.

5.

Prior to April 27, 2018 I asked Ms. Brooks once again to finalize insurance coverage for the East Point Campus, as Braddy Prep. and Education Capital were close to finalizing the Lease. I made Ms. Brooks aware of Braddy Prep.'s intention to renovate the East Point Campus once entered into the Lease.

6.

On May 1, 2018, Braddy Prep. received a Certificate of Property Insurance, issued by Great American from Powers-Leavitt, agreeing to provide various insurance coverage for the East Point Campus pursuant to the Lease.

7.

Soon after Braddy Prep. entered into the Lease, we began renovations to the East Point Campus. These renovations continued through the summer and into August and September.

8.

Between August 2, 2018 and August 9, 2018, my employees alerted me to damage to some of the East Point Campus buildings following a severe storm on

August 2, 2018.  I asked Ms. Brooks to call Great American and file a property insurance claim (hereafter "the Claim").

9.

On or about August 15, 2018, an adjuster from Great American and an engineer inspected the East Point Campus.  I had no issue letting the adjuster or the engineer inspect the interior of the East Point Campus, yet they only inspected the exteriors of the buildings.

10.

On or about August 21, 2018, I retained Russell Hart, a public adjuster, to represent Braddy Prep.'s interests in the Claim.  Mr. Hart was present for a second inspection on August 22, 2018, with Great American's adjuster and engineer.

11.

Mr. Hart and Great American's adjuster and engineer inspected the East Point Campus a third time on or about September 5, 2018.

12.

On September 18, 2018, I received a letter from Great American's counsel, requesting an Examination Under Oath of myself and Ms. Brooks, and three pages-worth of documentation and information requests, including a Sworn Statement in Proof of Loss.

13.

I began the lengthy preparation for the Examination Under Oath and began collecting documentation and information to comply with the request and to complete the proof of loss.

14.

I had every intention of sitting for the Examination Under Oath and to complete the proof of loss. I never outright refused to provide it.

15.

I continued to prepare for the Examination Under Oath and searched for available dates when I received a Complaint for Declaratory Judgment from Plaintiff's counsel on October 29, 2018.

16.

From August 9 until present, Plaintiff has never asked about the renovations of the East Point Campus or our use of those buildings.

17.

Since the filing of the instant action, Braddy Prep. has attempted to file two additional claims with Plaintiff: one for vandalism, another for damage stemming from a fallen tree. Plaintiff has refused to investigate these claims and has instead instructed us to wait until this current action is resolved.

18.

If Plaintiff rescinds its Policy with Braddy Prep., not only will Braddy Prep. be in breach of its lease agreement with Education Capital, but it will be completely open to liability for any acts or losses that occur on any building owned by Braddy Prep.

Pursuant to 28 U.S.C. § 1746, I declare by my signature below that the foregoing is true and correct, under penalty of perjury.

Signed this 9th day of December, 2018.

C. Harrison Braddy, CEO, Braddy Preparatory Academy, Inc.

BDP0005



Paul A. Wildes
(404) 885-6314
pwildes@deflaw.com

H. Michael Bagley
(404) 885-6415
mbagley@deflaw.com

June 3, 2019

***Via US Mail and E-mail***
David Forestner
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339

Mark Battleson
Battleson Law, LLC
3280 Peachtree Road NE
Terminus 100, 7th Floor
Atlanta, GA 30305

RE:   ***Great American Assurance Company v. Braddy Preparatory Academy v. Powers-Leavitt Insurance Agency, Inc.***
United States District Court
Civil Action File No. 1:18-cv-4974

Dear Dave and Mark:

As you are aware, your client has placed Great American on notice of two additional occurrences that happened on October 11, 2018 and November 16, 2018. As discussed in previous correspondences and with their previous attorney, Great American continues to be willing to investigate the damages related to these claims, but only if your client agrees that the rights of all parties are reserved and that no action taken by Great American during the investigation of these claim serves as a waiver of any right.

We previously forwarded a non-waiver agreement to your client via its former counsel, but we did not receive a response. Accordingly, please let this correspondence serve as Great American's renewed offer to inspect your client's subsequent claims under the attached non-waiver agreement.

Please discuss the agreement with your client and forward an executed copy of the agreement to my attention. Once the agreement is executed by both parties, we can coordinate for inspection. Thank you for your attention to this matter.

Very truly yours,

DREW, ECKL & FARNHAM, LLP



H. Michael Bagley

HMB/paw
attachment: Reservation of Rights/Non-Waiver Agreement

| From: | Georgia Doctors <georgiadoctors@yahoo.com> |
| Sent: | Tuesday, May 8, 2018 6:34 PM |
| To: | Hileman, Glenn; Evensen, Leeza |
| Cc: | LOLETHIA CHAPMAN |
| Subject: | Re: Urgent Gym Issues |

To my knowledge, they have decided to rent another gym which will cost them=way more money. I don't know if they are considering the logistics=and oversight required. Being that Braddy Prep is not as large, we could h=ve clearly cohabitated with the Gym as well as supported each other. Nonet=eless, I would hope that FLA at minimum repair what they have broken and g=t the paint off the walls and floor. Does the lease require them to turn o=er Gym in the condition that they received it?

CH=

=ent from Yahoo Mail for iPhone

I would suggest Lolethia contact the school to notif= them of the need to remain compliant with the terms of the lease. A=ditionally, they currently have no ong term solution for the gym use and s=ould they desire a continuation of use, they'll need to court Dr. Braddy a=d gain his approval. Tough to do if they aren't actively maintaining=the property.

<=iv dir="ltr">

**Glenn Hile=an** *CEO*
746 East Winchester Street= Suite 150
Murray, UT 84107
Mobile: 801.824.9606 |&n=sp; Office: 8=1.256.9550 x 109
Fax: 801.304.3551 | Conference: 641-715-3272 x 479 619
highmark=chools.com
 =&nbs=; Be sure to visit our updated web site!

On Tue, May 8, 2018 =t 2:22 PM, Evensen, Leeza <levensen@swlaw.com> wrote:

Glenn= we can send them a letter describing damages but in the interest of time,=we should send someone there to monitor the situation. But yes, they have =ntil May 31st to vacate. Let me know if you have a minute to discuss=

-

Thank=,

-

Leeza=u>

**PLAINTIFF'S EXHIBIT**
124
8·19·20
PENGAD 800-631-6989

1

Snell=& Wilmer L.L.P.=/span>

801-=57-1882<=p>

-

**Fr=m:** Hileman, Glenn [mailto:glenn@highmar=schools. com]
**Sent:** Tuesday, May 08, 2018 1:43 PM
**To:** Georgia Doctors
**Cc:** LOLETHIA CHAPMAN; Evensen, Leeza
**Subject:** Re: Urgent Gym Issues

-

We sent notice of eviction last week.&n=sp; They must be off the premise no later than May 31st.  The damage =nd failure to maintain is clearly a breach of the lease agreement.  A= such, I've copied our legal counsel, Leeza Evensen to weigh in on what we may be able to do to address the issue immediately.


 **Glenn Hileman**&=bsp;*CEO*
=/p> 746 East Winchester Street, Suite 150 Murray, UT 84107
   Mobile: 801.824.9606&=bsp; |   Office: 801. 256.9550 x 109
   Fax: 801.304.3551 &nb=p;|   Conference: 641-715-3272  x 479 619
   highmarkschools.com=u>

   &=bsp;              =*Be sure to visit our updated web site!*

-

On Tue, May 8, 2018 at 1:20 PM, Georgia=Doctors <> wrote:

Greetings Glenn,

-

I trust that all is well. We are having=some serious possible sabbatage issues of the Gym. I'm concerned t=at the way things are going could place the CO in jeopardy as well as incr=ase liability. FLA has placed all kinds of broken equipment and trash infront of the emergency exit doors. The doors have been broken =nd the Gym has several different groups coming in and out with their own k=ys. FLA poured paint on the carpet and wall. Please advise as to how shoul= we address this issue. I've asked Lolethia to reach out to them to request that they fixed the damages and r=ctify the Gym back to the way it was when they received keys. Look forward=to hearing from you.

-

2

C. Harrison Braddy <=p>

678-=77-4108

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Tuesday, May 8, 2018, 12:40 PM, Rodrick Frazier <drfrazier057@gmail.com> wrote=

> Trash everywhere. This is completely un=cceptable. Bathrooms filthy
> and stink

<=blockquote>

**From:**              Georgia Doctors <georgiadoctors@yahoo.com>
**Sent:**              Sunday, June 3, 2018 10:01 PM
**To:**                 Glenn Hileman; LOLETHIA CHAPMAN
**Subject:**         Urgent Request.

Greetings Team,

FLA trashed the gym. Paint is all over the place. Stage is flooded. Please advise as to what measures are available.

Thanks,

Dr. Braddy

| From: | Linda Kana |
|---|---|
| To: | Gizela Evans |
| Cc: | jbrooks@edsystem.org; Heidi Seal |
| Date: | Monday, April 2, 2018 3:14:40 PM |
| Attachments: | image001.jpg |
| | image003.jpg |

Good Morning Gizela – Please see my answers to your questions regarding the property. If you need any additional information, please feel free to let me know. Thank you. Linda

Landlord:
Education Capital Solutions, LLC
c/o EPR Properties
909 Walnut St., Suite 200
Kansas City, MO 64106

Property Addresses are:
2605 Ben Hill Road, East Point, GA
- 1 Story Brick Building 10,457 S.F. / Building Height 30.7'
- 1 Story Brick Building 12,072 S.F. / Building Height 12'
- 1 Story Brick Building 13,067 S.F. / Building Height 25.2'
- 2 Story Brick Building 8,626 S.F. / Building Height 27.8'
- 1 Story Brick Building 3,743 S.F. / Building Height 13.8'
- 2 Story Brick Building 3,518 S.F. / Building Height 24.2'
- 2 Story Brick Building 3,319 S.F. / Building Height 24.5'
- 1 Story Brick Building 2,145 S.F. / Building Height 13.1'
- 1 Story Brick Building 2,229 S.F. / Building Height 14.6'
- 2 Story Brick Building 4,145 S.F. / Building Height 25.7'

2640 Ben Hill Road, East Point, GA
Sits on 11.481 acres more or less and has the following buildings
- 1 Story Brick House 1,542 S.F. / Building Height 13'5"
- 1 Story Brick House 2,215 S.F. / Building Height 19'9"

2517 Dodson Drive, East Point, GA
Sits on 5.335 acres and has the following buildings
- 1 Story Brick House 1,759 S.F. / Building Height 14'2"
- 2 Story Brick Building 3,137 S.F. / Building Height 28.1'
- 1 Story Metal Sided Building 4,650 S.F. / Building Height 16'1"
- 1 Story Wood Sided Building 1,214 S.F. / Building Height 11'9"

**Linda Kana**



EXHIBIT 37
Gizela Evans
10/18/2019
Reported by: Eve Burton, RPR, CSR
AZ CR No. 50261, CA CSR No. 13527

Senior Transaction Manager

**EPR Properties**
**NYSE:EPR**
www.eprkc.com
816-303-6618 Direct
816-472-1700 Toll Free: 888-EPR-REIT
lindak@eprkc.com

909 Walnut Street, Suite 200
Kansas City, MO 64106



Please consider the environment before printing this e-mail.

**From:** Heidi Seal
**Sent:** Monday, April 02, 2018 11:17 AM
**To:** Gizela Evans <gizela-evans@leavitt.com>
**Cc:** lbrooks@edsystem.org; Linda Kana <lindak@eprkc.com>
**Subject:** RE: insurance requirements

Looping in Linda, who can provide you with this information.

**Heidi M. Seal**
Corporate Counsel

**EPR Properties**
**NYSE:EPR**
www.eprkc.com
816-472-1700 Toll Free: 888-EPR-REIT
Direct: 816-303-6589
heidis@eprkc.com

909 Walnut, Suite 200
Kansas City, Missouri 64106
cid:image001.jpg@01D0DC01.1D3C6640



Please consider the environment before printing this e-mail.

**From:** Gizela Evans [mailto:gizela-evans@leavitt.com]
**Sent:** Monday, April 02, 2018 11:09 AM
**To:** Heidi Seal <HeidiS@eprkc.com>
**Cc:** lbrooks@edsystem.org
**Subject:** FW: insurance requirements

PL 000045

Heidi,

Please provide the address of the Manager Landlord so the policy can be endorsed to provide the 30 day cancellation notice. In addition, please provide the address the insured is occupying with year built, construction type, and square footage. If multiple locations, please provide the main address with suite numbers and/or provide exactly the building information.

**From:** lbrooks@edsystem.org [mailto:lbrooks@edsystem.org]
**Sent:** Monday, April 02, 2018 9:02 AM
**To:** goze@edsystem.org; Gizela Evans <gizela-evans@leavitt.com>
**Subject:** insurance requirements

Good day

**Heidi M. Seal**
Corporate Counsel
Direct: 816-303-6589
heidis@eprkc.com

Questons
1) 30 days' notice cancellation/10 days' non-payment,

2) Waiver of Subrogation,

3) Add'l insured on all liability (or follow form)

4) Primary and non-contributory language

Thank you

-------- Original Message --------
Subject: insurance requirements
From: donotreply@gdp360scans.com
Date: Mon, April 02, 2018 11:26 am
To: "Brooks, Lorraine "<lbrooks@edsystem.org>


Please open the attached document. It was scanned and sent to you using a Xerox Multifunction Printer.

Attachment File Type: pdf, Multi-Page

Multifunction Printer Location:
Device Name: XRX9C934E60B0B8


For more information on Xerox products and solutions, please visit

http://www.xerox.com

PL 000047

| | |
|---|---|
| Center: | Customer |
| Name: | BRADDY PREPARATORY ACADEMY |
| Policy: | PAC0652314-04 |
| Line of Business: | Package |
| Effective Date: | 1/22/2018 |
| Tran: | Policy change |
| Policy Term: | 1/22/2018    1/22/2019 |
| Company: | Great American P&C Ins |
| Claim: | |

| | |
|---|---|
| Exec: | Powers, Charlene |
| Rep: | Evans, Gizela |
| Action: | Correspondence |
| Group Type: | |
| Group Name: | |
| Date: | 4/2/2018    Time:    09:13 AM |
| Entered By: | Evans, Gizela |
| Saved Date: | 4/2/2018    Time:    10:14 AM; |
| | Mountain |

**Description:**

TO HEIDI PROVIDE INFORMATION REGARDING MANAGER LESSOR ADDRESS AND INFO ON BUILDINGS INSURED IS OCCUPYING.

DEPOSITION
EXHIBIT
PENGAD 800-631-6989
brooks 11
4-18-19

### View Attachments

| | | File Name | | Ext | | Description | Ref # |
|---|---|---|---|---|---|---|---|
| | 0 | Email | | MSG | | [FWD: insurance requirements] | 180402-69 |
| | 0 | Email | | MSG | | FW: insurance requirements | 180402-70 |

Powers-Leavitt Insurance Age    GME

Ready

Good day

Landlord address:

Education Capital Solutions LLC
c/o EPR Properties
909 Walnut Suite 200
Kansas City, MO  64106

Building occupying:

Library - 2605 Ben Hill Road, East Point
Built 1991
Square footage - 21,454
Brick construction
2 story
Alarm System – Ackerman

Administration building - 2605 Ben Hill Road, East Point
Built 1954
Square footage - 3,069
Brick construction
2 story
Alarm System - Ackerman

Main building - 2605 Ben Hill Road, East Point
Built 1957
Square footage - 3,602
2 story
Alarm System - Ackerman

Gymnasium - 2531 Dodson Drive, East Point
Built 1966 remodeled 1987
Square footage - 16,174
3 story
Alarm System – Ackerman

Thank you

**From:** Gizela Evans
**To:** SHS_AccountServices@gaig.com
**Date:** Monday, April 2, 2018 2:57:00 PM
**Attachments:** GREATBRADY.pdf
Insurance requirements.pdf
image001.jpg
image003.jpg
image004.jpg

SEE BELOW FOR MORE INFORMATION ON THE BUILDINGS

**From:** lbrooks@edsystem.org [mailto:lbrooks@edsystem.org]
**Sent:** Monday, April 02, 2018 11:31 AM
**To:** Gizela Evans <gizela-evans@leavitt.com>
**Subject:** building information

Good day

Landlord address:

Education Capital Solutions LLC
c/o EPR Properties
909 Walnut Suite 200
Kansas City, MO 64106

Building occupying:

Library - 2605 Ben Hill Road, East Point
Built 1991
Square footage - 21,454
Brick construction
2 story
Alarm System - Ackerman

Administration building - 2605 Ben Hill Road, East Point
Built 1954
Square footage - 3,069
Brick construction
2 story
Alarm System - Ackerman

Main building - 2605 Ben Hill Road, East Point
Built 1957
Square footage - 3,602
2 story
Alarm System - Ackerman

Gymnasium - 2531 Dodson Drive, East Point

PL 000004

Built 1966 remodeled 1987
Square footage - 16,174
3 story
Alarm System - Ackerman

Thank you

**Gizela Evans, CRIS Commercial Lines**
**Powers-Leavitt Insurance Agency Inc**



**Offices in Buckeye, Goodyear and Scottsdale**

**Mailing Address: PO Box 125 | Buckeye, AZ 85326**

**Phone: 623.386.4452 | Fax: 1.866.836.5280 | gizela-evans@leavitt.com**

**Direct telephone: 623.298.3154**

**Please visit our website at: www.powers-leavitt.com**

**Sign Up for Leavitt Group News & Updates**

Send Certificate request to Kristina-Lucier@leavitt.com

**CERTIFICATE OF INSURANCE RULES:**

www.azcertfelony.com

Email Confidentiality Notice: The contents of this e-mail message and any attachments are
intended solely for the addressee(s) and may contain confidential and/or legally privileged
information. If you are not the intended recipient of this message or if this message has
been addressed to you in error, please immediately alert the sender by reply e-mail and then
delete this message and any attachments. If you are not the intended recipient, you are
notified that any use, dissemination, distribution, copying, or storage of this message or
any attachment is strictly prohibited.

Please consider the environment before printing this email

| From: | lbrooks@edsystem.org |
| To: | Gizela Evans |
| Date: | Friday, April 27, 2018 6:52:20 PM |
| Attachments: | List of Properties on East Point Campus at 2605 Ben Hill Road for Insurance.docx |

Good day

Attached is the list of buildings.....



DEPOSITION
EXHIBIT
Brooks 16
9-12-19
PENGAD 800-631-6989

List of Properties on East Point Campus at 2605 Ben Hill Road, 2640 Ben Hill Road, Dobson Road and

1. Landlord Name and Address:
   Education Capital Solutions LLC.
   c/o EPR Properties
   909 Walnut, Suite 200
   Kansas City, MO 64106

2. Burglar Alarm Systems and Camera Monitoring–Ackerman Security and Blue Ivy:
   a. Library
   b. Administration Building
   c. Gymnasium
   d. Dormitories
   e. Apartments
   f. Duplexes

3. 1 Library – 2605 Ben Hill Road, East Point
   a. Amount of the building
   b. Year built- 1991
   c. Square Footage – 21,454
   d. Type of Construction- brick
   e. 2 story
   f. Alarm System with Ackerman Security

4. 1 Old Administration Building (Burns Hall) – 2605 Ben Hill Road, East Point
   a. Amount of the building
   b. Year built -1954
   c. Square Footage -3,069
   d. Type of Construction- brick
   e. 2 story
   f. Alarm System with Ackerman Security

5. Old Main– 2605 Ben Hill Road, East Point

     a. Amount of the building
     b. Year built -1957
     c. Square Footage -5,602
     d. Type of Construction- brick
     e. 2 story
     f. Alarm System with Ackerman Security

6. Building (Apartment #1)– Ben Hill Road, East Point
     a. Amount of the building
     b. Year built - 1959
     c. Square Footage – 2,497
     d. Type of Construction- brick
     e. 2 story
     f. Alarm System with Ackerman Security

7. Building (Apartment #2)– Dodson Road, East Point
     a. Amount of the building
     b. Year built - 1963
     c. Square Footage – 2,571
     d. Type of Construction- brick
     e. 2 story
     f. Alarm System with Ackerman Security

8. Apartment Building # 3 – Ben Hill, East Point
     a. Amount of the building
     b. Year built -1963
     c. Square Footage -10,739
     d. Type of Construction -
     e. 3 story
     f. Alarm System with Ackerman Security

9. Apartment Building #4 – Dobson Road
     a. Amount of the building
     b. Year built -1967
     c. Square Footage -7,159

d. Type of Construction --

e. 3 story

f. Alarm System with Ackerman Security

10. Dormitory Building (Head Hall) – 2640 Ben Hill Road, East Point

    a. Amount of the building

    b. Year built -1959

    c. Square Footage – 16,130

    d. Type of Construction- brick

    e. Alarm System with Ackerman Security

    f. 2 story

11. Dormitory Building – (Gilbert Hall) 2556 Ben Hill Road, East Point, GA

    a. Amount of the building

    b. Year built – 1955/1990

    c. Square Footage – 7,500

    d. Type of Construction - brick

    e. Alarm System with Ackerman Security

    f. 2 story

12. Dormitory Building (Roberts Hall)– Ben Hill Road

    a. Amount of the building

    b. Year built - 1970

    c. Square Footage – 10,500

    d. Type of Construction - Brick

    e. Alarm System with Ackerman Security

    f. 2 story

13. Gymnasium (Alumni Hall) – 2531 Dodson Dive, East Point, GA 30344

    a. Amount of the building -$

    b. Year built – 1966/1987

    c. Square Footage – 16,174

    d. Type of Construction - brick

    e. 3 story

    f. Alarm System with Ackerman Security

14.1 Maintenance Building – Dodson Road, East Point
   a. Amount of the building
   b. Year built -1991
   c. Square Footage – 5,000
   d. Type of Construction - metal
   e. 1 story
   f. No Alarm System

15.1 Single Family Resident known as President House on Dodson Road
   a. Amount of the building
   b. Year built ;
   c. Square Footage – 2,100
   d. Type of Construction - brick
   e. 2 story
   f. No Alarm System

16.1 Single Family House on Ben Hill Road that Facility Person Kevin Peay lives
   in.
   a. Amount of the building
   b. Year built ;
   c. Square Footage – 1,500
   d. Type of Construction - brick
   e. 2 story
   f. Alarm System with Ackerman Security

17. Land Acreage – 11.03 acres undeveloped land across the street on Ben Hill
   Road

| From: | Linda Kana |
|---|---|
| To: | Heidi Seal; Gizela Evans |
| Cc: | lbrooks@edsystem.org; Joanna Greenlee |
| Date: | Monday, April 30, 2018 6:34:38 PM |
| Attachments: | List of Properties on East Point Campus at 2605 Ben Hill Road for Insurance (00000002).docx |
| | List of Properties on East Point Campus at 2605 Ben Hill Road for Insurance (00000002).docx |

Good Evening Gizela – attached please find the list of properties, build dates, construction material and values.

Please let us know if you need anything additional and if you could forward a copy of the insurance certificates to both myself and Joanna (copied in above) for review, I know that Dr. Braddy is anxious to get into the property.

Thank you,  Linda

**Linda Kana**
Senior Transaction Manager

816-303-6618 Direct
lindak@eprkc.com

**From:** Heidi Seal
**Sent:** Monday, April 30, 2018 10:30 AM
**To:** Gizela Evans <gizela-evans@leavitt.com>
**Cc:** lbrooks@edsystem.org; Joanna Greenlee <joannag@eprkc.com>; Linda Kana <lindak@eprkc.com>
**Subject:** RE: [FWD: Insurance requirements]

The Lease is still being negotiated, but the insurance language is final. Attached is a draft.

We will work on getting the clarification you need for addresses.

**Heidi M. Seal**
Corporate Counsel

**EPR Properties**
**NYSE:EPR**
**www.eprkc.com**
816-472-1700 Toll Free: 888-EPR-REIT
Direct: 816-303-6589
heidis@eprkc.com

909 Walnut, Suite 200
Kansas City, Missouri 64106
cid:image001.jpg@01D0DC01.1D3C6640





Please consider the environment before printing this e-mail.

PL 000165

**From:** Gizela Evans [mailto:gizela-evans@leavitt.com]
**Sent:** Monday, April 30, 2018 10:27 AM
**To:** Heidi Seal <HeidiS@eprkc.com>
**Cc:** lbrooks@edsystem.org; Joanna Greenlee <joannag@eprkc.com>; Linda Kana <lindak@eprkc.com>
**Subject:** RE: [FWD: Insurance requirements]

That makes sense. I have the list of the properties but some of the address are missing on the attached along with building values. Please send me a copy of the triple net lease so I may send to the carrier and attach to the file. Do you have a picture of the buildings with address assigned? It would make it easier to correlate the buildings.

**From:** Heidi Seal [mailto:HeidiS@eprkc.com]
**Sent:** Monday, April 30, 2018 7:12 AM
**To:** Gizela Evans <gizela-evans@leavitt.com>
**Cc:** lbrooks@edsystem.org; Joanna Greenlee <joannag@eprkc.com>; Linda Kana <lindak@eprkc.com>
**Subject:** FW: [FWD: Insurance requirements]

Gizela,

The Lease that is being negotiated between Braddy Prep and ECS is a true triple net lease. Dr. Braddy will be leasing the entire property, and has the contractual obligation to carry property insurance. Flood insurance will not be required (the property is not in a flood zone). We are listed as loss payee since we are the building owner. How insurance proceeds are handled is spelled out in the Lease.

I will ask that Joanna provide you with information you requested below regarding buildings to obtain the coverage.

**Heidi M. Seal**
Corporate Counsel

**EPR Properties**
**NYSE:EPR**
**www.eprkc.com**
816-472-1700 Toll Free: 888-EPR-REIT
Direct: 816-303-6589
heidis@eprkc.com

909 Walnut, Suite 200
Kansas City, Missouri 64106

cid.Image001.jpg@01D0DC01.1D3C6640

[?]

Please consider the environment before printing this e-mail.

Please advise why the insured needs to carry building insurance on a property that is not owned by the insured? The attached says building and personal property. I can provide the persona property & tenant improvements. ect. Are you requesting flood insurance to be carried in addition? Flood is not covered on a standard policy. An actual flood policy would have to be purchased. Why is Education Capital listed as a loss payee on these properties? Are they lender? A loss payee to property? These are the address provided by the insured prior to added to the policy.

2605 BEN HILL ROAD, EAST POINT, GA, 30344
**Loc #00002 Bldg #00002** 2605 BEN HILL ROAD, EAST POINT, GA, 30344
**ADMINSTRATION**
**BUILDING:**
**Loc #00002 Bldg #00003** 2605 BEN HILL ROAD, EAST POINT, GA, 30344
**SCHOOL BUILDING:**
**Loc #00003 Bldg #00001** 2531 DODSON DRIVE, EAST POINT, GA, 30344
**GYMNASIUM:**

What is 2517 Dodson Drive? Please provide information regarding the building. If building coverage will be required I will need values for all these buildings. See below .

Thank you,

Gizela Evans

**From:** lbrooks@edsystem.org [mailto:lbrooks@edsystem.org]
**Sent:** Friday, April 27, 2018 2:44 PM
**To:** Gizela Evans <gizela-evans@leavitt.com>
**Subject:** [FWD: Insurance requirements]

**Good day**

**I call and spoke with Linda and Joanna. Listed below are the**

requirements for the additional insurance for Braddy Prep.  Let
me know if you have any questions

Thank you

> -------- Original Message --------
> Subject: Insurance requirements
> From: Joanna Greenlee <joannag@eprkc.com>
> Date: Fri, April 27, 2018 5:36 pm
> To: "lbrooks@edsystem.org" <lbrooks@edsystem.org>
> Cc: Linda Kana <lindak@eprkc.com>
>
> Hi, Lorraine.
>
> Thank you for making time for a phone discussion.  To
> recap our conversation, we need the following
> information:
>
> **Liability certificate:**
> Notice of cancellation endorsement (your agent will know
> what this is)
> Add addresses to "description of locations"
> 2605, 2640 Ben Hill Rd. and 2517 Dodson Dr.
>
> **Property certificate:**
> Coverage for 100% replacement cost-TO WHAT?
> BUILDINGS OR TENANT IMPROVEMENTS? BPP?
> Required endorsements:
> Education Capital Solutions, LLC is to be the loss payee
> (as building owner)
> Primary and non-contributory-THIS IS ON  GL NOT
> PROPERTY
> Waiver of subrogation-SAME GL NOT PROPERTY
> Notice of cancellation –I WILL REQUEST.
>
> I'm not sure if you agent has a copy of our requirements
> so I've attached the insurance section from the lease.
> Please feel free to call me directly should you or your
> agent have any further questions. My direct line is 816-
> 303-6613.
>
> Thank you.
>
>
> **Joanna Greenlee**
> Insurance Compliance Administrator
>
> **EPR Properties**
> NYSE: EPR

PL 000168

www.eprkc.com
816-472-1700 Toll Free: 888-EPR-REIT
joannag@eprkc.com

PL 000169

List of Properties on East Point Campus at 2605 Ben Hill Road, 2640 Ben Hill Road, 2517 Dobson Road and

1. Landlord Name and Address:
   Education Capital Solutions LLC.
   c/o EPR Properties
   909 Walnut, Suite 200
   Kansas City, MO 64106

2. Burglar Alarm Systems and Camera Monitoring–Ackerman Security and Blue Ivy:
   a. Library
   b. Administration Building
   c. Gymnasium
   d. Dormitories
   e. Apartments
   f. Duplexes

3. 1 Library – 2605 Ben Hill Road, East Point
   a. Amount of the building  $2,145,400
   b. Year built- 1991
   c. Square Footage – 21,454
   d. Type of Construction- brick/block construction
   e. 2 story
   f. Alarm System with Ackerman Security

4. 1 Old Administration Building (Burns Hall) – 2605 Ben Hill Road, East Point
   a. Amount of the building - $306,900
   b. Year built -1957
   c. Square Footage -3,069
   d. Type of Construction- brick
   e. 2 story
   f. Alarm System with Ackerman Security

5. Old Main– 2605 Ben Hill Road, East Point
   a. Amount of the building $560,200
   b. Year built -1954
   c. Square Footage -5,602
   d. Type of Construction- brick/block construction
      administrative offices
   e. 2 story
   f. Alarm System with Ackerman Security

6. Building (Apartment #1)– 2605 Ben Hill Road, East Point
   a. Amount of the building  $249,700
   b. Year built - 1959
   c. Square Footage – 2,497
   d. Type of Construction- brick/block construction
      includes 2-one bedroom and 2-two bedroom apartments
   e. 2 story
   f. Alarm System with Ackerman Security

7. Building (Apartment #2 / aka Redmond House)– 2605 Ben Hill Road,
   ~~Dodson Road~~, East Point
   a. Amount of the building  $251,100
   b. Year built - 1963
   c. Square Footage – 2,571
   d. Type of Construction- brick/block construction
      includes 1, 2 and 3 bedroom apartments
   e. 2 story
   f. Alarm System with Ackerman Security

8. Apartment Building # 3 – 2605 Ben Hill, East Point
   a. Amount of the building $1,073,900
   b. Year built -1963
   c. Square Footage -10,739
   d. Type of Construction – brick/block construction
      includes eight (8) two bedroom apartments
   e. 3 story

PL 000155

d. Type of Construction – brick/block construction
dorm rooms, laundry and storage
e. Alarm System with Ackerman Security
f. 2 story


13. Dormitory Building (Roberts Hall)– 2605 Ben Hill Road, East Point
    a. Amount of the building $1,029,000
    b. Year built - 1970
    c. Square Footage – ~~10,500~~ 10,290
    d. Type of Construction – Brick /block construction
    includes: dorm rooms, dorm bathrooms, dorm lounge etc.
    e. Alarm System with Ackerman Security
    f. 2 story


14. Gymnasium (Alumni Hall) – 2605 Ben Hill Road ~~2531 Dodson Dive,~~ East
    Point, GA 30344
    a. Amount of the building -$1,617,400
    b. Year built – 1966/1987
    c. Square Footage – 16,174
    d. Type of Construction - brick
    e. 3 story
    f. Alarm System with Ackerman Security


15.1 Maintenance Building – 2517 Dodson Road, East Point
    a. Amount of the building $500,000
    b. Year built -1991
    c. Square Footage – 5,000
    d. Type of Construction – roof steel panels / sides metal
    e. 1 story
    f. No Alarm System


16.1 Single Family Resident known as President House – 2517 Dodson Road
    a. Amount of the building $270,000 (2,700 * $100/sqft)
    b. Year built - 1963
    c. Square Footage – ~~2,100~~ 2,700

d. Type of Construction – brick /block
   single family residence
e. 2 story
f. No Alarm System

17.1 Single Family House on 2640 Ben Hill Road that Facility Person Kevin Peay
lives in.
   a. Amount of the building  $150,000
   b. Year built - unknown
   c. Square Footage – 1,500
   d. Type of Construction - brick
   e. 2 story
   f. Alarm System with Ackerman Security

18. Land Acreage – 2640 Ben Hill Road -  11.03 acres undeveloped land across
the street on Ben Hill Road

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GREAT AMERICAN )
ASSURANCE COMPANY, )
         )
        Plaintiff, )
         )
v. )      Civil Action File No.:
         )      1:18-cv-04974-SDG
BRADDY PREPARATORY )
ACADEMY, INC., )
         )
        Defendant and Third-Party Plaintiff, )
         )
v. )
         )
POWERS-LEAVITT INSURANCE )
AGENCY, INC., )
         )
        Third-Party Defendant. )
_____ )

## BRADDY PREPARATORY ACADEMY, INC.'S RESPONSES AND OBJECTIONS TO POWERS-LEAVITT INSURANCE AGENCY, INC.'S FIRST INTERROGATORIES

COMES NOW, in accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, Braddy Preparatory Academy, Inc. ("Braddy Prep", "Defendant", or "Third-Party Plaintiff") hereby serves its responses and objections to Powers-Leavitt Insurance Agency, Inc.'s First Interrogatories. Powers-Leavitt Insurance Agency, Inc., may also be referred to herein as "Powers-Leavitt" or "Third-Party Defendant". Great American Assurance Company may be referred to herein as "Great American", "GAAC", or "Plaintiff".



PLAINTIFF'S
EXHIBIT
125
8-19-20

PENGAD 800-631-6989

# RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**: Identify, including name, address, and employment position, each and every individual who has provided information which served, either in whole or in part, as the basis for your answer(s) to these First Interrogatories and First Request for Production of Documents, including identifying each and every custodian of documents requested herein, or which are submitted pursuant to Rule 33(d), or which are intended to be incorporated within or relied upon as your response, in whole or in part, to an Interrogatory.

**RESPONSE**: Braddy Prep objects to this interrogatory in that it is overly broad and unduly burdensome. Subject to this objection, C. Harrison Braddy, M.D. of Braddy Prep has provided the verification of these interrogatory responses base on his personal knowledge and the information gathered from the following individuals and companies.

Lorraine Brooks
Braddy Preparatory Academy

Gizela Evans
Powers-Leavitt Insurance Agency

Linda Kana
Education Capital Solutions, LLC

Joanna Greenlee
Education Capital Solutions, LLC

Heidi Seal
Education Capital Solutions, LLC

Rodrick Frazier M.D.
Braddy Preparatory Academy

Donna Szydlo

2

Great American

Kevin Duke
Great American

Kevin Peady
Independent contractor of Education Capital Solutions, LLC
and then Education System Management, Inc.

Ty Whitaker
McLarens

Russell Hart
Public Adjuster
Hart's consulting Company
(770) 785-6244

Keith Hughes
Education Systems Management, Inc.

Lolethia A. Chapman, JD, MBA
Broker/President -License#303983
STELLA GROUP REALTY INC.
Office Address: 1750 Lyle Avenue, College Park, GA 30337
Mailing Address: PO Box 90941, East Point, GA 30364
Office:404.767.2541 Ext. 221 Direct:404.666.4970

The following are vendors or contractors ("Contractors") which have knowledge of the physical condition and repairs conducted, planned, quoted, or needed at the Property:

Chris Sechrest
Vice-President
Lang Restoration and Construction
4727 N. Royal Atlanta Drive Suite G
Tucker, GA 30084
(770) 491-0500

Kurt Pacely
Pacely Roofing

678-438-0767

Guyco Plumbing
Gregory Bryant
678-558-5485

Scott Burdian • Account Manager  Baytree Lawn Company
(866) 620-8750
5830 E. Ponce de Leon Ave.
Decatur, GA

Goma Pro
5602 New Peachtree Road
Atlanta, GA 30341

ET-AMS/FLD
Elevator Company
T: +1 770 250 6512
M: +1 678 230 8548

ADAM ONCALL Home-Improvement
Ben Zarei
2265 Waterford Park Drive Lawrenceville
(770) 895-2346

Louis Construction
Atlanta, Georgia

United Fire Protection Inc.
5201 Brookhollow Pkwy, St.C
Norcross, Ga. 30071

Seth Nelms (HVAC)
4035 Hwy 1941, Suite 105
Hampton, Ga 30228
(678) 485-0448

**INTERROGATORY NO. 2**:  Identify each and every person known to you who you believe may have discoverable information with respect to any of the Braddy's claims or the defenses raised by Powers-Leavitt. For each such individual identified,

describe what knowledge you know or believe each such individual possesses. To the extent that any document or other recorded information supports or relates to said individual or said individual's particular knowledge, please identify said document/recorded information.

**RESPONSE:**

Dr. Braddy is believed to have knowledge regarding the information provided to the insurance company, the plans for renovation of the East Point Campus, the discovery of the damage at the East Point Campus, the prior litigation with Great American, the reporting of claims, and the extent of the damages at the East Point Campus;

Ms. Brooks is believed to have knowledge regarding the interactions with ECS and Powers-Leavitt Insurance Agency related to the procuring of coverage for the East Point Campus, and the reporting of claims to Great American;

Ms. Evans is believed to have knowledge regarding the interactions with Defendant, ECS and Powers-Leavitt Insurance Agency related to the procuring of coverage for the East Point Campus, and the reporting of claims to Great American;

Ms. Kana, Ms. Greenlee and Ms. Seal are believed to have knowledge regarding the plans for the East Point Campus and their interactions with Gizela Evans of Powers-Leavitt Insurance Agency;

Dr. Frazier is believed to have knowledge regarding the communications with Mr. Whitaker at the East Point Campus and regular coordination of renovations;

Ms. Szydlo and Mr. Duke are believed to have knowledge regarding the reasons for the actions taken by Great American and the communications between Great American and Ty Whitaker;

Kevin Peady is believed to have knowledge regarding the condition of the Property;

Mr. Whitaker is believed to have knowledge regarding the damage to the structures at the East Point Campus, his instructions and communications with Great American, and the cause of damage at the East Point Campus;

Mr. Hart is believed to have knowledge of the cause of the damage at the East Point Campus, the inspections of the damage at the East Point Campus, his communications with representatives of Great American, and the amount of the damages incurred at the East Point Campus;

Mr. Hughes is believed to have knowledge of the damage to the Property and the efforts to secure and repair the Property after the losses;

Ms. Chapman is believed to have knowledge regarding the state of the property as the Realtor Broker for the Property listing, who represented Property Owner and Tenant.

The Contractors have varying degrees of knowledge and information relating to the pre-loss, post-loss, and post-repair condition of the Property.

**INTERROGATORY NO. 3**: Please identify all persons who to your knowledge, information or belief have investigated any aspect of the alleged occurrence, and indicate whether or not each has made a written record of the investigation or any part thereof.

**RESPONSE**: Each of the individuals or organizations listed in Braddy Prep's response to Interrogatories 1 and 2 have conducted various investigations of the facts surrounding the procurement of the Policy, coverage of the Policy, damage to the East Point Campus. To date, Braddy Prep has not retained an expert that has prepared any written report. For any responsive documents that are not privileged, Braddy Prep directs Powers-Leavitt to the documents previously produced by Braddy Prep in response and supplement to Great American Assurance Company's ("GAAC") First Request for Production of Documents.

**INTERROGATORY NO. 4**: Please state the names, addresses, telephone numbers and places of employment of all persons that, to your knowledge, information or belief, have any knowledge regarding the facts or circumstances giving rise to this lawsuit, any issue of liability in this lawsuit, and/or the damages you claim in connection with this lawsuit, and please provide a description of each individual's observations and/or knowledge.

**RESPONSE**: Please see Braddy Prep's responses to Interrogatories 1-3.

**INTERROGATORY NO. 5**: Please identify each statement, correspondence or other communication (oral, written, etc.) including, but not limited to, all emails, memos, notes, text messages, and social media postings, regarding the facts or circumstances giving rise to this lawsuit, any issue of liability in this lawsuit, and/or the damages you claim in connection with this lawsuit, including the name, address

and job title all persons involved in each statement or communication, the name and address of the person(s) or entity(s) taking each statement, a description of the contents of each.

RESPONSE: Please see Braddy Prep's responses to Interrogatories 1-4.

For any responsive documents that are not privileged, Braddy Prep directs Powers-Leavitt to the documents previously produced by Braddy Prep in response and supplement to Great American Assurance Company's ("GAAC") First Request for Production of Documents.

INTERROGATORY NO. 6: Please describe each act or omission that you contend was a breach of duty on the part of defendant.

RESPONSE: Defendant Braddy Prep did not commit any act or omission that was a breach of any duty. With respect to Third-Party Defendant Powers-Leavitt, Braddy Prep provided complete and accurate information in response to questions or requests for documents by Power-Leavitt when applying for the insurance coverage that is the Policy. To the extent that incorrect or incomplete information was relayed to GAAC, it was the result of negligence or Powers-Leavitt.

INTERROGATORY NO. 7: With regards to the damages claimed in your Complaint, please describe fully and specifically each category of costs, expenses, and damages attributed to each separate cause of action, including for each such category of damages a full and specific explanation of how you calculated the damages referred to in your Complaint, identify every fact upon which you base your damage calculations and allegations regarding damages, identity all persons with knowledge or information concerning the above, and identify all documents concerning your answer to this Interrogatory.

8

**RESPONSE**: Defendant objects to this interrogatory because it is inherently vague and calls for privileged information. The claim that underlies this action is the claim for which Great American seeks to disclaim coverage. The other two claims have not been disclaimed and thus do not underly this action. Despite these objections, Defendant will respond as follows:

1. The claim underlying this action was discovered on or about August 7, 2018. The damage was caused by a windstorm and resulted in water damage to several building as described below. To date, Defendant has paid an unknown amount to repair or mitigate the damage caused by the windstorm. Defendant has provided relevant invoices and proof of payment (to the extent they currently exist) in its response to Plaintiff Great American Assurance Company's First Request for Production of Documents to Defendant. Defendant has had difficulty obtaining estimates and bids for such a large scope of work without upfront payment. Estimates and bids to repair the buildings damaged by the windstorm are still being compiled and those obtained thus far have been produced by Defendant in its response to Plaintiff Great American Assurance Company's First Request for Production of Documents to Defendant.

2. A second claim was reported to Great American after vandalism damage was found by Great American while inspecting the damage caused by

the windstorm. The damage includes the damage to walls and ceilings and the removal of pipes and wires and resultant water damage. To date, Defendant has paid and unknown amount to repair or mitigate the damage. Defendant has provided relevant invoices and proof of payment (to the extent they currently exist) in its response to Plaintiff' Great American Assurance Company's First Request for Production of Documents to Defendant. Defendant has had difficulty obtaining estimates and bids for such a large scope of work without upfront payment. Estimates and bids to repair the buildings damaged by vandalism are still being compiled and those obtained thus far have been produced by Defendant in its response to Plaintiff Great American Assurance Company's First Request for Production of Documents to Defendant.

3.    A third claim was reported to Great American that was the result of a tree falling on a building at the East Point Campus. To date, Defendant has paid an unknown amount to repair or mitigate the damage caused by the fallen tree. Defendant has provided relevant invoices and proof of payment (to the extent they currently exist) in its response to Plaintiff Great American Assurance Company's First Request for Production of Documents to Defendant. Defendant has had difficulty obtaining estimates and bids for such a large scope of work without upfront payment. Estimates and bids to repair

the building damaged by the fallen tree are still being compiled and those

obtained thus far have been produced by Defendant in its response to Plaintiff

Great American Assurance Company's First Request for Production of

Documents to Defendant.

Below is a summary of damages sustained by Braddy Prep and its East Point

Campus:

| Building Name (Map Ref) | Loss Date | Loss Type | Damage Est. | |
|---|---|---|---|---|
| Library | 8/3/2018 est | Wind | $ | 63,350.48 |
| Old Main Bldg - Burns Hall | 8/3/2018 est | Wind | $ | 46,014.45 |
| Gym | 8/3/2018 est | Wind | $ | 65,965.67 |
| 2538 Main Level, LR, Kitchen, HVAC | 8/3/2018 est | Wind | $ | 62,376.76 |
| 2538 Main Level - Foyer/Stairwell | 8/3/2018 est | Wind | $ | 5,632.22 |
| 2630 | 8/3/2018 est | Wind | $ | 12,247.18 |
| 2542 (2642?) | 8/3/2018 est | Wind | $ | 11,903.87 |
| | | | $ | 267,490.63 |
| | | | | |
| Head Hall (rear) | 11/16/2018 est | Tree | $ | 10,120.96 |
| | | | $ | 10,120.96 |
| | | | | |
| Materials Sales Tax @ 6% | | Wind/Tree | $ | 3,570.24 |
| Overhead | | Wind/Tree | $ | 36,556.41 |
| Profit | | Wind/Tree | $ | 33,744.33 |
| | | | $ | 73,870.98 |
| | | | | |
| 2537 | 10/11/2018 est | Vandalism | $ | 1,140,700.00 |
| 2636 | 10/11/2018 est | Vandalism | $ | 1,140,700.00 |
| President Building | 10/11/2018 est | Vandalism | $ | 264,000.00 |
| 24xx Dodson | 10/11/2018 est | Vandalism | $ | 286,000.00 |
| Robert Hall | 10/11/2018 est | Vandalism | $ | 1,837,500.00 |
| Head Hall | 10/11/2018 est | Vandalism | $ | 2,828,000.00 |
| 2537 (rear storage) | 10/11/2018 est | Vandalism | | |
| | | | | |
| | | | $ | 7,496,900.00 |
| | | | | |
| | | | $ | 7,848,382.57 |

For any supportive, responsive documents that are not privileged, Braddy Prep directs Powers-Leavitt to the documents previously produced by Braddy in response and supplement to Great American Assurance Company's ("GAAC") First Request for Production of Documents.

**INTERROGATORY NO. 8**:  Please identify by name, address and Policy description each building on the East Point Campus you Occupied on May 31, 2018.

   **RESPONSE**:  No buildings of the East Point Campus have been vacant (as defined by the Policy) from the date of the commencement of the lease with ECS and the issuance of the Policy, including, but not limited to May 31, 2018.

**INTERROGATORY NO. 9**:  Please identify by name, address and Policy description each building on the East Point Campus you Occupied on August 2, 2018.

   **RESPONSE**:  No buildings of the East Point Campus have been vacant (as defined by the Policy) from the date of the commencement of the lease with ECS and the issuance of the Policy, including, but not limited to August 2, 2018.

**INTERROGATORY NO. 10**:  Please identify by name, address and Policy description each building on the East Point Campus you contend was under renovation at any time during the Policy period, and for each such building please provide: the date the renovation commenced; a description of the nature of the renovation; the identity of the party or parties contracted to perform the renovation; and the date of completion and/or the present status of the renovation.

   **RESPONSE**:  Braddy Prep was a new tenant at the time of the commencement of the ECS lease and inception of the Policy.  Since becoming a

tenant, all buildings of the East Point Campus have been under various stages of renovation or construction from the inception of the ECS lease through the dates of loss under the Policy.

**INTERROGATORY NO. 11**: Please identify by name, address and Policy description each building on the East Point Campus you contend sustained damaged during the Policy period and for which you have either initiated a claim or intend to initiate a claim under Policy. For each such building you identify, please include: the date(s) the damage allegedly occurred or was discovered; a description of the damage; the amount you have paid for any costs associated with the damage; and the amount of any estimates or bids you have received associated with the damage.

**RESPONSE**: Please see Braddy Prep's objections and response to Interrogatory 7.

**INTERROGATORY NO. 12**: Please identify by name, address and Policy description each building on the East Point Campus that was Vacant or Unoccupied on May 31, 2018.

**RESPONSE**: Braddy Prep was a new tenant at the time of the commencement of the ECS lease and inception of the Policy. Since becoming a tenant, all buildings of the East Point Campus have been under various stages of renovation or construction from the inception of the ECS lease through the dates of loss under the Policy.

**INTERROGATORY NO. 13**: Please identify by name, address and Policy description each building on the East Point Campus was Vacant or Unoccupied on August 2, 2018.

**RESPONSE**: Braddy Prep was a new tenant at the time of the commencement of the ECS lease and inception of the Policy. Since becoming a

tenant, all buildings of the East Point Campus have been under various stages of renovation or construction from the inception of the ECS lease through the dates of loss under the Policy.

**INTERROGATORY NO. 14**: Please identify by name, address and Policy description each building on the East Point Campus that is presently Vacant or Unoccupied.

**RESPONSE**: No buildings of the East Point Campus have been vacant (as defined by the Policy) from the date of the commencement of the lease with ECS and the issuance of the Policy through the date of this response.

**INTERROGATORY NO. 15**: Please explain the basis for your contention set forth in paragraph 7 of Lorraine Brooks' Declaration dated December 10, 2018, and as set forth in paragraph 14 of your third-party complaint, that Gizela Evans was on a conference call with Lorraine Brooks, Linda Kana, Joanna Greenlee and Heidi Seal on or about April 27, 2018.

**RESPONSE**: Upon information and belief this event occurred as described. On or about that date, and in the several days surrounding that date, there were a number of conference calls, emails, and individual telephone calls between representatives of Braddy Prep, ECS, and Powers-Leavitt concerning the East Point Campus and the commencement of insurance coverage. Powers-Leavitt issued an initial Great American Assurance Corporation policy for the month of April of 2018, while Braddy Prep was a licensee of ECS concerning the use of the East Point Campus, and then in the days leading up to the commencement of the ECS lease and

issuance of the Policy, Powers-Leavitt interacted with Lorraine Brooks, ECS representatives, and others in furtherance of the issuance of the Policy.

**INTERROGATORY NO. 16**: Please explain the basis for your contention that Powers-Leavitt knew you were not occupying or using all of the buildings on the East Point Campus.

    **RESPONSE**: Gizela Evans was involved in the entire process of Braddy Prep initially locating and licensing three buildings at the East Point Campus for approximately one month prior to the execution of a triple net lease by Braddy Prep as the tenant of the entire property consisting of 14 buildings. Ms. Evans was provided with documentation from the listing broker which explicitly stated that the majority of the East Point Campus was vacant prior to Braddy Prep's tenancy, and Ms. Evans spoke directly with the owner of the East Point Campus when determining the status, risk, age, type of construction, location, use, and general nature of the property that is the subject of the Policy. Under the ECS lease, Braddy Prep had the option to purchase the entire property, and it was known that the East Point Campus was going to require rehabilitative renovation and preparatory work in order to utilize the buildings of the East Point Campus as intended, a school for special needs children.

Respectfully submitted, this 10th day of October, 2019.

/s/ Mark D. Battleson
Mark D. Battleson
Georgia Bar No. 042415
mbattleson@battlesonlaw.com
BATTLESON LAW, LLC
3280 Peachtree Road NE
Terminus 100, 7th Floor
Atlanta, Georgia 30305
Telephone: (404) 382-8149

David J. Forestner
Georgia Bar No. 269177
dforestner@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Telephone: 770-434-6868
Facsimile: 770-434-7376

*Counsel for Braddy Preparatory Academy, Inc.*

# CERIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing Braddy

Preparatory Academy, Inc.'s Responses and Objections to Powers-Leavitt Insurance

Agency, Inc.'s First Interrogatories was served on October 10, 2019 to counsel

for all parties via electronic mail, addressed as follows:

> William T. Mitchell
> Matthew I. Dowling
> CRUSER, MITCHELL, NOVITZ, SANCHEZ,
> GASTON & ZIMET, LLP
> bmitchell@cmlawfirm.com
> mdowling@cmlawfirm.com
>
> H. Michael Bagley
> DREW, ECKL & FARNHAM, LLP
> bagleym@deflaw.com

> */s/ Mark D. Battleson*
> Mark D. Battleson
> Georgia Bar No. 042415

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GREAT AMERICAN ASSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action File No.: 1:18-cv-04974-SDG |
| BRADDY PREPARATORY ACADEMY, INC., | ) ) ) | |
| Defendant and Third-Party Plaintiff, | ) ) | |
| v. | ) ) ) | |
| POWERS-LEAVITT INSURANCE AGENCY, INC., | ) ) ) | |
| Third-Party Defendant. | ) | |

## **VERIFICATION**

My name is C. Harrison Braddy, and I am authorized to make this declaration on behalf of Defendant and Third-Party Plaintiff Braddy Preparatory Academy, Inc. I declare under oath that the facts contained in BRADDY PREPARATORY ACADEMY, INC.'S RESPONSES AND OBJECTIONS TO POWERS-LEAVITT INSURANCE AGENCY, INC.'S FIRST INTERROGATORIES are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the

foregoing is true and correct.

Dated: 10 | 3 | 2019

C. Harrison Braddy